82,475-01

December 22, 2014

Justice Sharon Keller
Presiding Judge Court of Criminal Appeals
P.O. Box 12308 Capitol Station
Austin, TX 78711

RECEIVED IN
COURT OF CRIMINAL APPEALS

This document contains some
pages that are of poor quality
at the time of imaging.

JAN 0 5 2015

Abel Acosta, Clerk

RE: 03-13-00723CR
D-1-DC-13-904021A

Dear Judge Keller,

I am coming to you in an attempt at preventing a furtherance of a miscarriage of justice. I am in dire straits, and I am pleading for help!

M. Ariel Payan is my Appellate Attorney of record, and I have an irrepairable **Conflict of Interest** with Payan.

As you can see by the enclosed documents and civil rights complaints, Payan and his wife are more than material witnesses in criminal conduct and gross violations of State and Federal law, Texas and United States Constitution's Rights of Due Process, Judicial Misconduct on the State Trial Judge, Karen Sage Complaint No. CJC No. 14-0826-D1, and egregious violations of the American Bar Association Model Rules of Professional Conduct, by Travis County District Attorney's Holly Taylor, my Prosecutor, Susan Oswalt, Greg Coxx and RoseMary Lehmberg, and my two trial attorneys, Jackie Wood and Tamera Needles, and Payan himself.

This fundamental **miscarriage of justice** and obscene Deprivation of Rights not only to myself, but my co-defendant, Mary-Jo Woodall as well. The State's malicious and vindictive efforts to cover multiple felonies, including **Attempted Murder**, through Payan's negligence and abandonment caused me to file a 132 page Brief with over 1800 pages and photos, not including the two CD's of Trial Court records in a Writ of Habeas Corpus received by your office, WR82,475-01 on 11/24/14. This after being dismissed by Sage, in another innapropriate action, as she is the subject of a Judicial Misconduct complaint and a Federal Civil Rights Complaints on her, and her refusal to act on my Motion(s) To Remove Counsel and Bond For Certain Applicant's leaves me wrongfully imprisoned.

I have not been conferred with over, nor provided a copy of Appellate Counsel's M. Ariel Payan's Brief. However, I have been informed through outside sources, that he has made several **Patently False** and **Malicious** statements in the Brief that must be **Adamantly** objected to!

According to Jeffery Kyle, Clerk, Third Court of Appeals, that Court cannot remove Payan, and I cannot be present at oral arguments. I have bar grievances and civil rights complaints filed against Payan and **any** representation he provides me is a furtherance of this miscarriage of justice.

Your Honor, how do I get rid of Payan and get a conflict free attorney?

Respectfully,

Charlie Malouff

CHARLES A. MALOUFF, JR. §
  AKA CHARLIE MALOUFF §

                                 §

        v.                       §      CASE NO. 03-13-00723-CR

                                 §

    STATE OF TEXAS               §

                                 §

---

## MOTION TO REMOVE APPOINTED APPELLATE COUNSEL

---

### TO THE HONORABLE JUDGE OF SAID COURT

Now comes, Petitioner, Charlie Malouff, pro se, in the interest of justice to move the Honorable Court to remove appointed Appellate Counsel, M. Ariel Payan, from this case and appoint another attorney who is not intimately involved with Petitioner's Trial Counsel; the Trial Judge; employees of the Travis County District Attorney; the Travis County Sheriff's Office; the United States Attorney's office; the City of Jonestown; or persons who testified as Government Witnesses in Petitioner's trial in the 299th District Court of Travis County, Case No. D-1-DC-13-904201.

### DISCUSSION

Petitioner was convicted of Securing A Document By Deception in State Court. M. Ariel Payan was appointed Appellate Counsel by trial Judge, Karen Sage. An irrepairable Conflict of Interest has been created by Payan's appointment, unproffessional conduct, abandomnemt and failure to recuse, furthering a fundamental miscariage of justice.

Filed In The District Court
of Travis County, Texas

NOV 24 2014

At _____

Amalia Rodriguez-Mendoza, Clerk

CHARLES A. MALOUFF, JR    §
AKA: CHARLIE MALOUFF

   §

   §

v.    §    CASE NO. 03-13-00723CR
                  D-1-DC-13-904021 A

   §

STATE OF TEXAS    §

   §

---

## MOTION FOR BOND FOR CERTAIN APPLICANTS

---

### TO THE HONORABLE JUDGE OF SAID COURT

Now comes, Applicant, Charlie Malouff, pro se, in the interest of justice to move the Honorable Court to GRANT Applicant's prayer for bond under Article 11.65, Code of Criminal Procedure, while seeking relief from judgement in the above criminal case.

### DISCUSSION

Applicant was convicted of Securing A Document By Deception in State Court. A motion to remove Appellate Counsel M. Ariel Payan resulting from an irrepairable Conflict of Interest, was entered at the Third Court of Appeals on October 30, 2014. An Application for Writ of Habeas Corpus Seeking Relief From Final Felony Conviction Under Code of Criminal Procedure, Article 11.07, As A Result of Violations of Article 1, Sections 8, 9, and 10 of the Texas Constitution and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution Resulting from Police, Prosecutorial, Judicial and Professional Misconduct was filed with the District Court of Travis County, Texas,

Filed In The District Court
of Travis County, Texas

NOV 24 2014

At _____ 9:300 _____ M.
Amalia Rodriguez-Mendoza, Clerk

--------------------------------------------------------------------------------

FROM: 66089179
TO: Malouff, Charles
SUBJECT: Payan
DATE: 05/30/2014 08:57:08 PM

5-26-14

Mr. Payan,
I want to be sure there is no doubt as to the irreparable Conflict of Interest in your representation. This is not a politically correct letter nor is it intended to be. I don't know what they taught you in LAW SCHOOL, but I will tell you what they taught us in the POLICE ACADEMY.

Attempted Murder is a CRIME. Sabotage is a CRIME. Destruction of a Federally Funded Energy Project is a CRIME. Theft of Trade Secrets is a CRIME. Industrial Espionage is a CRIME. Destruction of Evidence is a CRIME. Theft is a CRIME. Abuse of Office is a CRIME. Official Oppression is a CRIME. Conspiracy is a CRIME. OBSTRUCTION OF JUSTICE is a CRIME. ALL found in the Texas Penal Code and/or the United States Code. Do I need to keep going? Wood fucked my case because of her reliance that her "best friend", Sage, would show her favoritism.

The windmills in the Jonestown Wind Project were SABOTAGED. That is a CRIME. There are POLICE REPORTS FILED months BEFORE the Gestapo showed up at my door. People tried to KILL me..not once, but twice! (They should have gotten me when they had the chance. Fortunately, God wasn't ready for me.) That is a CRIME x2. Toby Miller and his fuckbuddy Lori Carter are covering up multiple felonies (CRIMES) committed by Miller and his cohorts, and CONDONED by Holly Taylor, YOUR BUDDY, and the District Attorney. And, Sage violated my right to due process, IN ADDITION to committing CRIMES for pecuniary interests in her re-election. MY constitutional rights have been GROTESQUELY violated, leaving Mary Jo out of this for the moment. Am I pissed...YOU FUCKING BET I AM. Do I have a right to be pissed..YOU FUCKING BET I DO!! Am I going to sit around and let you fuck me some more? NO FUCKING WAY!

You, Jackie and Tamara made those statements, and at the time were sincere in your comments. You had no way to know my reaction. The fact that you said in your email ...the statements "WE" made..... "WE" means not only is that an admission that not only you but at least two of you, DID make them, but the three of you are now getting your stories together because YOU THREE FUCKED UP. THAT, MR. PAYAN, is CONSPIRACY to OBSTRUCT JUSTICE (do I need to give you the Black's definition of OBSTRUCTION of JUSTICE?), because not only did I file the Judicial Misconduct against Sage (which YOU have refused to do) I filed a CRIMINAL COMPLAINT (which YOU did not do either) with the Texas Attorney General's Office for Abuse of Office for Pecuniary Interest, and Official Oppression. And, your attempt to thwart that by trying to suck wind on your statements. The fact is, that is OBSTRUCTION OF JUSTICE. A CRIME. CONSPIRACY, also a CRIME, is two or more persons, with the intent...and the three of you knowingly and intentionally trying to thwart criminal charges against Jackie Wood's "best friend" Karen Sage, is CONSPIRACY. AND, I would bet a dollar to a doughnut, you have discussed this with not only your wife, but your pal Holly Taylor and her husband..as you said, "We are a tight nit group and we all talk." Further adding to your efforts to OBSTRUCT JUSTICE because no one has filed any motions or made any complaints to the Attorney General or U.S. Attorney. Not only in the Abuse of Office by Sage, but in the Destruction of a Federal Energy Project. In addition to your inaction CRIMINAL CONDUCT, it violates the Texas Disciplinary Rules of Conduct 8.04 (4).

You ARE a material witness to CRIMES, and Professional Misconduct Mr. Payan. As a material witness in both State and Federal CRIMINAL actions, and professional license administrative action, you cannot represent me, or stay on as my counsel for ANY length of time, as each day you remain violates my right to due process, and is furtherance of your intentional OBSTRUCTION OF JUSTICE as you are doing nothing in light of your responsibility to report. I didnt put up with Miller and Cook's criminal conduct and I wont put up with Sages or yours.

Sage and the District Attorney, with their biased Austin American Statesman (go read the articles during my trial), may control what happens in their little circle, but I PROMISE, I will be out of here shortly and I WILL BE ALL OVER THE INTERNET, INTERNATIONAL NEWS AND WASHINGTON DC. This was FEDERAL FUNDS!! And those are FEDERAL CRIMES begin COVERED UP!!

So, like I said. I will make this very clear. Get OFF my case and get me an attorney who's spouse does not work for the District Attorney, who is NOT fucking Toby Miller, his wife, Lori Carter, Jackie Wood or Tamara Needles or is 'best friends" with Karen Sage before you dig yourself deeper into CRIMINAL CONDUCT.

Charlie Malouff

Copy

TRULINCS 66089179 - MALOUFF, CHARLIE - Unit: BAS-C-A

--------------------------------------------------------------------------------

FROM: 66089179
TO: Malouff, Charles
SUBJECT: Conflict of Interest
DATE: 05/23/2014 12:09:23 PM

5-22-14

Mr. Payan,
In light of the circumstances, I have given this serious thought. I feel the irreparable Conflict of Interest has come to pass.

I have filed a Judicial Misconduct with the State Judicial Commission, a formal complaint with the TX Attorney General, formal complaints to Congressmen Bob Goodlatte, Chairman House Judiciary Committee; Daryl Issa Chairman House Oversight Committee; Senator Ted Cruz; and the U.S. Department of Justice. I am in the process of contacting numerous international news agencies. Austin news has proven to be biased. As I said in my previous letter, I have NO INTENTION of letting this lay.

We both know you and Jackie made those statements. Your earlier response saying they were "taken out of context" is an admission they were made. Sucking wind now to say they were out of context, considering the magnitude of circumstance, doesn't cut it with me. We both know Sage "GOT IT". She knew I was innocent. She knew Taylor was still hiding Brady. She knew Carter and Miller were liars and full of shit. Speaking of SHIT, she read just about every piece of discover BEFORE it was brought into trial. That is in trial statements early on with Joe Turner, over Lori Carter's, multi-author, original police report that she LIED about on the stand, trying to pass off a 25 page document when it the actual report was over 225 pages and actually ended up being even larger.

Sage's decisions WERE POLITICALLY motivated. SOMEONE WANTS THAT WIND ENERGY PROJECT DESTROYED. Pecuniary interest is illegal. Plain and simple. That said, you are now a hostile defense witness in criminal allegations against Abuse of Office For Pecuniary Interest, Official Oppression, Judicial Misconduct and whatever else comes out of this. AND, since there will be no attorney client privilege, you are also subject to interrogation over what you do know about the case in general, as this is a COVER UP FOR MULTIPLE FELONIES AND CONSTITUTIONAL VIOLATIONS.

What needs to be done immediately is a demand for new trial considering these allegations, a change of venue, and formal criminal investigations. Her denial of these motions is further proof of her politically motivated intentions to convict and imprison INNOCENT PEOPLE!

As a material witness, who is going to be contradictory to my allegations, I cannot in any way see how you can effectively give me the zealous advocacy I am entitled to, or how, in any way shape or fashion, I can have any attorney client privilege with you, let alone trust in your ability to provide me effective counsel. Your attitude about Sage, and your relationship with Holly Taylor and the District Attorney's Office, is too compromised to give me effective representation against Wrongful Conviction, False Imprisonment and the Abuse of Office and Official Oppression for Pecuniary Interest.

I am still working on getting a polygraph examiner. Thanks to the Debarment action by DOE, that has been pushed back a little. The Judicial Misconduct is addressed in that action too. I have demanded, as my right under the Code of Federal Regulations to have a hearing, and I have demanded that hearing be in front of both Congressional and Senate committees. Copies of my letters to DOE and OPR have been sent to multiple legislators and others.

I stand by my request of you finding me an attorney who's spouse does not work for the District Attorney; is best friends with Sage or anyone at the DA; or is fucking Toby Miller, Lori Carter, Jackie Wood or Tamara Needles. This needs to be done as soon, as possible as further delay will only be taken as intentional action to continue to violate my rights and exacerbate the COVER UP of Attempted Murder, the Destruction of a Federally Funded Energy Project, Theft of Trade Secrets, Destruction of Evidence, Abuse of Office, Official Oppression, Coercion, Falsifying Time Sheets, Malfeasance by Federal Agents, Corruption, Miranda and Brady Violations, Selective Prosecution, Prosecutorial and Judicial Misconduct.

Respectfully,

Charlie Malouff

--------------------------------------------------------------------------------

FROM: Harris, Stacey
TO: 66089179
SUBJECT: Ariel
DATE: 03/21/2014 06:51:01 AM

Mr. Malouff,


I certainly respect your efforts.


the trial transcript is due by 4-2 according to the 3rd court of appeals web site

the court reporter has requested a 30 day extension to turn in you record

as I put in my initial letter to you, this is a long process and will take quite a bit of time.


for instance at the current rate it is taking to put the record together, I would not be surprised if the appellant's brief is not filed till september or october, or possibly later.


most jury trials take 3 to 5 days and have less than 50 exhibits, and the records are turned in within 180 days of sentence. Your trial was a month long, and the volume of exhibits exceeds that of a capital murder trial. that means it takes longer, no matter how inpatient a person gets, it takes a long time.


The delay is standard, read the initial letter I sent you again. Whatever Judge Sages decisions were or the rationale behind them, they have no bearing on the procedures of the 3rd Court.


Also I think you are misconstruing what we told you about the 'political' nature of the rulings on certain of your motions, and pulling that one phrase out of context of our conversation.


Sincerely,

Ariel Payan

C O P Y

TRULINCS 66089179 - MALOUFF, CHARLIE - Unit: BAS-C-A

---

FROM: 66089179
TO: Malouff, Charles
SUBJECT: Ariel
DATE: 05/11/2014 04:42:32 PM

5-10-14

Mr. Ariel Payan
1012 Rio Grande
Austin, TX 78701

Dear Mr. Payan,

As you know, I am a decorated, and honorably retired, chief of police, and Military Veteran with 29 years service to my country. I was shit on by the government for the conduct of another, while I was off fighting a war, back in 2006. While I tried to put in for a Presidential Pardon, it was NOT denied and left open for me to re-apply. Recently, I found the United States v James V Vest case, and it is clear what the intent of Congress was on those laws, further infuriating me as to the misconduct and abuse of power of the government. Now I am in jail for crimes I did not commit, perpetuated by the cover up of criminal conduct by persons in positions of trust in the government, and decisions made by a judge for picunary interest.

The case against me here is not just a simple abuse of power, but an outrageous and unconstitutionally oppressive miscarriage of justice. We are talking about violations of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, Articles I and II of the U.S. Constitution, I dont know all of the Texas Constitution violations (by amendment or article), and multiple violations of Federal and State criminal laws, by the police, prosecutor and state trial judge, compounded by the ineffective assistance of my trial attorney who is also the judges best friend, and now further complicated by the Department of Energy in Washington, DC, at the urgance of the Travis County District Attorney.

In addition to responding to the Department of Energy, I have sent a formal complaint to the US Department of Justice, Office of Professional Responsibility, for an official investigation. Additionally, I am doing everything in my power to get a Congressional Investigation into this case, and the conduct of DOE, the District Attorney, Miller and Sage. I have had it. I am NOT a criminal minded person!

There is no question the statements made in my allegations regarding Sage are true, and will be shown as true in multiple polygraph examinations. I have no intention of letting that go. I have found several cases now where the judges ruled against the attorneys in similar cases, stating "it is not the context of the statements made by the attorney, but the fact that the attorney made the statements."

It is clear this is a complicated and complex case. It is also clear that I have multiple grounds of Ineffective Assistance of Counsel, and Bar Grievances against Jackie and Tamara and Wannamaker, and a Judicial Misconduct on Sage.

Cutting to the chase, you know as well as I do, your "good old boy we are lawyer buddies association", is going to do what you can to fight me in my arguments and grievances. I expect that. I will be out of here in 8 months. Shortly thereafter, I will parole out of TDC should I go there. I promise all my grievances, supporting documents and video, and polygraph results will be posted all over the internet and on TV. Austin papers may be biased in favor of the DA, but international news loves US government abuse to its own people. Social media has proven its effective against government oppression.

That said, right now there is a crack in the sidewalk you and I are walking on. While I do not want to see it become an uncrossable gorge, I have been denied my rights to see the evidence against me by Jackie, along with her constant refusal to get me important court documents and evidence I left with her prior to my incarceration. Not just for my federal case, but for important exculpatory review for my state case. I am NOT an idiot. As she said, no one knows more about my case than I do. There is NO RECORD on file of Jackie, or Tamara EVER coming to Bastrop to see me. There should only be three visits during the times I was incarcerated in Travis County Jail of their visits, and I think the longest was 45 minutes. THAT IS BULLSHIT for a capital case that is as complicated and complex as this. As you said, my trial was longer than a capital murder trial, and we didnt put on a defense because Jackie Wood KNEW Sage "has my back." You know it and so do I. And, so do they! Then, to top it off with this shit with Sage and her re-election...

Right now, I really feel it is in both of our best interest you consider recusing yourself from my counsel. The facts that you will not file complaints with the Judicial Commission against Sage, or the Bar against Wood, or file a motion for a new trial; your wife works for the District Attorney and the statements you made regarding Sage; your telling me to my face, that day of the last

---

hearing with Sage, you were going to argue Taylor's motions and challenge Carter's Affidavit, and you stood there and did nothing, has disintegrated and prejudiced any level of trustworthiness that has been developed between us, so far. And, to lie about those statements will irrepairably disintegrate any level of honesty that I have in respect for you as an officer of the court, further prejudicing my rights to due process and a fair appeal. I already lost a fair trial, by people I was supposed to trust.

However, in the interest of fairness, and the benefit of the doubt to your integrity and intentions as an officer of the court, at this stage, please tell me how you think this crack can be patched? If it cannot be patched, before you become a target of more critical oversight, micromanagement and IAC, please consider finding me an appellate attorney who's spouse does not work for the District Attorney; is best friends with Sage; is not fucking Toby Miller, Lori Carter, Jackie Wood or Tamara Needles; and, who is experienced in both Texas and Federal Constitutional laws in a complex and complicated case, further compounded by the DOE"s latest act of Official Oppression at the behest of the Travis County District Attorney.

I admit, I AM an ASSHOLE!! I have never denied that. I will tell you that to your face and put it in writing. Being an asshole does not make me a criminal. But, I am also a fair person, and every man carries his own weight, integrity, honesty and trustworthiness. If you think you have the balls, integrity, and honesty to step up to the plate and not fuck me around anymore, please arrange to come visit with me in a face to face and let's get this worked out. Otherwise, as time is of the essence, and in both of our interests, please find me a competent appellate attorney without the baggage stated above, to zealously, honestly and ethically represent me, and move on.

Respectfully,

Charlie Malouff

--------------------------------------------------------------------------------

FROM: 66089179
TO: Malouff, Charles
SUBJECT: ARIEL
DATE: 03/29/2014 01:00:32 PM

3-28-14

Mr. Payan,

Both Jackie and Tamara told me that "...Holly Taylor should not be prosecuting this case." YOU told me Holly Taylor should not have prosecuted this case. Jackie and Tamara both told me there needed to be a Special Prosecutor. This was AFTER I submitted my 2255 and Jackie and Joe Turner both got copies of it. I cannot believe that they did not address this to the Court. My 2255 alleging Police Misconduct and Selective Prosecution was submitted over a month before my state trial. It boggles me to believe that none of the newspapers did not contact Karen Sage for comment before or during my trial. If not, they sure as heck contacted the DA. And, because Karen Sage made her decisions to deny me my motions for mistrial, dismissal, Franks hearing and other motions, for POLITICAL considerations, someone I am sure intimately connected to Rosemary Lehmberg, contacted her. I WILL find out who. Just a matter of when. Holly Taylor, my prosecutor, was specifically named in accusations of the covering up of criminal conduct, Constitutional and Civil Rights violations and violations of Federal law in my 2255. Yet she still stayed on as my prosecutor. What part of violation's of the Constitution and Due Process am I missing??

The Preamble: A Lawer's Responsibilities in the Texas Rules of Professional Conduct (see attached), Section 1 states you are my representative and an officer of the legal system and that you have an obligation to maintain he highest standards of ethical conduct. Section 2 states, as my advocate you have a responsibility to zealously defend me. Section 3 says you are to zealously pursue my interests within the bounds of the law. My instructions and complaints not only fall within the bounds of the law under the Constitution's of both Texas and the United States, but also the very rules that regulate you as attorney's and judges. I have legitimate complaints of violations of law. Section 8 says you have a responsibility to assure these regulations are undertaken in public interest and not in self-interested concern and any neglect of these responsibilities compromises both the profession and the public interest. Consitutional violations of this magnitude are definately public interest.

The Texas Attorney General investigates the corruption of public officials. I am instructing you to, in addition to filing the appropriate complaints with the Texas Bar Association, and Texas Commission on Judicial Conduct, file a formal complaint with the AG. The Obstruction of Justice, covering up crimes under the color of authority, and for POLITICAL reasons are included in the term CORRUPTION, as defined on page 397 of the Black's Law Dictionary, Ninth Edition.

You need to read BOWEN and VIDRINE. Both are beginning to pale in comparison in a precedent MISCARRIAGE OF JUSTICE. BOWEN was mostly the egregious conduct of the prosecution. VIDRINE was mosty the egregious and outrageous misconduct of the police. THIS not only involves the prosecutors, but the cops, elected officials, multiple government agencies, local, state and Federal, AND the presiding state JUDGE. AND, the MALICIOUS, VINDICTIVE, and SELECTIVE, prosecution of TWO INNOCENT people FOR PERSONAL GAIN and POLITICAL FAVORTISM!!!!!!!!!!!!!!!!!!!!!!

Sincerely,

Charlie Malouff

---------------------------------------------------------------------------------------

FROM: 66089179
TO: Malouff, Charles
SUBJECT: ARIEL
DATE: 03/22/2014 06:34:04 AM


3-24-14

Mr. Payan,
The Supreme Court just ruled against Terry. That is how I found this. I have been yelling and screaming since the day I was arrested, this case is NOT about fraud or deception, or insider information, but the COVERING UP of Miller's crimes, Constitutional and Civil Rights violations by Carter and Taylor, and the DESTRUCTION OF A FEDERALLY FUNDED WIND PROJECT BY DOE, THE DA AND JONESTOWN!! What part of FEDERAL CRIME do you people NOT understand? I said it then, and I stand by it now!

Sage is a judge who supposedly "GOT IT," according to her BEST FRIEND, AND Tamara Needles, who has no stake in their friendship. Political office does not give imunity to persons engaged in or in covering up crimes. There is NOTHING MISCONSTRUED in my statements!!!

So you are aware, I was, a long time ago, directly involved in SEVERAL elected offical corruption cases. Three specifically, that I will address here, were, former Speaker of the House, Jim Wright, who took a forced retirement, former Congressman Albert Bustamonte, who finally got three years on contract fraud, but was involved in much more, and Bob Bullock, our former Lt. Governor, who, in his early years, and when he was Comptroller, was directly connected with the Mafia Kingpin, Carlos Marcello. It was I that brought that connection to light through an investigation I was conducting (Lead Investigator) over in Houston. The outcome is irrelevant. He is gone. There are more. What is important now, is YOU, Jackie nor anyone else can tell me this is NOT a cover up to multiple crimes, state and federal. I can show you MULTIPLE cases, with convictions, of elected officials, JUDGES included, in recent years, and in Texas alone, that were involved in corruption. More and more cases against District Attorney's wrong doings are coming to light.

I am VERY SERIOUS about my allegations and my intentions to get a federal investigation into this cover up. I am not doing this just to blow smoke up peoples asses. There are pictures, and statements, and witnesses, and physical evidence to these crimes!! Its called EVIDENCE. PHYSICAL EVIDENCE. You, as attorney's are officers of the court. You have a DUTY TO REPORT! If it involves attorneys and judges playing games, so be it. It is already full of crooked cops and prosecutors.

I am NOT a criminal minded person and according to Jackie, EVERYONE knows we were WRONGED. Mary Jo and I already knew this. Mary Jo committed NO CRIME and for that matter, I COMMITTED NO CRIME. There is absolutely NO WAY Mary Jo could have ever gotten a fair trial in Sage's court, not after this bullshit.

1. I told Jackie, Tom Walsh, Kristen and the first lady atty that was before Tamara, in the first big meeting in Jackie's office, that we could not get a fair trial in Sage's court.
2. There needed to be a change of venue.
3. Jackie told me then that we didnt want a change of venue and "Karen is my best friend," and "this is good we have her."
4. Jackie and Tamara told me there needed to be a SPECIAL PROSECUTOR. Duh!

There is more. Please do not take me lightly, or ignore me on my instructions, or my participation in this appeal process. It will not end up good. See you at polygraph.

Respectfully,

Copy

11-19

Ariel

In your letter dated Oct 22, 2013 you stated the issues that will be alleged in the motion for new trial are ① Spoilation, ② Suppression and ③ Legal Sufficiency.

Karlson aside, for the moment, because that is another Discovery Issue, it appears by the Government's Response to our MNT we only argued Selective Prosecution and Suppression.

Did you address in the Selective Prosecution Carter's admissions of violating my First and Fifth amendment rights ( Constitutional Violations the prosecution says needed to be exceptionally clear)? Jackie was very "clear" on those Violations at Trial. Did the Judge miss something or what was her argument there if you did address this? This in addition to the fact the Signors of the Contracts were not indicted. Did you use Carter's Testimony (transcripts) to Support our Argument?

Why was legal Sufficiency left out of the motion?

Charlie

February 12, 2014

Mr. Ariel Payan
Attorney at Law
1012 Rio Grande
Austin, Texas 78701

**Re:   Violations of The Texas Code of Judicial Conduct; Texas Rules of Professional Conduct: Texas Disciplinary Rules of Conduct; Sixth Amendment Right of Due Process**

Mr. Payan:

These issues need to be addressed now versus later. These are the facts of the above violations of professional conduct and law:

1.  When Jackie Wood was first appointed my trial counsel, I expressed serious concerns regarding the integrity of the 299th District Judge, Karen Sage, because of her relationship to the Travis County District Attorney, and the Democratic Party. I told her this case was a case of malicious prosecution perpetrated by Travis County Deputy Sheriff, Toby Miller and his friends at the District Attorney's office. Jackie told me Karen Sage was "my best friend," and that their friendship was "a good thing," inferring judicial integrity.

2.  In my last visit at the Travis County Jail with Jackie Wood, just prior to trial, she again told me Judge Karen Sage was her "best friend" and "Karen has my back." While I do not have the jail records showing the exact date of the meeting, it was the meeting where she left me documents addressing both sides witnesses after giving me an email dated 7-22, 2013, 8:06a.m. (see attached). This was in the visiting room where I met you, on the 3rd floor.

3.  During the course of the trial, juror's kept falling asleep. One time, as many as five jurors were falling asleep and not paying attention. I brought this up to Tamara Needles, my co-counsel and Jackie. Tamara told me as long as they were falling asleep on the prosecution, that was a good thing. I made notes on the yellow tablets given to me by counsel.

    After the prosecution "rested," we excused to go back and confer in the visit room. Once in there, we discussed the jurors falling asleep, and the situation with the jury and where to go with the defense. According to Jackie and Tamara, we were "losing the jury." I could see they were falling asleep, but I did not recognize that as "losing the jury." We had only gone into the prosecution side, and it is incumbent on the defense attorney's to keep them awake during the defense presentation. In that conversation both Tamara and Jackie told me Sage "got it!" Jackie said, "Karen's got it!" She told me this several times. She also said "Karen has my back!" We discussed having Dan Dodson, City

Administrator for the City of Jonestown, and Mike Fox, my former Installation Supervisor, testifying. Jackie and Tamara both told me we had "disproved" the state's case. Jackie said she was concerned we were losing the jury, and if we put on a defense we might lose them. She said we had several week's worth of witnesses. Again, we discussed at least putting on Dodson and Fox. Again, Jackie said, "Karen has my back!" Jackie told me she has "a lot of experience with jury's," that I should "trust me" and we should rest. Tamara was in and out of the room during a lot of the conversation. I told Jackie I really wanted Fox and Dodson to testify. I was also mad over the Karlson issue. Jackie said, he, (Karlson) said there was a stack of blank pre-signed papers. I told her I wanted to see them. And, there was also a power chart, in addition to a video we had of a working prototype at the UT JJ Pickle Center, that Karlson had done the testing on, and that Eric Graham created from Karlson's test somewhere in Discovery. And that the DA was still hiding that if they had not offered it up. I told her Karlson's declaration was similar to Fred Herber's because I used Karlson's to create Herber's. They would look almost the same, side by side. She was insistent she wanted to rest. Jackie told me "trust me!" I still argued for Dodson and Fox to testify. Again, she told me "Karen's got it!" And, "We should rest." And, "trust me!" I told her "I trust you." The rest is history.

4. In our visit at the Travis County Jail, when you hand delivered your letter dated October 22, 2013, in a "let's cut to the chase" conversation, you told me "my wife works for the prosecutor's office." "We are friends with Holly Taylor and I know her husband." And, "We all talk." And, "It's a close knit group." You also told me "the judge's decisions were political." And, "The judge is not likely to decide on something that can effect her election."

Combined, your statement's and Jackie's statement's regarding Karen Sage's decision's based on "political" reasons, considering she is up for re-election, March, 2014, equate to a violation of the **Texas Code of Judicial Conduct, Canon 3, B(2),** "A judge should be faithful to the law and shall maintain professional competence in it. A judge shall not be swayed by **partisan interests, public clamor or fear of criticism.**" And, **(5)** "A judge shall perform judicial duties **without** bias or prejudice."

As in *Henderson v. Perry*, 399 F. Supp. 2d. 756, June 9, 2005 (Dist. Ct. 5th Cir) (...**actuated by the instinct of political survival**) for you and Jackie to make those independent statement's and observations, Sage is clearly concerned with getting political support from the local Democratic Party, and **not** in the interests of justice. From this, **Karen Sage violated my rights to due process.** *Anthony v. Cain,* U.S. Dist. LEXIS 100697 (Dist. Ct. 5th Cir. 2009) ( "A judge will, however, violate a defendant's due process rights if he (she) is biased against the defendant or **has an interest in the outcome of the case.**"). Personal reward of getting votes and campaign contributions for re-election, **is** having an "interest" in the case.

You cannot tell me that the public flack Sage got over the Nestande DWI case, that was going on early in my trial process (we were both in the papers at the same time), or the ongoing criminal/disbarment issues the Travis County District Attorney, Rosemary Lehmberg, was going through at the same time of my trial (again sharing front page coverage), were not weighing on her decisions that could **adversely affect her political support.**

Sage heard testimony the jury did not. She was privy to behind closed door conversations between the defense and the prosecutor. She listened to Miller admit to falsifying timesheets and committing multiple felonies. She listened to Carter admit to violating my Miranda and **targeting** me for **free speech, both Constitutional violations.** She listened to other Government witnesses, some from agencies that have law enforcement Criminal Investigation sections that reviewed the grant, and searched Mary Jo Woodall's work computer **weeks before** Carter applied for her warrants, and the **DA's own forensic auditor** all say there was **no crime**, when "she got it" as described by Jackie and Tamara, and visibly observed by me, by her throwing her head to the side and sitting back in her seat with a look of disgust. On August 20th, she even ruled that **Carter mislead the magistrate.** It was clear by the testimony of Carter and Miller, (in Sage's own words) this was a **"travesty of justice."** Sage's failure to grant a mistrial, or dismiss with prejudice, and her rulings and failures to rule on other motion's, her behavior manifested this **ongoing miscarriage of justice** rendering my trial so fundamentally unfair **it violated my due process.**

According to the **Texas Disciplinary Rules of Conduct, Rule 8.02** "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or **integrity** of a judge." I do not believe you, Jackie, or Tamara made those statements falsely or recklessly, therefore, I am taking them as **true.** As such, **judicial integrity** over the fairness of my trial, and the eventual plea bargain agreement of Mary Jo Woodall, based on a pretty good presumption **she would not have gotten a fair trial,** is at issue, because Mary Jo **never** gave me insider information, or provided me with information **that was not authorized by policy or law.** And, the employees of the Texas Comptroller, State Energy Office, all said Mary Jo was doing her job as proscribed by policy and law and there were numerous measures in place to detect any fraud or wrongdoing. Not to mention, Martin Cano, the Chief of Enforcement for the Investigations Division, testified HE, along with an IT person, searched Mary Jo's work computer and a personal USB and gave it all back and allowed her to continue working because **there was no evidence of wrongdoing.** In *United States v. Nolen*, 172 F. 3d. 362 (5th & 11th Cir. Dec. 2006) the Court states Rule 8.2 "Solely proscribes false or reckless statements questioning judicial qualifications or **integrity."**

3

I provided Jackie with a complete copy of my Federal 2255 Motion to Vacate, Cause No. A-13-CA-572-LY, (see attached) that was filed in Federal District Court, July 9th, 2013, a month prior to our going to trial. In that motion, I allege corruption, cover-up, destruction of evidence, the destruction of a Federally funded energy project, and police misconduct, among other things, on the part of the District Attorney and others. That Motion was also sent to all of the Austin news media outlets, Travis County Commissioner's and Senator's and Congressmen. I intend to investigate if there was any contact, from **any party** to Sage regarding this case prior to, or during trial, again furthering integrity issues.

My next question is; does the **Texas Disciplinary Rule of Professional Conduct Rule 8.03 (a)** "A lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyer's **honesty, trustworthiness** or fitness as a lawyer in other respects **shall inform the appropriate disciplinary authority**, apply to Sage? I know it applies to you, Jackie and Tamara. While she is a judge, she is also a lawyer.

According to the **Board of Directors of the State Bar of Texas, Model Rules of Professional Conduct Rule 8.3 (1983),** "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question of that lawyer's **honesty, trustworthiness** or fitness as a lawyer in other respects **shall inform the appropriate authority.** *Clemons v McNamee*, U.S. Dist. LEXIS 36916, May 2008 (5th Cir.); 2012 Bankr LEXIS 2306, In Re Jarvis Adventure Bldg, LLC., May 2012 (5th Cir).

I, as a client, **must be able to trust that my lawyer(s) will faithfully and zealously represent me.** *Howell v. State Bar of Texas,* 843 F. 2d. 205, 1988 (5th Cir.), and making a decision to rest without putting on a defense in such a high profile case, making the front page of the papers daily, and that was inundated with police misconduct, selective prosecution, Constitutional and civil rights violations because my lawyer(s) believe the judge "has her back," who, unless was previously told so by that judge, would have no way to know how the judge's ruling could go, but made such a strong showing in the confidence of that belief, shows a complete disregard for a clients welfare. **That irresponsible and unethical conduct is not trail strategy.** Especially when the judge, who personally witnesses and listen's to the testimonies of the Government agents admitting to multiple felonies and Constitutional and civil rights violations and continues to not stop the trial, and rules against me in motions that have clearly provided legal sufficiency in their claims.

While the doctrine of separation of powers in a Constitutional scheme of government prohibit free judicial interference in the exercise of discretionary powers of attorney's in criminal prosecutions, the judiciary has always borne the basic responsibility for protecting individual's against unconstitutional invasions of their rights by the Government. *United States v Johnson,* 577 F. 2d. 1304, 1308 (5th Cir 1978); *United States v Falk,* 479 F.2d. 616, 624 (7th Cir. 1965), quoting *Stamler v Willis,* 415 F 2d. 1365, 1369-70 (7th Cir. 1969), cert. denied sub. nom., *Ichord v Stamler,* 399 U.S. 929, 90 S. Ct. 2231, 26 L. Ed. 2d. 796 (1970). See *United States v Butler,* 297 U.S. 1, 62-63, 56 S. Ct. 312, 80 L. Ed. 477 (1936); *Marbury v Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803); *Calder v Ball* 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798). See also A. Hamilton, Federalist Paper No. 78, reprinted in Cook(e) (ed.) The Federalist 521, 524-25 (1961). **This case** falls into that rare situation in which the decision to prosecute was so abusive of this discretion because it encroached on Constitutionally protected rights and the judiciary **must** protect against unconstitutional deprivations, **not turn a blind eye for political favoritism.**

To rule in a separate hearing, on August 20, 2013, for Mary Jo Woodall, that Carter "mislead" the magistrate on the Search Warrant Affidavit, and (1) not to hold a full *Franks* hearing in her case; (2) not to stop my trial to hold a full *Franks* hearing, and (3) to tell me Carter's "misleading" did not apply to "my" search warrant affidavit, when that very information was the foundation information on **all** of the search warrant affidavits in the Government's case, is in error. Allowing evidence that was **clearly fruits of the poisonous tree** from Carter's admission to violating my Miranda rights be admitted, for **"political"** reasons is **unethical.**

For two experienced attorney's to tell me "she got it," plus my own personal observation- a person who **HONORABLY RETIRED** from Law Enforcement with **29 years experience** that "she got it!" and for a third, experienced attorney, who regularly has personal interaction with the very people who are prosecuting me to tell me the "the judge's decisions were political." And, "The judge is not likely to decide on something that can effect her election." And, for that judge to recognize the manifestation of a "Travesty of Justice" **(her words)**, and to rule as she did for "political" reasons, be they for re-election, or as a favor to the District Attorney in the furtherance of ongoing Brady violations, exculpatory evidence, the destruction of a Federally funded wind project, and police misconduct, **is an unethical miscarriage of justice and professional conduct.**

While polygraph examinations are seldom, if ever, admissible into evidence in a criminal procedure, they are allowed in Bar Association and Judicial Misconduct hearings. I am making arraignments to take a polygraph regarding the aforementioned statements and attached Sworn Affidavit. I challenge you, Jackie, and Tamara to polygraph examination

5

too, as you told me she, Jackie, (and I assume you too) would claim trial strategy. This is **not** any "strategy." Or, you can provide the examination independent of me and I will take your examiner's test(s), or both. Preferably I would like to take both so there is no discrepancy as to my telling the truth about these statements. I have already told Jackie I am going to press the FBI to provide one for me.

**I want all of this on the record in my appeal**, and brought to the attention of the proper authority **as required** by the **Rules of Disciplinary and Professional Conduct**, and **Judicial Conduct.**

My resume and a full copy of my 2255 Motion to Vacate, was provided to both Jackie, and Joe Turner, showing the file date and my allegations against the Travis County District Attorney right after filing July 9th.

I have over 20 years experience investigating police and state and federal elected officials, and **I do not** make these allegations frivolously, or take their seriousness lightly.


Respectfully,


Charlie Malouff
66089179
P.O. Box 1010
Bastrop, TX 78642

6

*COPY*

# SWORN AFFIDAVIT

I, Charlie Malouff, the defendant in the 299th District Court of Travis County, Case No. 13-904021, under the penalty of perjury, question the integrity of proceedings conducted in this Case and make the following declaration:

1.  When Jackie Wood was first appointed my trial counsel, after Daniel H. Wannamaker was relieved for a Conflict of Interest, (see Federal 2255 Motion To Vacate, Set Aside, or Correct Sentence Cause No. A-13-CA-572-LY), I expressed serious concerns regarding the inability of getting a fair trial and integrity of the 299th District Judge, Karen Sage, because of her relationship to the Travis County District Attorney, and the Democratic Party, and the selective and malicious prosecution by the Travis County District Attorney's office.

2.  I told her, this case was a case of malicious prosecution perpetrated by Travis County Deputy Sheriff, Toby Miller and his friends at the District Attorney's office. Jackie told me Karen Sage was **"my best friend,"** and that their friendship was **"a good thing,"** inferring to judicial integrity.

3.  In my last visit at the Travis County Jail with Jackie Wood, just prior to trial, she again told me Judge Karen Sage was her **"best friend"** and **"Karen has my back."** While I do not have the jail records showing the exact date of the meeting, it was the meeting where she left me documents addressing both sides witnesses after giving me an email dated 7-22, 2013, 8:06a.m. This was in the visiting room on the 3rd floor.

4.  During the course of the trial, juror's kept falling asleep. One time, as many as five jurors were falling asleep and not paying attention. I brought this up to Tamara Needles, my co-counsel and Jackie, and I made notes on the yellow tablets given to me by counsel.

5.  After the prosecution "rested," we excused to go back and confer in the visit room. Once in there, we discussed the jurors falling asleep, and the situation with the jury and where to go with the defense. According to Jackie and Tamara we were **"losing the jury."** I could see they were falling asleep, but did not recognize that as **"losing the jury."** We had only gone into the prosecution side, and to me it is incumbent on the defense attorney's to keep them awake during the defense presentation. Not to quit on a "perception" when you have **numerous** exculpatory defense witnesses and **mounds** of exculpatory documentary evidence.

6.  In that conversation both Tamara and Jackie told me Sage **"got it!"** Jackie said, **"Karen's got it!"** She told me this several times. She also said **"Karen has my back!"**

1

7. We discussed at least having Dan Dodson, City Administrator for the City of Jonestown, and Mike Fox, my former Installation Supervisor, testify. Jackie and Tamara both told me we had **"disproved"** the state's case. Jackie said she was concerned we were **"losing the jury,"** and if we put on a defense we might lose them. She said we had **several week's** worth of witnesses. Again, we discussed at least putting on Dodson and Fox.

8. Again, Jackie said, **"Karen has my back!"**

9. Jackie told me she has **"a lot of experience with jury's,"** that I should **"trust me"** and we should rest. Tamara was in and out of the room during a lot of the conversation.

10. I told Jackie I really wanted Fox and Dodson to testify. I was also mad over the Karlson issue. Jackie said, he, (Karlson) said there was a stack of blank pre-signed papers. I told her I wanted to see them, and that there was also a power chart, in addition to a video we had of a working prototype at the UT JJ Pickle Center, that Karlson had done the testing on, and that Eric Graham created from Karlson's test somewhere in Discovery. And that the DA was still hiding that if they had not offered it up. I told her Karlson's declaration was similar to Fred Herber's because I used Karlson's to create Herber's. They would look almost the same, side by side.

11. She was insistent she wanted to rest. Jackie told me **"trust me!"** I still argued for Dodson and Fox to testify. Again, she told me **"Karen's got it!"** And, **"We should rest."** And, **"trust me!"** In the end, I told her **"I trust you."**

12. After trial, in a visit at the Travis County Jail, with my appointed appellate attorney, M. Ariel Payan, when he hand delivered a letter dated October 22, 2013, in a "let's cut to the chase" conversation, he told me **"my wife works for the prosecutor's office."** **"We are friends with Holly Taylor and I know her husband."** And, **"We all talk."** And, **"It's a close knit group."**

13. In the same conversation, he told me **"the judge's decisions were political."** And, **"The judge is not likely to decide on something that can effect her election."**

14. Over the next several months I sent Jackie Wood and Ariel Payan multiple letters and email addressing what I felt was a compromise in the integrity of Karen Sage and my trial, and never heard back from them.

15. The Texas Disciplinary Rules of Conduct, Rule 8.02 states, "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or integrity of a judge."

16. I do not believe Jackie Wood or Ariel Payan made those statements falsely or recklessly, and they should be taken as true. As such, judicial integrity over the fairness of my trial is at issue.

17. Also at issue is the plea bargain agreement of my co-defendant, Mary Jo Woodall. This is based on a pretty good presumption she would not have gotten a fair trial because Mary Jo. never gave me insider information, or provided me with information that was not authorized by policy or law, and if Karen Sage compromised her integrity in my trial, then there is an **unethical miscarriage of justice and professional conduct** in the prosecution of Mary Jo Woodall.

18. The Board of Directors of the State Bar of Texas, Model Rules of Professional Conduct Rule 8.3 (1983) states, "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question of that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority.

19. I, as a client, must be able to trust that my lawyer(s) will faithfully and zealously represent me. Making a decision to rest without putting on a defense in such a high profile case, making the front page of the papers daily, and that was inundated with police misconduct, selective prosecution, Constitutional and civil rights violations because my lawyer(s) believe the judge **"has her back,"** who, unless was previously told so by that judge, would have no way to know how the judge's ruling could go, but made such a strong showing in the confidence of that belief, shows a complete disregard for a clients welfare. That **irresponsible** and **unethical** conduct is **not** trail strategy. Especially when the judge, who, by **her own words**, is concerned about a **"Travesty of Justice"** personally witnesses and listen's to the testimonies of the Government agents admitting to multiple felonies, Constitutional and civil rights violations, continues to not stop the trial, and then rules against motions that have clearly provided legal sufficiency in their claims.

20. The combined statement's of two of the three of my attorney's regarding Karen Sage's decision's based on **"political"** reasons, considering she is up for re-election, March, 2014, violate the Texas Code of Judicial Conduct, Canon 3, B(2), "A judge should be faithful to the law and shall maintain professional competence in it. **A judge shall not be swayed by partisan interests, public clamor or fear of criticism."** And, (5) **"A judge shall perform judicial duties without bias or prejudice."**

21. I have instructed my appellate attorney, Ariel Payan, to put all of this on the record in my appeal, and be brought to the attention of the proper authority as required by the Rules of Disciplinary and Professional Conduct, and Rules of Judicial Conduct.

I declare under the penalty of perjury pursuant to 28 USC 1746, the foregoing is true and correct to the best of my knowledge.

3

Executed on this 26th Day of February, 2014 by _____

Notary Public                                  Charlie Malouff

S. Schappaugh
Bastrop, Texas
Exp. April 20, 2014



S. SCHAPPAUGH
MY COMMISSION EXPIRES
April 20, 2014

# State Commission on Judicial Conduct

**Officers**
Steven L. Seider, Chair
M. Sue Kurita, Vice Chair
Valerie E. Ertz, Secretary

**Members**
Karry K. Matson
Patti H. Johnson
Joel P. Baker
Edward J. Spillane, III
Martha M. Hernandez
Diane D. Threadgill
Ricky A. Raven
Demetrius K. Bivins
Douglas S. Lang
Orlinda L. Naranjo



**Executive Director**
Seana Willing

May 14, 2014

**CONFIDENTIAL**

Charles A Malouff Jr
PO Box 1010
Bastrop TX   78602-1010

Re:    CJC No. 14-0826-DI

Dear Mr. Malouff:

We have received your complaint against a Texas judge.  All complaints receive a thorough review and investigation relevant to the allegations, and are presented to the Commission.  After its consideration, the Commission may dismiss a complaint, impose sanctions against a judge, or take other appropriate action.  The Commission's actions are governed by Article V, Section 1-a of the Texas Constitution and Chapter 33 of the Texas Government Code.

Please be advised that our proceedings are confidential.  We are prohibited by Section 33.033(c) of the Texas Government Code from identifying by name the judge against whom you have filed a complaint.  In order to assist us with our investigation, please reference the above-listed CJC case number in all future correspondence.  Additionally, if you intend to submit additional documents for our consideration, please send photocopies.

For your additional assistance, we have enclosed an information sheet that will explain more completely the process involved in investigating allegations of judicial misconduct.

We will inform you in writing of the Commission's action on your complaint.

If you have any questions or need additional information, please contact our office. When calling, please mention the above-listed CJC case number so as to expedite your phone call.

STATE COMMISSION ON JUDICIAL CONDUCT

Enclosure

*Copy*

# State Commission on Judicial Conduct
PO Box 12265
Austin, TX 78711-2265
Tel. (512) 463-5533 · Toll Free: (877) 228-5750
**Complaint Form**
• *If you are filing a complaint about more than one judge, please use a separate form for each judge.*
• *You may complete this form online before printing.*
• *Send the completed form and any additional pages or related documents to SCJC.*

For SCJC use only.

\* Indicates required fields.    Please note that faxed complaints will NOT be accepted.

*Your name:* Charles A. Malouff, Jr.    *Judge: Karen Sage
*Mailing Address: #66089179 P.O. Box 1010    *Court Number: 299th District Court
*City, State Zip: Bastrop, TX 78602    *City and County: Austin, Travis County
*Date of Birth: 12.27.1957
Your Phones: Day ( 512 ) 321.3903    Evening ( ___ ) _____
Cell/Other ( ___ ) _____    Best time to call you: 8-5    ☒A.M. ☒P.M.

---

**If your complaint involves a court case, please provide the following information:**

Cause Number: D-1-DC-13-902041    Status of your case: ☐Pending ☐Concluded ☒On appeal
Your attorney: Ariel Payan    Opposing Attorney: TCADA Holly Taylor
Address: 1012 Rio Grande    Address: Travis County Courthouse
City/Zip: Austin, TX 78701    City/Zip: Austin, TX 78701
Phone Number(s): _____    Phone Number(s): _____

---

PLEASE FILL IN ALL INFORMATION AVAILABLE FOR ANY WITNESSES (attach additional pages as needed)

Name: Jackie Wood, Atty    Name: Tamara Needles, Atty
Address: 805 W. 10th St #101    Address: 805 W. 10th St #101
Phone Number(s): _____    Phone Number(s): _____
What did this person witness?    What did this person witness?

| See Attached Affidavit and other documents | See Attached Affidavit and other documents |

**If you are submitting documents, please provide copies, not originals.**

*I understand that as part of the Commission's investigation the judge may be provided a copy of this complaint. Please note  - the Commission will do its best to maintain your confidentiality, if you so request. However, it may not be possible for us to pursue our investigation without revealing your identity at some point. If it is necessary to reveal your identity directly to the judge, we will advise you before proceeding.*

*I request that my identity be kept confidential. ☐Yes ☒No I want this as public as possible!

*Signature: _____    *Date: 2 May 2014

| How did you hear about the State Commission on Judicial Conduct? (*please select one*)  ☐State Bar of Texas |
| ☐Another State agency  ☐News media  ☒Attorney  ☐Friend  ☐Other: _____ |

Revised 07/13/2009

*Copy*

May 2, 2014

## Details of Complaint

**Dates of Alleged Misconduct of Judge:** April 2013-December 2013

The court is supposed to be the instrument to advance the ends of justice. When the trial judge, for **personal pecuniary interest**, turns a blind eye, the trial, and the fundamental constitutional rights of due process become unduly prejudiced.

The Texas Code of Judicial Conduct, Canon 3 (B)(2) states, "A judge should be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor of fear of criticism." And, (5)" A judge shall perform judicial duties without bias or prejudice."

Travis County 299th District Court Judge Karen Sage violated the Canon's of Judicial Ethics and my due process, because she had a personal and financial interest in the outcome of the case.

Canon I of the Texas Code of Judicial Conduct states, "A judge should maintain and enforce high standards of conduct and personally observe those standards to preserve the integrity of the judiciary."

During the trial, Karen Sage observed what she saw as the making of, **in her own words**, "a travesty of justice."

In an interview with the Austin American Statesman on August 16, 2013, during the course of the trial, Sage said she was **troubled by the governments conduct** (see attached news articles). There were two requests for mistrial amongst the many other Defense motions.

There were numerous allegations of bad faith, selective and vindictive prosecution and ongoing Brady violations. Sage heard multiple days of testimony out of the presence of the jury requiring her to comply with Canon 2(A) and (B). Sage heard the police, persons in positions of public trust, admit to committing multiple felonies and Constitutional violations, such as **targeting me** for my freedom of speech and violating Miranda, in addition to the **still ongoing** Brady violations.

Jackie Wood, my appointed counsel, appointed by Karen Sage, is Karen Sage's best friend. She told me this several times throughout her representation, and this is well known by all at the District Attorney's office where Sage and Wood worked together.

Jackie Wood told me, during representation and before the Defense's decision to Rest, "**Karen is my best friend.**" And, "**She's got my back!**" (See Sworn Affidavit).

After the verdict, Jackie Wood told me "**Karen's decisions were political.**" Shortly thereafter I was appointed Ariel Payan as my appellate counsel. He tells me, early on, Karen Sage's decisions **were political and influenced to get contributions and votes for her upcoming re-election** (See Sworn Affidavit and letter to Payan).

These statements, made by two independent Officers of the Court, regulated by the Texas Disciplinary Rules of Professional Conduct, can only be taken as true and support Sage's violations of Canon 2(A)(B); Canon 3(B)(2); Canon 4(A)(1) and Canon 5(1)(i). And, her making decisions contrary to and involved unreasonable application of clearly established state and federal laws as determined by both Supreme Courts and the Constitutions of both Texas and the United States.

There are over 4 Terrabytes of exculpatory evidence and trial transcripts supporting this complaint. This evidence and trial transcripts reveal the Governments arbitrary, selective, vindictive and malicious misconduct is horrifying violation's of the First, Fourth, Fifth, Sixth, Eighth, Fourteenth Amendments to the Constitution, Code of Federal Regulations, State and Federal laws, Rules of Professional Conduct, including, but not limited to, Attempted Murder, Industrial Espionage, Destruction of a Federally Funded Energy Project, Destruction of Evidence, Theft of Trade Secrets, Abuse of Office, Falsifying Time Sheets, Malfeasance by Federal Agents, Corruption, ongoing withholding Discovery, resulting in the convictions of not one person, but two. The other, Mary Jo Woodall, a 57 year old woman who never committed anything other than a traffic violation at age 17, and who, because of the Judicial Misconduct of the state trial judge, Karen Sage, never had a chance at a fair trial.

**I PRAY** there still remains an **ethical and honest** Government advocate in you and your consideration of my complaint and claims.

Respectfully Submitted,

Charlie Malouff
66089-179
P.O. Box 1010
Bastrop, TX 78602

**Defense attorneys deal blow to prosecutor's fraud case**

Posted: 6:18 p.m. Friday, Aug. 16, 2013

By Ricardo Gandara - American-Statesman Staff

Prosecutors found themselves in the hot seat Friday during the trial of former police officer Charlie Malouff Jr., who is accused of falsifying documents to secure a grant for a failed Jonestown wind energy project.

Malouff's defense attorneys challenged testimony by the prosecution's star witness, an accountant who told jurors she suspected that Malouff spent some money from the $2 million federal stimulus grant for personal use. The defense had previously asked for a mistrial because they had not received evidence that formed the basis of that testimony — detailed spreadsheets organized by Robin Timmins, a former accountant in the district attorney's office.

Defense lawyers got the evidence earlier this week. On Friday, attorneys Jackie Wood and Tamara Needles told District Court Judge Karen Sage that they found that only $100,000 went to the 57-year-old Malouff. The rest of the grant went to pay employees salaries and purchase equipment to build wind turbines.

Prosecution witnesses had painted the 55-year-old Malouff as a con man. Dana Malouff McCoy, the defendant's daughter, said he persuaded her to be his company's president on paper only. Travis County Sheriff's Deputy Toby Miller testified that Malouff used his romantic relationship with former Texas Comptroller grant administrator Mary Jo Woodall to get the grant. Ken Price, a civil engineer employed by Malouff, said Malouff oversold his ability to build wind turbines. Malouff also didn't pay him all the money he'd earned, Price said.

The newly released evidence seemed to put the prosecution's case in jeopardy. The jury was not present for Friday's court discussion, and Sage has said that she wants to hear what Lori Carter, the state's chief investigator in the case, has to say about the gathering of evidence.

"I would have thought Charlie had a bank account in Switzerland. I'm troubled. That's the impression I got," said Sage, who spoke outside the presence of the jury. "Timmins' spreadsheets do cause me concern."

Assistant District Attorney Holly Taylor, with Travis County's Public Integrity Unit, spent 35 minutes Friday going over the evidence she's introduced in the trial.

Prosecutors said they would have another accountant review evidence to re-create Timmins' spreadsheets and would provide the new documents to defense attorneys late Friday. Defense attorneys will have time to review them before next week when Timmins, who now works as an accountant in the Rio Grande Valley, will be called back to the witness stand.

Taylor has said she didn't know about the existence of potentially exculpatory evidence Timmins had in her possession.

"The state has done something wrong and they are trying to rectify that," Wood said Friday.

Sage, after hearing from Carter and others on Monday, could declare a mistrial or allow testimony to continue and have the jury to make its own decision about Malouff's culpability.

If convicted of securing execution of a document by deception, Malouff could be sentenced to life in prison. He is already serving a 2 1/2- year sentence in federal prison for possession of a firearm and destructive devices, including hand grenades.

**Defense accuses state of 'selective prosecution' in wind energy fraud case 8-19-13**

Posted: 6:14 p.m. Monday, Aug. 19, 2013

By Ricardo Gandara - American-Statesman Staff

The fight over Charles Malouff's fate continued Monday outside the presence of jurors, with attorneys arguing over the gathering and sharing of evidence in the case of a failed wind energy project in Jonestown.

Defense attorneys Jackie Wood and Tamara Needles hammered at the prosecutors with a 15-page motion to suppress evidence and dismiss the case against Malouff, who is accused of falsifying documents to obtain a $2 million federal stimulus grant for wind turbines. Among other things, his lawyers claim the Travis County District Attorney's Office acted in bad faith by failing to hand over spreadsheets detailing the finances of Malouff and his companies.

District Judge Karen Sage denied the request and ordered everyone, including jurors, to return on Wednesday. But she left one opening for the defense: If Malouff is convicted of fraud charges, the judge would be willing to hear the defense attorneys' motion for a new trial on the grounds that prosecutors engaged in "selective prosecution."

Wood suggested that one key prosecution witness, Deputy Toby Miller, "double dipped" by claiming hours at the Travis County Sheriff's Office while he was working at Malouff's company, CM Energies. She noted that prosecutors did not bring charges against Miller. Prosecutors acknowledged the double-dipping claim but said they had looked into his background and had not found a problem.

"I'm appalled that anything Toby Miller said is being considered," Wood said.

The defense also claimed prosecutors overlooked possible misdeeds by others at CM Energies, including staff attorney Michael Guevara, who signed the grant application, and Malouff's daughter Dana Malouff McCoy, who testified she served as president in title only while her father ran the company.

Monday was the third consecutive day that jurors did not hear testimony.

Defense attorneys asked for a week delay while they review newly discovered spreadsheets of Malouff's bank accounts prepared by former county accountant Robin Timmins, but Sage granted only two extra days.

On Wednesday, jurors will hear from Timmins — who followed the money trail — and lead investigator Lori Carter.

**\*\*\*\*\*NOTE: LATE JULY EARLY AUGUST 2010 MAYOR CAME INTO JONESTOWN OFFICE UPSET AT ME AND STARTED TAKING IT OUT ON MIKE ABOUT MY BACKGROUND. SUBSEQUENT CONVERSATIONS WITH HER AND DAN REVEALED KIRK WATSON WAS STIRRING POT ABOUT ME AND WANTING ME OFF GRANT. MAYOR LATER APOLOGIZED TO ME BECAUSE SHE ALREADY KNEW ABOUT MY BACKGROUND AND THAT WATSON HAD UPSET HER.**





- CAPD Home
- Kick Ass Award Sponsors
- Emma S. Barrientos
- Bylaws
- Endorsements 2012
- Take Action

# Capital Area Progressive Democrats Austin,Texas - Kick Ass Sponsors

## CAPD Annual Kick Ass Awards 2012 Banquet Sponsors

### KICK ASS

Tx Sen. Kirk Watson
Judge John Lipscombe

### Platinum Stars

State Rep. Elliott Naishtat
Judge Karen Sage
Ken Craig
US Rep. Lloyd Doggett
Black Austin Democrats
Gerard Washington
Mayor Pro Tem Sheryl Cole

### Gold Stars

Todd & Paula Wong
Eva Gonzales
Rosemary Lehmberg
Judge Herb Evans
Efrain De La Fuente
Judge Eric Shepperd
David Butts
State Rep. Eddie Rodriquez
Council Mbr Mike Martinez
Sylvia Camarillo
Co Comm Sarah Eckhardt
Jan Soifer
Mayor Lee Leffingwell
Joe and Dorothy Gunn
Judge Clifford Brown
Judge Nancy Hohengarten

Joel and Laura Kohlstad
Granger & Mueller, P.C.
**Silver Stars**
Ramey Ko
Council Mbr Laura Morrison
Cecelia Crossley
Sherry Statman
Walter Timberlake
Judge Raul Gonzalez
Michelle Brinkman
Nicholas Chu
Virginia Schilz
Andy Brown
Judge Gisela D. Triana
Judge Elizabeth Earle
**Bronze Stars**
Judge Tim Sulak
Michael J. Ruiz
Martha R. Johnson
Larry Kelly-Mahaffey
County Comm. Maria Canchola
Shirley Johnson
Council Mbr Laura Morrison
Sarah L. Shaw
Nancy Williams
Alicia Del Rio
Judge Brenda Kennedy
Becky Moeller

# BYLAWS OF THE
# CAPITAL AREA PROGRESSIVE DEMOCRATS

_Revised_
**January 4, 2011**

## Article I *NAME*

This organization shall be called the Capital Area Progressive Democrats (CAPD).

## Article II *PURPOSE*

Recognizing that in a multi-cultural democratic society bridges and coalitions must be built between our various communities, and to promote the influence of each citizen regardless of race, religion, color, age, gender or sexual orientation, we associate ourselves together creating the Capital Area Progressive Democrats.

*The primary purpose of the Capital Area Progressive Democrats shall be to endorse and actively support the election of those Democratic candidates, issues or propositions on the voting ballot which further the ideals of this organization.*

## Article III MEMBERSHIP, DUES & MEETINGS

A.Membership is open to activist Democrats who support the purpose of this organization.

B.Membership dues shall be payable annually and due each May to coincide with the annual membership/fundraiser. Exception: a former member whose membership has lapsed within the previous 24 months may renew at the primary election candidate's forum. The amounts and categories of membership shall be set by majority vote of the executive board.

C.General meetings shall be held monthly. The regular monthly meeting date shall be set by the executive board. The executive board must give seven days notice to the membership prior to an alternate meeting day.

D.Special meetings of the membership may be called upon by a majority vote of the executive board.

E.The organization shall host an annual membership/fundraising party at which will be presented four awards, to be named the "Kick-Ass Awards," honoring those who have served the Democratic Party and progressive causes with distinction. In addition, an annual award, to be named the Emma Barrientos Memorial Award, will be presented to an individual who has demonstrated a long-term commitment to progressive ideals through dedication to improving the lot of all in society, particularly the most disenfranchised and vulnerable. A contribution to the Emma Barrientos Scholarship Fund in the name of the award recipient will be made in an amount to be determined by the Budget Committee. The recipients of all awards will be chosen by a committee appointed annually by the Chair.

## Article IV OFFICERS

The officers of CAPD shall be as follows: one chairperson, two vice chairpersons, one treasurer, one secretary, a managing editor (website/newsletter), a chairperson for the Programs Committee, a Public Communications Chair, a chairperson of the Fundraising Committee, a Counselor, and a Youth Liaison.

A.Elections – the officers of CAPD shall be elected each year at the regular meeting in June. Officers shall be elected by simple majority vote of the members present & voting. In case of a plurality vote among three or more nominees, a runoff shall be held between the candidates receiving the greatest number of votes.

B.Voting Eligibility – Members must have joined by end of the thirtieth day prior to the election in order to be eligible to vote.

C.Nomination – any member of CAPD may nominate himself or herself or another member from the floor at the election meeting.

D.Installation – Officers-elect will be installed at the subsequent July meeting with terms of July to June.

E.Succession and Vacancies – Officers shall continue to serve in their respective offices until their successors are chosen or until their resignation is in effect. Resignation shall be submitted in writing to the secretary, and upon receipt shall be deemed effective. Vacancies shall be filled at any time by a simple majority vote of the executive board subject to approval by the membership at the next general meeting.

F.Executive Board - The officers as a body comprise the executive board of CAPD, meetings of which shall be held based upon circumstantial need and called by the chairperson.

## Article V DUTIES OF THE OFFICERS

A.Chairperson – *the duties of the chairperson shall be to:*

1.provide leadership for CAPD,
2.represent the organization in the community & the media,
3.establish agendas for and preside at general and special meetings,

4.      4.establish agendas for and preside at executive board meetings,
5.      5.call for any needed special executive board meeting,
6.      6.rule on parliamentary procedural disputes,
7.      7.establish an annual calendar of meetings and special events at the beginning of their term of office, and
8.      8.establish an annual budget for CAPD to be approved by the executive board acting as the Budget committee. The Chair may authorize spending between regular meetings that is not included in the budget according to the following procedures:

       a)if the individual expenditure is below $100 or cumulatively $200 between regular monthly meetings, or

       b)an amount exceeding those limits with the consent of 2/3 (8) of the members of the Executive Board. Such consent may be given either in person at an Executive Board meeting, or electronically via e-mail or a "virtual meeting."

9.      9.annually form an ad hoc committee open to current members not serving on the Executive Board for the purpose of performing an audit of treasury records, and

10.      10. establish a permanent mail box in a central Austin location, and be responsible for mail delivery.


B.**Vice Chair for Endorsements** – *the duties of the Vice Chair Endorsements shall be:*

1.      1.act as temporary Chairperson in the absence of the Chairperson for CAPD,
2.      2.serve as Chair of the Endorsement Committee which shall be open to all current members who express an interest in the committee, and
3.      3.be responsible for candidate endorsements procedures.

*The Endorsement Committee shall meet when called by the Endorsements Chair. The committee's duties are to assist the chair in his/her duties:*

4.      4.The Vice Chair for Endorsements will serve as Chair of a Political Strategy Committee which shall be open to all current members who express an interest in the committee, and
5.      5.develop and implement programs to aid in the election of candidates endorsed by CAPD. Included, are voter registration drives, Get Out The Vote (GOTV) procedures, dissemination of candidate information and any other such measures as are approved by the Political Strategy Committee.

*The Political Strategy Committee shall meet when called by the Chair of the Political Strategy Committee and shall assist the chair in his or her duties.*


C.**Vice Chair for Membership** – *the duties of the Vice Chair for Membership shall be:*

1.      1.serve as chair for a Membership Committee to be open to all current members who express an interest in the committee,
2.      2.collect membership fees and renewals from each member,
3.      3.keep a database with membership information and make semiannual reports to the executive board and membership committee,
4.      4.conduct regular recruitment efforts and membership drives, and
5.      5.send meeting notices to the members.

*The Membership committee shall meet when called by the Membership chair and shall assist the chair in his or her duties.*


D.**Secretary** – *the duties of the Secretary shall be:*

1.      1.keep accurate minutes of membership and executive board meetings,
2.      2.receive resignations of officers and declare vacancies, and
3.      3.maintain organizational files & record books.

**E.Treasurer** – *the duties of the Treasurer shall be:*

1. 1.maintain all financial records and make annual written reports to the executive board,
2. 2.report on current CAPD financial status at each general meeting,
3. 3.write CAPD checks and pay all organization debts,
4. 4.coordinate with the Chair of CAPD in preparation of the annual budget,
5. 5.file all reports required by law, and
6. 6.provide financial records necessary for an annual audit to be performed by an ad hoc audit committee called by the Chair, which will be open to current members not serving on the Executive Board.

**F.Managing Editor, Website/Newsletter** – *the duties of the Managing Editor shall be:*

1. 1.to oversee the publication and disbursement of an electronic newsletter called "D-News" containing articles and information of interest to CAPD members and the general public,
2. 2.to exercise editorial control of newsletter and Web content in conjunction with the Chair, Communications and Public Relations Committee Chair, and Counselor,
3. 3.oversee and update the CAPD website content with input from the aforementioned officers, and
4. 4.maintain CAPD's web presence by contracting for web hosting space with CAPD membership approval.

**G.Programs Committee Chair** – *the duties of the Programs Committee Chair shall be:*

1. 1.serve as Chair of the Program Committee, open to all current members who express an interest in the committee,
2. 2.develop programs & social activities of interest to the general membership, and
3. 3.further the political awareness of CAPD members.

*The Programs Chair Committee shall meet when called by the Chair of the Programs Committee and shall assist the Chair in his or her duties.*

**H.Communications & Public Relations Committee Chair** – *the duties of this Committee Chair shall be:*

1. 1.to coordinate with and monitor the news media concerning events which might be of interest to CAPD,
2. 2.to mold the image of CAPD to the general public in order to facilitate the goals of the organization, and
3. 3.to assist the Newsletter Editor when needed in the publication of the newsletter.

**I.Fundraising Committee Chair** – *the duties of this chair shall be:*

1. 1.serve as Chair of the Fundraising Committee to be open to all current members who express an interest in the committee,
2. 2.plan, present & implement with the Fundraising Committee, fundraising projects, short term & long term for raising sufficient funds to support the organization, and
3. 3.the Fundraising Committee shall assist the Chair of the Fundraising committee in his/her duties.

**J.Counselor** – *the duties the Counselor shall be:*

1. 1.act as parliamentarian in assisting the chairperson in rules discussion, and
2. 2.review all bylaws, amendments to the bylaws, and all CAPD sponsored publications for their impact on CAPD.

**K.Youth Liaison** – *the duties of the Youth Liaison shall be:*

1. 1.to encourage voting age young adults to participate in CAPD & CAPD sponsored activities by reaching out to the Young Democrats & University Democrats organizations, and
2. 2.assist the Membership Chair as needed.

## *Article VI ENDORSEMENT PROCEDURES*

The Vice Chair for Endorsements shall, with the Endorsement Committee, draft a questionnaire to be used in the endorsement process. The Endorsement Committee shall send the questionnaire to all Democratic candidates selected by the Endorsement Committee. The Committee shall upon receiving the returned and completed questionnaire, inform the candidates of their opportunity to appear at a previously scheduled candidate's forum and shall fully publicize the candidates' forum to the membership.

A. The Endorsement Committee chair shall preside over the Candidates Forum & the following endorsement vote by the membership of CAPD in accordance with the rules determined by the Endorsement Committee and approved by the executive board. Copies of these rules shall be made available at the meeting. The rules shall state that a candidate must provide a signed questionnaire in order to be eligible for endorsement. Copies of the completed questionnaire shall be made available to the membership at the meeting.

B. To be eligible to vote following the Candidates Forum, a member must be current. New members must have joined CAPD by the end of the 30th day prior to the endorsement meeting. Former members whose memberships have lapsed within the previous 24 months will be allowed to pay the yearly dues at the meeting to renew their memberships and will then be eligible to vote in the endorsement election.

C. Procedures:

1. 1. The entire membership present at the endorsement meeting may participate. A candidate in a race must receive 55% vote of the members present & voting in order to receive CAPD's endorsement.
2. 2. There will be no runoffs. In any race in which no candidate gets 55% vote of the members of CAPD voting, there will be no endorsement in that race.

## Article VII RULES

Except as otherwise provided in these bylaws; Robert Rules of Order (latest edition) shall govern procedures at all CAPD meetings and other business that might affect CAPD. The Chair person of CAPD or Counselor shall serve as Parliamentarian.

## Article VIII AMENDMENTS

Any member of CAPD may propose amendments to these bylaws. All proposed bylaw amendments must be submitted in writing. Proposed amendments must be published prior to discussion and possible adoption at the next general meeting. Amendments shall be adopted by 3/4 majority vote of the members present and voting. Changes regarding the form of proposed amendments maybe offered from the floor at the general meeting and adopted without prior publication.

*Original Bylaws August 22, 1994*
*Compiled and submitted by*

*Bill Carlon*
*Vice Chair for Endorsements*
*Bylaws Committee: Jerry Garcia, Obie Greenleaf, and Sheryl Cole*

*Amendments Dated May 1, 2007*

*Cecilia Crossley, Chairman*
*Bylaws Committee: Gerard Washington, Chuck King, Efrain De La Fuente*

*Amendments Dated January 4, 2011*

*Cecilia Crossley, Chairman*
*Bylaws Committee: Virginia Schilz, Cecelia Crossley, Brandi Mueller, Ken Craig, Shirley Johnson, Marge Ferrell, Eva Gonzales*



## STATESMAN SUBSCRIBERS

**Claim what's yours.**
Gain full access to digital products today.
statesman.com/AddDigital

## IN THE NEWS

### Remembering Pearl Harbor

Survivors are joined by 2,500 people at the site of the bombing by the Japanese in Hawaii that led the U.S. into WWII 72 years ago. **A5**

## NATION & WORLD

### Racial inequality still issue in South Africa

Post-Mandela, wealth and education gaps remain wide between blacks and whites. **A2**

## POLITIFACT

**Mostly False:** PolitiFact checks a statement by Lt. Gov. David Dewhurst about

---

Travis County District Attorney Rosemary Lehmberg goes on trial Monday, fighting for her job after a DWI.

# PROSECUTOR ON THE DEFENSE



JAY JANNER / AMERICAN-STATESMAN

**By Clara O'Rourke and Tony Plohetski**
corourke@statesman.com | tplohetski@statesman.com

Almost eight months ago, Travis County District Attorney Rosemary Lehmberg was caught driving drunk, beginning a public drama that has included unexpected twists and turns and political sideshows that have ...

RICARDO B. BRAZZIELL / AMERICAN-STATESMAN

**Travis County District Attorney Rosemary Lehmberg:** Pleaded guilty to driving while intoxicated and served jail time after ...

---

## STATESMAN INVESTIGATES GRANT FRAUD

# Chances to stop project blown

State, federal agencies were warned of flawed wind energy endeavor.

**By Eric Dexheimer and Ricardo Gándara**
edexheimer@statesman.com
rgandara@statesman.com

Convinced the wind energy company he worked for was about to receive hundreds of thousands of dollars in taxpayer money it didn't deserve, general operations manager Toby Miller alerted everyone he could think of.

He first notified the Travis County district attorney's office in early August 2010. He warned the U.S. Energy Department, whose renewable energy program was providing the money, on three separate occasions in August and September 2010, records show. He tipped off the city administrator in Jonestown, the small city on Lake Travis where the wind turbines were to be built, at the same time.

Miller, who also was (and still is) a Travis County sheriff's deputy, charged that his boss at CM Alternative Energies had lied on the compa-

# Jonestown

continued from A1

ny's application to win a nearly $2 million government grant to build wind turbines. He added that Charles Malouff had a close personal relationship with Mary Jo. Woodall, the state employee who was in charge of deciding which companies would get the public money — a connection that gave him a potentially illegal advantage in winning the government money.

Yet the Energy Department's investigation into Miller's allegations resulted in little action, documents show. After two months, it kicked Miller's complaint to the Texas attorney general's office. Four months after that, in February 2011, the state's top lawyer deflected it back to the Travis County district attorney.

That office's Public Integrity Unit, meanwhile, had been tied up with other demanding cases, notably the high-profile Tom DeLay and Kino Flores trials, which ran through late 2010. Holly Taylor, the assistant prosecutor who eventually took on the Malouff case, described Miller's complaint as "very raw."

"We did not aggressively pursue it at the time," she said. "We were swamped."

Prosecutors didn't start digging into Miller's concerns until the spring of 2011. By then, much of the $1.8 million in government money was out

earlier, before all the taxpayer money had been spent. Records suggest there were ample chances along the way for authorities to identify any deception on the project. All were ignored or missed.

"This could have been stopped before the grant was ever funded," Miller says today. "They had plenty of opportunities."

In addition to Miller's early warnings, court records assert that some of Woodall's colleagues at the Texas comptroller's office were aware of her relationship with Malouff. But no one apparently did anything to interrupt or further scrutinize the fact she was assisting an old friend with a grant application being reviewed by her department.

Later, officials missed still more chances to stop the money before it was all lost. Energy Department audits of the project raised no red flags. In mid-2011, when state-hired auditors paid a visit to Jonestown to check on the project's progress, documents show, they noted only minor deficiencies.

"If this was such a fraud," said Jacqueline Wood, Malouff's attorney, "they certainly were negligent in not finding it."

## Pressure to fund

The first opportunity to save the taxpayer money spent on Malouff's failed wind project might have been hampered by the government's efforts to stimulate the national



Mary Jo Woodall pleaded guilty Nov. 25 to misuse of information for assisting Charles Malouff with lying to acquire federal grant money to build wind turbines in Jonestown. DEBORAH CANNON / AMERICAN-STATESMAN



LINDA SCOTT / STAFF

installing solar panels on public buildings.

Priority was given to projects that could be built quickly — "shovel-ready" was the popular phrase — preferably in a year to 18 months. Malouff's 194-page grant application described his wind turbines as "readily deployable" and "commercially available."

money into the economy. "The stimulus grants were a push item," Taylor said. "There was a lot of pressure to push the funds out quickly."

The comptroller's committee of "program experts" that graded the renewable energy applications wasn't given the authority to review the technical feasibility of the projects described in applicants' paperwork. "They were not allowed to look beyond the assertions in the applications," Taylor said.

Robert Wood confirmed the comptroller's committee did no independent investigation of how likely a proposal was to succeed or fail when deciding whether to fund the projects. "We assumed the local officials

concerns.

A half-dozen of Woodall's colleagues, including supervisors, said they were aware the two had dated, were longtime friends and had attended wind energy conferences together, according to the defense filings. For a time, Woodall kept a photo of Malouff on her desk. One co-worker "admitted she recognized the conflict of interest between Malouff and Woodall and yet, as Woodall's manager, did nothing," the filing stated.

The court filings also claim several of the comptroller's office staffers attended presentations and conferences with the two describing the experimental nature of the technology Malouff was using. The comptroller's office even helped fund the development of the same turbines through another Energy Department grant.

"He didn't pull the wool over anyone's eyes," said Malouff's attorney, Jacqueline Wood. "Everybody knew about it."

Energy Department representatives audited the comptroller's office several times and gave it high marks for administering the grants. The reports show that, while they visited several sites to check up on individual projects, Jonestown wasn't one of them.

As the official applicant for the government grant money, Jonestown's elected officials also could have slowed or stopped the project be-

the project before any grant funds were paid." But, she wrote, the city learned about the fraud allegations only in October 2011, when Malouff was arrested.

Taylor said her office had to keep its investigation quiet. "We have to tread very, very carefully in these types of cases to avoid destruction of evidence," she said.

## Sold for scrap

Besides, Taylor added, one Jonestown official did receive early warnings about the project.

But he brushed them off. When Miller brought his concerns about Malouff to then-City Administrator Dan Dodson in a private August 2010 meeting, the top city bureaucrat dismissed them as not the city's problem. Even if the wind project failed, he said during a meeting that Miller secretly recorded, "There's nothing back on the city."

Later Dodson added: "To worry about the federal government pissing off a million and a half dollars to Jonestown, Texas, I'm not going to lose sleep over that."

Dodson resigned in 2012 and couldn't be reached for comment.

As the project continued, many in Jonestown seemed satisfied with the results. While prosecutors alleged Malouff improperly spent some grant money on motorcycle accessories and trips with Woodall, they also agreed he hired workers

of 2011. By then, much of the $1.8 million in government money was out the door and in Malouff's hands. A handful of incomplete wind turbines were erected before the wind toppled one and the city dismantled the others.

In August, a Travis County jury found Malouff, a former police officer, guilty of lying to acquire the grant money; he is appealing the conviction. Thanks to an earlier federal conviction on weapons charges, he was sentenced to 15 years in prison. On Nov. 25, Woodall pleaded guilty to misuse of information, a lesser charge, for assisting him. Her sentencing is set for Dec. 20.

Such cases are uncommon — by late 2011, the latest information available, the Energy Department reported only a half-dozen Recovery Act-related criminal prosecutions — and local prosecutors said they were pleased with the convictions. Yet a review of court and other public documents and interviews also raises questions about why the scheme wasn't caught

the government's efforts to stimulate the national economy.

The money Malouff pursued through Jonestown was part of the American Recovery and Reinvestment Act of 2009, a federal program designed to stimulate the sputtering economy by dispersing more than $700 billion. Federal officials say it created 4,000 jobs in Texas.

About $17 billion for renewable energy programs was given to the Energy Department, which sent a portion of that to states to spend locally. The Texas comptroller's office began accepting grant applications through its Distributed Renewable Energy Technology Program in 2010.

The program encouraged cities, counties and schools to seek federal money to build small alternative energy projects to help power local facilities. It ended up distributing nearly $70 million over three years, said Robert Wood, director of economic development and analysis for the comptroller's office. Most of the projects involved

wind turbines as "readily deployable" and "commercially available."

But that was a lie, Taylor said. Far from being shovel-ready, the technology Malouff proposed erecting in Jonestown was years away from producing meaningful levels of electricity.

"The product was still in the research and development phase," she said. "He never had a product he could install anywhere." Taylor said her office's investigation concluded that Malouff intended to use the grant money not to produce power for Jonestown, but to pay for additional testing and tweaking of the technology, which he would then later sell at a profit.

Malouff insisted his plan was closer to feasible than prosecutors claimed. In court filings, he produced a letter from a University of Texas professor who had worked on the unusual design — the wind turbine spun on a vertical axis rather than a horizontal one — describing the technology as having "significant potential for commercialization."

Yet officials were eager to inject the government

deciding whether to fund the projects. "We assumed the local officials were telling us the truth," he said. Jonestown's proposal for Malouff's company to build 18 wind turbines was approved by the state comptroller's office in November 2010.

## 'Everybody knew about it'

In retrospect, documents and interviews suggest that many of those in a position to slow down or interrupt the Jonestown wind project over ethical concerns and questions about its viability either missed signs or chose to ignore them.

In its affidavit in support of searching Malouff's and Woodall's homes, investigators suggested Malouff was receiving improper inside help on his application to the comptroller's office from Woodall, who was overseeing the energy grants for the state and who secretly was an old friend of his. But court filings from Malouff and Woodall respond that their relationship was well-known at the state comptroller's office, which didn't raise

elected officials also could have slowed or stopped the project before the money was gone. Yet many local officials seemed too excited by the prospect of introducing alternative energy to their city to rock the boat. "I was looking at the prospect of new jobs and energy savings," recalled Mayor Deane Armstrong.

City employees were also invested in the project — in some cases, literally. Alderman Lance Wedell was hired as CM Energy's director of marketing. Wedell, who said he recused himself from any official city action involving the company, later resigned; he didn't respond to requests for comment. Two other city employees were also on the payroll. Others performed on-the-clock work for the company as part of the Energy Department's requirement that applicants provide matching funds or in-kind help.

Even then, city officials later said they could have saved taxpayers some money if they'd known Travis County prosecutors were investigating Malouff. But in a 2012 letter, Jonestown's attorney said that Travis County prosecutors and the Energy Department never alerted them that the project was under a cloud, a communications gap she said resulted in the city continuing to write checks to Ma-

with Woodall, they also agreed he hired workers and spent the vast majority of the money on salaries and equipment.

In May 2011, the city held a dedication ceremony for the first wind turbine, a striking blue helix-shaped structure erected next to city hall. "We have to be innovative in finding a way to reduce the bills," Armstrong said. The turbine spun slowly in a light breeze. Officials said they expected to install five more in the coming weeks.

A month later, auditors hired by the state comptroller's office traveled to Jonestown to inspect progress on Malouff's wind project as part of the federal rules requiring periodic check-ups on American Recovery and Reinvestment Act projects. The team issued its final report on Sept. 27, 2011. It said that some invoices weren't properly documented, and "a meter observed on the Site Visit was labeled as being constructed in Mexico which is not compliant with the Buy American terms of the grant contract."

Police crashed into Malouff's and Woodall's homes two weeks later.

A spokeswoman for the comptroller's office said it was "working with the Office of the Attorney General to pursue recovery options." The city of Jonestown has filed a lawsuit to try to recover the

# Our ER is as big as Austin.

## St. David's Emergency Network

## Our ER is as big as Austin.
*St. David's Emergency Network*

Every year more than a quarter of a million people look to us in times of an emergency. We have convenient locations throughout Central Texas. Board-certified physicians. Life-saving technology. And a skilled nursing staff.

**St. David's is Austin's Emergency Support System.**

# S‡David's HEALTHCARE

StDavidsERnetwork.com

...es questions about why the scheme wasn't caught

...ment and analysis for the comptroller's office. Most of the projects involved

...ization."

Yet officials were eager to inject the government

ship was well-known at the state comptroller's office, which didn't raise

known Travis County prosecutors were investigating Malouff. But in a 2012 letter, Jonestown's attorney said that Travis County prosecutors and the Energy Department never alerted them that the project was under a cloud, a communications gap she said resulted in the city continuing to write checks to Ma-

terms of the grant contract."

Police crashed into Malouff's and Woodall homes two weeks later

A spokeswoman for the comptroller's offic said it was "working wi the Office of the Attorn General to pursue reco ery options." The city ( Jonestown has filed a l: suit to try to recover th

louff's company even as prosecutors were building a case against him.

"Had the city been made aware of the report of criminal activity back in August 2010, the city could have declined the grant," the letter from City Attorney Paige Saenz said. "Had the city been made aware of the criminal investigation before it submitted invoices for grant funds, the city could have stopped

lost money from Malouf however, officials concede the chances of success are slim.

The turbines were dismantled over liability fears, and what remains of them sits in a warehouse and an outdoor scrap pile. City Administrator Manuel De La Ros said he hopes to sell the parts for salvage.

Contact Eric Dexheimer at 512-445-1774

# Council races to be wild this fall

## Election by districts, more seats will mean many new candidates

By Sarah Coppola
scoppola@statesman.com

... considered running for the Austin City Council before, but he always ruled it out. ... waging a citywide campaign would be too costly, he reasoned. He also didn't know the movers and shakers — the political consultants and political clubs, usually from Central Austin, who help elect council candidates ...

But 2014 is a whole new ball game.

Eleven people will be elected to the Austin City Council this year, expanding the council by four. For the first time, every candidate except those for mayor will run in and represent a geographic area, or district, instead of the whole city. Most of the council's incumbents can't run again because of term limits. And the election will be ...

Elections continued on A4

Inside
A map shows the racial and ethnic breakdown of the population, district by district. A4

# Elections

continued from A1

In November, not May – attracting a larger, more diverse set of voters.

Those sweeping changes were approved by Austin voters in 2012, and they become reality this fall. It will be a messy but exhilarating election that could bring fresh faces and more diversity – including more Hispanics and at least one Republican – to the City Council.

Already, dozens of people have said they will run or are seriously considering it, including Thomas in District 10.

"It will truly be a local race in every district – a chance to represent neighbors you've worked with on so many issues," he said. "It will be transformational."

## Opening the door

The recipe for winning an Austin City Council seat used to be pretty clear-cut.

Have some experience at City Hall, maybe serving on a commission. Have some money you can invest in a run. Get recruited by or seek out one of the few political consultants who reliably win city races. Get yourself endorsed by Austin's public safety unions, business groups and some environmentalists. And be a friend of the neighborhoods in and near downtown whose residents vote in big numbers.

District-based campaigns will scramble most of that. For one

## City Council scramble

For the first time ever, 10 district-based representatives and a citywide mayor will be elected to the Austin City Council this November. District candidates will have to reach a much smaller number of registered voters than prior candidates, who had to run citywide.



Registered voters in each Austin City Council district. (Total: 479,660)

### Racial and ethnic breakdown

The numbers below show the percentages of white, black, Asian and Hispanic voting-age residents in each of the 10 City Council districts, according to the 2010 census. The numbers don't add up to 100 percent because residents were allowed to check more than one box for race and ethnicity.

| Dist. | White | Hispanic | African-American | Asian |
|---|---|---|---|---|
| | | | | |
| 2 | 58.9% | 62.8% | 8.9% | 1.6% |

One example: District 9 in Central Austin, in which council incumbents Chris Riley and Kathie Tovo both live and will likely run.

"Some districts have a large number of registered voters. You'll have to do a lot of targeted mail and grass-roots activity to reach them. Even though that's not buying TV, it's not cheap," Butts said.

And several consultants noted some possible downsides to district campaigns: candidates who are new to the process and less informed about city issues; a large, confusing set of candidates from which to choose; and runoffs that will happen during the holiday season – Dec. 16 – and attract very few voters.

## New groups could win

At the same time, the new districts system could open up City Hall to previously sidelined groups. For decades, a sort of unspoken rule has reserved one Austin City Council seat for a Hispanic candidate and one for an African-American. (Whites occasionally ran for those seats,

## WHAT HAPPENS NEXT

Several candidates have said they plan to run for City Council or are thinking about it. Candidates can begin raising money May 8 and can file to be on the ballot between July 21 and Aug. 18. Expect the campaigning to heat up in the fall as the Nov. 4 election approaches. In crowded races where no candidate gets a majority of the vote, the top two finishers go to a Dec. 16 runoff. After this year, races will be staggered so only half of the council seats are up for election at a time.

Travis County Republican P. "We have some exciting races and people involved in this process who have not been involved in many years."

## Honing the message

Candidates will still address citywide concerns such as transportation and affordability, but district-specific issues will dominate this year, said Nelson Linder, president of the Austin NAACP.

For example, he said, East Austin candidates are likely to talk about economic empowerment, police-community relations and the displacement of longtime, minority residents by high property taxes. Those issues could get lost in citywide races, he said.

Advocacy groups are already rethinking how to make their voices heard in district races. The Real Estate Council of Austin is forming teams of its members to track development issues in each district. "We plan to be heavily involved" in the fall races, president Ward Tisdale said.

Sources: Austin political consultants, Austin Independent Citizens Redistricting Commission

ROBERT CALZADA / STAFF

| | | | | |
|---|---|---|---|---|
| 4 | 57.1% | 59.2% | 10.5% | 3.5% |
| 6 | 76.8% | 13.8% | 4.6% | 12.0% |
| 8 | 83.6% | 16.1% | 2.4% | 7.7% |
| 10 | 86.2% | 8.7% | 1.8% | 8.2% |

Many of this year's 11 races already have more than five announced or seriously-thinking-about-it candidates.

They are a diverse bunch economically, ethnically and politically. Some are new to City Hall. Some have run and lost Austin council races before. Some have been in city politics for years but were intimidated by the prospect of a citywide run.

"It is really opening the door to a bigger, better pool of candidates jumping into the fray," said Steven Aleman, former president of the Austin Neighborhoods Council, an umbrella group for several neighborhood associations citywide. "We are bound to have candidates from areas south of the river and in Northwest Austin, which have not been represented before."

In the past, a few kingmaker consultants helped propel candidates into council seats. They knew the advocacy groups that make endorsements, the voters to target, and the issues that would galvanize voters.

Candidates also had to have enough personal wealth or connections to raise big sums of money to reach voters citywide. All but a few council members elected in recent decades have lived in a few ZIP codes in wealthy West Austin and Central Austin, the city's politically active core.

Under a districts system, candidates with money and good consultants will still have an edge. But they won't be a sure thing, said Peck Young, who runs a public policy program at Austin Community College.

"Candidates with modest incomes can draw on their long-time work and connections with neighborhood and civic groups," he said. And people from the far corners of Austin will run, energizing voters who have ignored prior council races, he said.

[illegible] who helped lead a coalition that pushed for district representation on the City Council. "People from all over – not just West Austin or downtown – can finally be viable candidates."

**'Hand-to-hand combat'**

Candidates will also target a much smaller pool of voters.

Running citywide, candidates had to reach 480,000 registered voters, which meant raising more than $150,000 for campaign costs, including TV ads.

The new districts each have only 27,000 to 62,000 registered voters. Small enough that candidates can focus on cheaper campaign tactics such as attending neighborhood meetings, knocking on doors and sending out mailers, political consultant Mark Littlefield said.

"It will be more hand-to-hand combat, more door-to-door," said Littlefield, who has worked on prior council races. "It will be more about candidates who know the most people in the district."

"Money won't disappear entirely from city races," said longtime Austin political consultant David Butts.

Political action committees – groups that independently campaign and raise money for certain candidates – will be more active this year, he said. Candidates in poorer districts might not be able to raise much money from friends or neighbors, but PACs could pull in money from other parts of town, he said. PACs also might seek influence by backing slates of candidates in a crowded field, he said.

Races that grow heated or are based in politically active areas could still be expensive, he said.

Historically, white power brokers chose and helped elect minority candidates who weren't always the preferred candidates of black and Hispanic neighborhoods, said Paul Saldana, once the chief of staff to former Mayor Gus Garcia.

That could change this year. To comply with the Voting Rights Act, the commission that drew Austin's 10 new council districts had to draw a few districts with large numbers of black and Hispanic voters, to fit Austin's demographics and give minorities a chance to elect candidates they prefer.

"Hispanics will get two, three, maybe four council seats this year and we'll finally get a Latina on the City Council," said Paul Saldana, who owns an Austin public affairs firm.

Another group that could finally have a shot is Republicans – or, at least, candidates with a conservative bent.

City Council races are nonpartisan, but for several decades, most council candidates have been Democrats, reflecting the liberal leanings of Central Austin, the most potent voting bloc.

This year, District 8 in Southwest Austin and Districts 6 and 10 in Northwest Austin have enough Republican voters to potentially elect a Republican.

"In the past, there were very few council candidates espousing even semi-conservative philosophies," said Roger Borgelt, vice chairman of the ra Club chapter said that group will still endorse candidates, as it had in the past, and focus time and volunteers on every district.

Environmental issues "don't stop at a district boundary," he said. "We'll have to broaden our political committees and have a better ground presence in each area."

The timing of the election will also make a difference.

Prior council races were held in May and tended to draw less than 10 percent of Austin's 480,000 registered voters.

This year, all 11 City Council races will be held in November on a ballot packed with local, state and federal races, including a high-profile governor's race.

A larger number of voters – as many as 200,000 – who are younger, more diverse and don't normally vote in May races will show up to the polls, said Mark Nathan, a longtime Austin political consultant and former chief of staff to Mayor Lee Leffingwell.

That is why it will be especially important for candidates to talk to voters one-on-one, he said.

"People who have strong relationships at the grass-roots level will have a chance of competing for a council seat," he said. "I'd love to see the idea validated, that you can win a race like that with a lot of shoe leather and less money."

Contact Sarah Coppola at 512-912-2939.



MY Wind ENErgy System in
Taylor, TX

# Lehmberg: Perry's cuts 'partisan'



Travis County District Attorney Rosemary Lehmberg and Travis County commissioners on Tuesday discuss Gov. Rick Perry's $3.7 million cut to the Public Integrity Unit. This was Lehmberg's first public appearance since being released from jail May 9 after her DWI conviction. Story, B1 LAURA SKELDING / AMERICAN-STATESMAN

---

WED JUNE 19, 2013

# Lehmberg, commissioners talk about budget cuts



Travis County District Attorney Rosemary Lehmberg talks briefly with reporters Tuesday after meeting with county commissioners. She again said she won't resign over her DWI conviction. LAURA SKELDING / AMERICAN-STATESMAN

**With 'misguided' veto drying out funding by Aug. 31, officials discuss ways to keep unit going.**

By Farzad Mashhood
fmashhood@statesman.com

Travis County District Attorney Rosemary Lehmberg made her first public comments Tuesday about Gov. Rick Perry's move Friday to cut about $3.7 million in annual funding to her office.

"It feels partisan, and it's misguided, as far as I'm concerned," Lehmberg said in a brief interview with reporters after addressing county commissioners for about 45 min-utes Tuesday morning.

Lehmberg appeared before the commissioners to talk about Perry's line-item veto in her first public appearance since being released from jail May 9 after a drunken driving conviction in April. Perry had pledged last week to cut the unit's funding if Lehmberg did not resign.

Gerald Daugherty, the commission's lone Republican and the only member to have publicly called for Lehmberg's resignation, was absent from Tuesday's meeting. In a phone interview, Daugherty said: "I am not going to get pushed into a corner as a commis-

**Unit** continued on B3

# Taxpayers could get unit tab

## Unit
Continued from B1

sioner to fund the Public Integrity Unit, because that is not the responsibility of the Commissioners Court. ... I am not going to put that on the backs of the taxpayers of Travis County."

The Public Integrity Unit, a department of the district attorney's office, has been funded by the state since 1982 and prosecutes state corruption crimes committed in Travis County as well as some tax and insurance fraud committed statewide. The unit has 34 employees, and the state funding pays their salaries, as well as other costs. This year's state funding will run out Aug. 31.

Speaking with reporters, Lehmberg refused to answer questions about anything other than the unit and said again that she will not resign.

County commissioners discussed options to keep the unit running but took no action. County Judge Sam Biscoe said he expects to bring the issue back to the commissioners in two weeks to take action, which might include using county taxpayer funds to pay for the department. Commissioners were not optimistic about the Legislature finding another way to fund the unit, despite Rep. Sylvester Turner, D-Houston, saying Monday that he would work to make sure the unit gets the money it needs to operate.

"Without some extraordinary effort, state funding has disappeared for the next biennium ... and the future of the Public Integrity office depends on Travis County," Biscoe said.

> ## 'It's a financial surprise to all of us taxpayers who have to foot the bill.'
>
> **Commissioner Ron Davis,** discussing cuts to unit

Read previous coverage of Rosemary Lehmberg with this story at statesman.com.

Of the roughly 400 cases pending for the unit, about 280 can only be prosecuted in Travis County, officials said. Despite the funding cut, Lehmberg said her office still has the responsibility to prosecute those cases. Commissioner Margaret Gómez equated Perry's cut to an unfunded mandate, leaving local taxpayers with the responsibility to pay for a statewide office.

"This is an unfortunate situation we have to consider..... It's a financial surprise to all of us taxpayers who have to foot the bill," Commissioner Ron Davis said.

If the commissioners fund the entire $3.7 million for the unit this year, that would cost the owner of a $200,000 home about $7.60 in property taxes. County taxpayers already fund the district attorney's $17.5 million budget.

Contact Farzad Mashhood at 512-445-3972.

# Austin American-Statesman

Saturday, June 15, 2013     Real Austin. Real News.     Breaking news at statesman.com

## IN THE NEWS

### U.S. House passes $638 billion bill to fund defense

The Republican-led House ignores White House veto threats and approves the measure, which would also block President Barack Obama from closing the U.S. detention facility in Guantanamo Bay and restrict his efforts to reduce America's nuclear stockpile. **A2**

## NATION & WORLD

### Ex-Florida governor defends immigrants

During his speech at the Faith and Freedom Coalition's annual conference, former Florida Gov. Jeb Bush says the future of the nation's economy depends on immigrants because they are more fertile and create more businesses than natives. **A2**

**Newtown massacre:** The Connecticut town marks six months since the gun violence that claimed 26 lives at Sandy Hook Elementary School. **A2**

**Wildfire:** Firefighters deploy le med huge

---

## STATESMAN CAPITOL WATCH: VETOES

# Perry largely spares budget

## He vetoes 24 of 1,437 bills, picking off guns in schools and equal pay provisions for women.

**By Kate Alexander**
kalexander@statesman.com

Gov. Rick Perry on Friday picked off a few high-profile bills relating to higher education oversight, guns in schools and equal pay provisions but otherwise exercised a light touch with his veto pen.

In advance of Sunday's veto deadline, Perry released a roster of 24 bills that he had struck down from among the 1,437 that reached his desk. Before Friday, Perry had vetoed two bills.

The 2014-15 budget, which totals $197 billion in state and federal funds, escaped largely unscathed despite criticism

**Vetoes** continued on **A13**

---

### GOVERNOR'S VETOES

Gov. Rick Perry vetoed 24 bills Friday and eliminated individual items within the budget bills. The vetoes include:

- $29 million in general revenue spending, mostly for higher education projects.
- $325 million in bonding authority to construct two state office buildings. It would have been the first construction in the Capitol complex since 2000.
- Constraints on oversight from boards of regents of the state's university systems.
- Limits on sugary drinks in public schools, which Perry said would restrict access to such innocuous beverages as 2 percent milk.
- Exemptions from state assessments and accountability for certain high-performing school districts.

**More inside**
- Senate OKs boundaries in court-drawn redistricting maps. **B1**

---

## ETHICS

# Perry vetoes funding of Lehmberg-led unit

## Governor makes good on vow to cut Public Integrity's state funds if DA did not resign.

**By Mike Ward**
mward@statesman.com

Making good on a promise, Gov. Rick Perry on Friday halted funding for the state ethics enforcement office after Travis County District Attorney Rosemary Lehmberg did not heed his call to resign because of her drunken driving conviction.

Perry's decision to veto the Public Integrity Unit's $7.5 million, two-year allocation

### Hit-and-run probe suspended
- Sheriff's office: Lehmberg not linked to hit-and-run. **A5**

Get more coverage of the Legislature at **statesman. com/virtualcapitol.**

from the state budget means that more than 30 prosecutors, investigators and support staffers could be out of work come Sept. 1, unless Travis County officials decide to pay for their salaries and related costs.

The fate of the unit's 400 pending cases and investi-

**Integrity** continued on **A5**

# Current probes thrown in doubt

## Integrity
Continued from A1

gations – from a politically charged inquiry into multimillion-dollar grant irregularities at the Austin-based Cancer Prevention and Research Institute of Texas to an appeal of the campaign finance conviction of former U.S. House Majority Leader Tom DeLay – is in doubt as well. The unit also prosecutes motor fuels tax and insurance fraud cases.

"Despite the otherwise good work (of) the Public Integrity Unit's employees, I cannot in good conscience support continued state funding for an office with statewide jurisdiction at a time when the person charged with ultimate responsibility of that unit has lost the public's confidence," Perry said in his veto message.

"This unit is in no other way held accountable to state taxpayers, except through the state budgetary process. I therefore object to and disapprove of this appropriation."

Perry on Friday also vetoed a series of reforms for the Texas Ethics Commission that had widespread legislative support, including a ban on Railroad Commission members running for higher office unless they resigned first. Perry said in his veto message that such a change should be sent to the voters for approval, not simply enacted by the Legislature.

Gregg Cox, head of the Public Integrity Unit, said he was disappointed by Perry's decision to veto the unit's state funding. The heads of two government watchdog groups – Craig McDonald of Texans for Public Justice and Tom Smith of Public Citizen – blasted Perry's decision.

"This is a Friday night massacre," McDonald said. "Perry's office is like an ethical black hole. Good reform goes in, but nothing good comes out."

Friday's late evening veto capped a day of drama over the veto threat. Earlier Friday, Texans for Public Justice filed complaints seeking an investigation into whether Perry's veto pledge violated several laws – abuse of office, coercion of a public servant, official oppression and even the state bribery law.

"Threatening to take an official action against her office unless she voluntarily resigns is likely illegal," said McDonald, a longtime Perry critic. "It's no surprise he wants to wipe out the unit that's currently investigating corruption in at least one of the governor's signature corporate subsidy programs."

"The governor overstepped his authority by sticking his nose in Travis

## 'Perry's office is like an ethical black hole. Good reform goes in, but nothing good comes out.'

**Craig McDonald,**
Texans for Public Justice

County's business," said McDonald, noting that Lehmberg is the subject of a removal petition that is working its way through the courts.

Lehmberg could not be reached for comment, but Cox said the complaint would be looked into by either Travis County Attorney David Escamilla or prosecutors in a neighboring county. "It's clear it would not be appropriate for us to have any role in this," Cox said.

Lehmberg, 63, whose drunken driving arrest prompted widespread criticism at the state Capitol among Republican leaders, said after her arrest and conviction (she pleaded guilty and received a 45-day jail sentence) that she had no plans to resign. She is a Democrat, and had she resigned, Perry, a Republican, would have appointed her replacement.

Lehmberg has not commented publicly about Perry's veto pledge. Perry suggested this week that Travis County could choose to continue funding the unit if county officials think the work is important.

Legal experts and legislative leaders familiar with state ethics laws said Friday they doubted that Texans for Public Justice's complaint would stick and said the filing would just add drama to the political theater that

has been playing out since shortly after Lehmberg's April 12 arrest and the release of video from her field sobriety test and jailhouse booking.

In a separate development Friday, the Travis County sheriff's office announced that no evidence ties Lehmberg to a hit-and-run accident that occurred near the scene of her arrest and that the investigation into that incident has been suspended.

Contact Mike Ward at 512-474-2791. Twitter: @mikestatesman

P2

METRO & STATE, B1
**Safer weekend: What plans are afoot to make biker rally safe**

LIFE & ARTS, D1
**The generalist: How Alcalde editor appeals to all alumni**



BUSINESS, B5
**Refreshed: What new things did Apple unveil?**

YOUR WEATHER, B8

**Today**
Mostly sunny, warm and muggy. 96/74
Wednesday: Mostly sunny. 97/75
Thursday: Mostly sunny. 98/75
Friday: Mostly sunny. 99/75
Saturday: Mostly sunny. 100/75

$1.00

# Austin American-Statesman

Tuesday, June 11, 2013      Real Austin. Real News.      Breaking news at statesman.com

## IN THE NEWS

**Half-trillion-dollar farm bill passes Senate in 66–27 vote**

The five-year measure, called the most significant reforms to agriculture programs in decades, expands government subsidies for crop insurance, rice and peanuts while making small cuts to food stamps. It will reportedly save about $2.4 billion a year on farm and nutrition programs. A2

## NATION & WORLD

**South Africans urge prayers for Mandela**

Nelson Mandela, 94, remains in intensive care on the third day of his fourth hospitalization for a recurring lung infection since late last year. Appeals from President Jacob Zuma for prayers stir concern. A3

**STATESMAN EXCLUSIVE: POLITICS**

# Perry pushing Lehmberg to quit

**Officials say he's vowing to veto funding for the state's ethics unit if she doesn't resign.**

By Mike Ward
mward@statesman.com

Gov. Rick Perry is vowing to veto funding for the state's Austin-based ethics-enforcement unit unless Travis County District Attorney Rosemary Lehmberg resigns, officials confirmed Monday.

Perry has until Sunday to veto bills passed by the Leg-

islature during its regular session that ended in May, including the state budget that contains about $7.5 million to fund the Public Integrity Unit for the next two years.

The officials confirmed that Perry intends to exercise his line-item veto on the appropriation for the unit unless Lehmberg steps down in the wake of a drunken driving charge, something she has steadfastly refused to do so far. She pleaded guilty after her April 12 arrest in northern Travis County, served a 45-day jail sentence and entered a treat-

ment program.

While Perry's office would not discuss specifics, spokesman Rich Parsons said, "we're going through the budget line by line. (The governor) has very deep concerns about the integrity of the Public Integrity Unit."

Asked whether Lehmberg has been advised of Perry's veto intentions, Parsons would say only that "our position has been communicated very clearly today to Sen. (Kirk) Watson."

Watson, D-Austin, called it "very unfortunate if the gov-


**Rosemary Lehmberg spent 45 days in jail and entered treatment after her DWI.**

ernor is going to do this."

"If he does, this should be Rosemary's decision," he said. "If she decides to (resign), I will do whatever I can to make sure whoever might replace her represents the interests of Travis County."

As the senator who rep-

**Lehmberg** continued on A4

*June 12, 2013*

**NEW DETAILS:**
LEHMBERG

# Officials: Perry imperils justice

## CPRIT, other ethics investigations could be stalled by funding veto he threatens in DA case.

**By Mike Ward,**
**and Ciara O'Rourke**
mward@statesman.com
corourke@statesman.com

If Gov. Rick Perry makes good on his promise to veto state funding for the Public Integrity Unit unless Travis County District Attorney Rosemary Lehmberg resigns, a variety of high-profile investigations could be derailed, officials said Tuesday.

Among the more than 400 cases that could be affected: the investigation of accusations that the Cancer Prevention and Research Institute of Texas mishandled $56 million in grants, the prosecution of grant fraud charges involving a Jonestown wind turbine project and accusations of contract-steering against a former high-level official at the Texas Department of Public Safety.

Even the pending appeal of former U.S. House Majority

**Perry** continued on **A9**

INSID

the department will drop ... was met with praise from ... to suspend the ca ...

# Unit slated to receive $7.5 million over 2 years

## Lehmberg
Continued from A1

resents most of Austin, Watson has some sway over whom Perry would appoint to replace Lehmberg, should she resign. Her term ends in 2014, and Perry could appoint a replacement quickly and call a special election later this year.

Lehmberg could not be reached for comment, though she has said several times previously that she had no plans to resign. She is expected to return to work this week, officials said Monday.

Since her arrest and conviction, partisan scuffling has continued on her job status. A Republican-led petition drive to force her ouster has failed so far, and Democrats have been pushing hard for her to stay in office — since Perry is a conservative Republican and Lehmberg is a Democrat.

Lehmberg, 63, was arrested for drunken driving by Travis County deputies after they responded to a report that a Lexus sedan was driving erratically near RM 2222 and FM 620.

Deputies found a bottle of vodka on the passenger seat of her car, and an analysis of a blood sample later showed her blood-alcohol level was nearly three times the legal limit for driving.

She subsequently pleaded guilty to a first offense, and in addition to the jail time, she paid a $4,000 fine and had her driver's license revoked for 180 days — punishment that her attorney David Sheppard called "the harshest sentence anybody has ever received for a first offense

for a DWI in the history of this county."

Her travails were the subject of several unsuccessful attempts by some Republican leaders in the Texas House to cut funding to the Public Integrity Unit or to transfer its operations to the Attorney General's Office. They insisted that her arrest and conviction were more than enough reason she should not continue serving as the district attorney in Texas' capital city.

According to the proposed budget, the Public Integrity Unit is slated to receive about $3.7 million in state funding in the 2014 fiscal year and $3.8 million in 2015. That pays for more than 30 employees who at present have more than 400 active cases, ranging from motor-fuels tax fraud to ethics enforcement.

It wasn't clear who would prosecute those types of cases in the future or what would happen to pending cases if Perry vetoes the state funding. Over the years, the Public Integrity Unit has prosecuted a variety of public officials, including lawmakers and statewide elected officials.

It also receives about $14 million in funding from Travis County for items such as office space, computer servers and other costs, though Gregg Cox, the unit's director, said that money does not pay for personnel.

Former Travis County Attorney Ken Oden, a friend of Lehmberg's, said Perry's apparent veto threat "gets into very dicey territory" of making an untoward demand on an elected official. He also said it would not remove the authority of Lehmberg's office to investigate official wrongdoing.

Contact Mike Ward at 512-474-2791. Twitter: @mikestatesman



# DONATE YOUR CAR

## Wheels For Wishes

Benefiting

MAKE·A·WISH.

Central and South Texas

*Free Vehicle Pickup ANYWHERE
*We Accept All Vehicles Running or Not
*We Also Accept Boats, Motorcycles & RVs
*Fully Tax Deductible

*Share the Power of a Wish*

WheelsForWishes.org
Call: (512) 687-9155



ROLEX

OYSTER PERPETUAL DEEPSEA

*Cristiani's*

JEWELERS

512-263-8441 • Lakeway Commons • 620 at Lakeway Blvd • Austin, TX

OFFICIAL ROLEX JEWELER

ROLEX ♔ OYSTER PERPETUAL AND DEEPSEA ARE TRADEMARKS.

Monday July 8, 2013



Austin American-Statesman · Rea

**News:** communitynews@statesman.co

## TRAVIS COUNTY

## Public Integrity Unit funding requested

Travis County commissioners on Tuesday unanimously approved a resolution asking the Legislature to restore funding to District Attorney's Public Integrity Unit.

State Rep. Sylvester Turner, D-Houston, filed a bill July 1 that could override Gov. Rick Perry's recent veto of $7.5 million for the unit over the next two years. Perry had threatened to cut the funding if District Attorney Rosemary Lehmberg didn't resign following her drunken driving arrest and conviction in April.

Commissioners and Lehmberg have derided the veto for the past month, but this is the first official county stance on it. Gerald Daugherty, the lone Republican commissioner and only one to call for Lehmberg to resign, was absent from Tuesday's meeting.

The Public Integrity Unit handles high-profile public corruption cases, typically involving state politicians, but the vast majority of its work is prosecuting white collar tax and insurance fraud cases around the state. Without state funding, the 34 employees in the unit would be laid off or the county would have to find another way to pay for it.

— FARZAD MASHHOOD, AMERICAN-STATESMAN STAFF

CASE No. D-1-DC-13-904021    COUNT I
INCIDENT NO./TRN: 9074133967
NUNC PRO TUNC

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 299TH DISTRICT |
| | § | |
| V. | § | COURT |
| | § | |
| CHARLES ANTHONY MALOUFF JR. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| STATE ID No.: TX08928360 | § | |

Filed in The District Court of Travis County, Texas OCT 18 2013 At 11:15 M Amalia Rodriguez-Mendoza, Clerk

## JUDGMENT OF CONVICTION BY JURY

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. KAREN SAGE | Date Judgment Entered: | 9/24/2013 |
| Attorney for State: | HOLLY TAYLOR | Attorney for Defendant: | JACKIE WOOD |

Offense for which Defendant Convicted:
**SECURING EXECUTING A DOCUMENT BY DECEPTION/ENHANCED**

| | |
|---|---|
| Charging Instrument: **INDICTMENT** | Statute for Offense: **32.46(b)(7) Penal Code** |

Date of Offense:
**11/30/2010**

| | |
|---|---|
| Degree of Offense: **1ST DEGREE FELONY** | Plea to Offense: **NOT GUILTY** |
| Verdict of Jury: **GUILTY** | Findings on Deadly Weapon: **N/A** |
| Plea to 1st Enhancement Paragraph: **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: **N/A** |
| Findings on 1st Enhancement Paragraph: **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: **N/A** |

| | | |
|---|---|---|
| Punished Assessed by: **COURT** | Date Sentence Imposed: **9/24/2013** | Date Sentence to Commence: **9/24/2013** |

2013 OCT 23 PM 12: 18

| | |
|---|---|
| Punishment and Place of Confinement: | FIFTEEN (15)YEARS INSTITUTIONAL DIVISION TDCJ: SAID SENTENCE TO BEGIN DECMEMBER 27,2012 AND TO RUN CONCURRENT WITH CAUSE # 4:06CR00237-001 IN THE US DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS OFFENSE: UNLAWFUL TRANSFER OF A FIREARM STATUE: 26 U.S.C. SEC. 5812, 5861 (e), &5871 ; HE WAS SENTENCED TO THREE (3) YEARS PROBATION IN JANUARY 8, 2007; INSTITUTIONAL DIVISION, TDCJ⟹ *THIS IS FALSE!!!!* |

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: $ N/A | Court Costs: $ 299.00 | Restitution: $ | Restitution Payable to: ☐ VICTIM (see below) ☐ AGENCY/AGENT (see below) |
|---|---|---|---|

☒ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A** .

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

| Time Credited: | From 12/27/2012 to 9/24/2013   From   to   From   to | | |
|---|---|---|---|
| | From   to   From   to   From   to | | |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

**N/A DAYS   NOTES: N/A**

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Travis County, Texas. The State appeared by her District Attorney.

Counsel / Waiver of Counsel (select one)

☒ Defendant appeared in person with Counsel.

# *Charles A. Malouff, Jr., (Ret. M.P.O., M.B.O).*

P.O. Box 118

Cedar Park, Texas 78630

*(512)796-7000*          .charlie@cmenergies.com

## SUMMARY

Chief Executive Officer responsible for management and corporate development and implementation of domestic and international Alternative Energy programs in the United States and Mexico. Domestic and International Patents holder of CM Energies' Vertical Axis Wind Energy System. Honorably Retired Chief of Police and Emergency Services Specialist with over 29 years of diverse experience and background that encompasses law enforcement, maritime and military law, counter-terrorism, education, management, and international private business services. Proven performance in leadership, management, highly advanced investigations and examinations of violations of law including Maritime laws, contract negotiations, research, strategic planning, development, quality assurance, general and specialized presentations, presentation and evaluation of commercial and specialized products and training.

**Key skills include:**

- Experience in corporate upper-level management
- Experience in international business development
- Experience in successful NEPA Environmental Assessments and Environmental Impact Studies related to wind energy projects
- Experience in upper-level management in state, county and municipal law enforcement
- Over 20 years supervisory and management experience
- Over 10 years experience in successful grant writing
- Senior Sea Marshal, U.S. Coast Guard, Port of Houston
- Supervisory Reservist, U.S. Coast Guard, Special Missions Team, Galveston
- Executive Board Member and multiple term Vice-President South Region, Texas Narcotic Officers Association
- Graduate Chief's Developmental Program Series I-II-LEMIT
- Graduate of the Coast Guard Maritime Law Enforcement Boarding Officers School (Leadership and Command Course) with more than 29 years law enforcement experience
- Instructor certification and experience in numerous areas, including financial crimes, grant writing, identity theft, field training, firearms, cultural diversity, maritime interdiction, counter-terrorism, organized crime, defensive tactics/less lethal and impact weapons
- Completed training and demonstrated experience in US Department of Labor Facilitation Management
- Experience in strategic planning involving multi jurisdictions and geographic areas
- Experience in training coordination, planning, development, delivery and evaluation
- Experience in budget development and fiscal responsibility
- Experience in commercial/military sales, business management, and multi-organizational research and development
- Extensive experience in emergency services, dealing with crisis situations regularly
- Extensive experience in Organized Crime, Public Integrity, Fraud and other Criminal Investigations
- Key coordinator between Coast Guard and civilian law enforcement agencies
- Experience with FBI Joint Terrorism Task Forces, US Attorney Anti-Terrorism Task Forces
- 10 year Guest Lecturer Criminal Justice Department Advanced Criminal Investigations Texas State University

**Awards and Achievements**

Honorably Retired Chief of Police. Master Peace Officer. Silver Star for Gallantry. Purple Heart. U. S. Air Force Outstanding Unit Award, Presidential Citation, assigned to dignitary protection detail for Shah of Iran, 1979. U.S. Coast Guard Commandants Letter of Commendation, for investigating and identifying Eastern Bloc foreign operative (Russian Spy) operating in Port of Houston. Coast Guard Commendation Medal (2). U.S. Coast Guard District 9 Life Saving Award. Command Letter of Appreciation for performance during Counter-Smuggling operations, U.S.-Canadian Border. Graduate of Law Enforcement Management Institute of Texas, Chief's Development Program Series I and II. Graduate of the Coast Guard Maritime Law Enforcement Boarding Officers School. Over 3,150 hours TCLEOSE recognized training, and 160 college credit hours, Majoring in Criminal Justice. Participant-Operation Iraqi Freedom. Participant-Operation Enduring Freedom. Senior Enlisted Supervisor, Physical Security Team, Coast Guard Special Missions Team, MSST 91104. Boarding Team Supervisor. First Sea Marshal, Port of Houston. Senior Sea Marshal Port of Houston. Outside Agency Coordinator. Member U.S. Attorney's Office Anti-Terrorist Task Force. Member FBI Joint Terrorism Task Force (JTTF). Rewrote Coast Guard Tactical Operations and Defensive Tactics-Post 911. Other pre-911 duties included Maritime Investigations, MSO Houston. Responsible for closing 163 out of 166 narcotic cases against mariners between 1999 and 2000. Staff Member, Planning Division MSO Houston. Developed USCG Gulf Coast Hurricane Planning Committee Operations Plan For Regional Gulf Coast Area Emergency Operations 2000. Created and developed initial Strategic Threat Assessment Against the Port of Houston 2000-2001. Multi-Agency (Federal, State and local) Coordinator for 1122 and 1033 Programs (1988-2005). TCLEOSE Law Enforcement Instructor. Specialized instruction in Organized Crime, Money Laundering, Identity Theft, Narcotics, Terrorism, Undercover Operations, Ballistic Shield Tactics. Recognized expert in ballistic materials and applications. Maritime Law Enforcement Boarding Officer-Instructor. Master Instructor, Precision Ordnance Products, including Less Lethal and Explosive devices. ASP Instructor. Tactical Training Instructor. Advanced FBI Firearms Instructor. TCLEOSE Firearms Instructor. NRA Police Firearms Instructor. Personal Protection Instructor. Home Firearms Responsibility Instructor experienced in static and dynamic firearms training. ASP Baton Instructor. OC Chemical Restraint Instructor. Less Lethal and Explosive Devices Instructor. Defensive Tactics Instructor. Guest Lecturer to Southwest Texas State University Criminal Justice Division on "Conspiracy, the Making of an Organized Crime" (1997-2005). Guest Instructor Texas Hispanic Peace Officers Association 2005. Texas Municipal Police Association Member (2003- ). Staff Instructor, Cypress Creek Advanced Tactical Team Tactical Emergency Medical Services Training Unit (CCATT/TEMS), Houston, Texas (2000-2005). Member U. S. Attorney's Anti-Terrorism Task Force. Vice-President, South Region, Texas Narcotic Officers Association (2005-2006). Vice-President, South Region, Texas Narcotic Officers Association (2004-2005). Regional Director, South Region, Texas Narcotic Officers Association (2002-2004). Training Coordinator, South Region, Texas Narcotic Officers Association (2001-2002), Member, Texas Narcotic Officers Association (1997-2006), Assigned to dignitary protection details for Pope Paul, and President Reagan. Analyzed, developed, and published three-part article on tactical vehicle assaults published in Command Magazine 1998. Published article on Ballistic Shield Usage in Command Magazine 1996. Presented Special Confidential Report(Organized Crime and Money Laundering) to the Treasurer, State of Texas, 1990. Lead Agent in coordination, development, and operation of multi-agency Organized Crime Task Force in Fort Worth area, 1991-92. Created and developed Confrontation Management Course instructing in traditional Riot Control, and Confrontation Management techniques

*I-2*

and Field Force Options for the Director of Criminal Justice Division, Lamar University, Beaumont, Texas. One of five civilian tactical instructors invited by U.S. Air Force Security Police to participate as staff instructors in "Urban Tactics" (advanced SWAT) Course at Fort Dix, New Jersey. Former faculty member of "Top Gun" Investigation and Prosecution of Drug Cases, Sea Girt, New Jersey. Former member of U.S. Air Force's first Anti-Terrorist Tactical Neutralization Team. Former member of American Society of Law Enforcement Trainers (A.S.L.E.T.). Former member of National Rifle Association (N.R.A.). One of two participants in review and modification of Chapters 154 and 155, Texas Tax Code resulting in Legislative changes directed toward black market of cigarettes, 1990. Former representative to FBI's Central Texas Terrorist Working Group. Former member, Dallas/Fort Worth Retail Merchants Security Association. Former alternate member of Regional Organized Crime Information Center. Former member, Texas District and County Attorneys Association. Former member, Combined Law Enforcement Association of Texas.

Vietnam Era Veteran.

**Amalia Rodriguez-Mendoza**  *Copy*
**Travis County District Clerk**
**Travis County Courthouse Complex**
**P.O. Box 679003**
**Austin, Texas 78767-9004**



November 20, 2014

Charles Anthony Malouff Jr
TDC#0892836
F. C. I #66089179
P. O. Box 1010
Bastrop, Texas 78602

Re: D-1-DC-13-904021-A

THE STATE OF TEXAS VS. Charles Anthony Malouff Jr.

DEAR SIR OR MADAM:

{ } YOUR REQUEST FOR COPIES IN THE ABOVE CASE(S) HAS BEEN RECEIVED. COST FOR COPIES ARE
_____ AND WE WILL FORWARD YOUR COPIES UPON RECEIPT OF _____, FOR TOTAL
COST. PLEASE MAKE CHECK PAYABLE TO AMALIA RODRIGUEZ-MENDOZA, DISTRICT CLERK OF TRAVIS
COUNTY, TEXAS.

{ } YOUR REQUEST FOR THE TRANSCIPT OF YOUR CRIMINAL PROCEEDING(S) HAS BEEN RECEIVED. YOU ARE
HEREBY ADVISED THAT IT WILL BE NECESSARY FOR YOU TO CONTACT THE OFFICAL COURT REPORTER OF
THE     DISTRICT COURT AT PO BOX 1748, AUSTIN, TEXAS 78767. HE/SHE CAN DISCUSS HIS/HER COURT
COST AND PAYMENT PROCEDURE WITH YOU CONCERNING A TRANSCRIPT.

{ X } ATTACHED ARE COPIES REGARDING YOUR APPLICATION FOR POST CONVICTION WRIT OF HABEAS
CORPUS:
_____ ORDER DESIGNATING ISSUES
_____ AFFIDAVIT IN RESPONSE TO APPLICATION FOR WRIT OF HABEAS CORPUS
_____ STATE'S ORIGINAL ANSWER
__x_ FINDINGS OF FACT, RECOMMENDATION, AND ORDER TO
TRANSMIT HABEAS CORPUS RECORD (POST CONVICTION APPLICATION)
_____ ORDER TO TRANSMIT
_____ OTHER:

{ } YOUR REQUEST IS BEING RETURNED, AS WE ARE UNABLE TO DETERMINE, WITH UNCERTAINTY, WHAT
YOU ARE ASKING. PLEASE BE MORE SPECIFIC AS TO YOUR NEEDS.

RESPECTFULLY,
AMALIA RODRIGUEZ MENDOZA
DISTRICT CLERK OF TRAVIS COUNTY, TEXAS

Copy

NO. D-1-DC-13-904021-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 299TH JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CHARLES A MALOUFF, JR. | § | TRAVIS COUNTY, TEXAS |

## FINDINGS OF FACT, RECOMMENDATION, AND ORDER TO TRANSMIT HABEAS CORPUS RECORD (POST CONVICTION APPLICATION)

ON THIS 19th day of November, 2014, came on to be considered the Application for Writ of Habeas Corpus in the above cause. The court makes the following findings of fact and conclusions of law.

1. A jury found applicant guilty of securing execution of a document by deception. The court assessed punishment at confinement for fifteen years. Sentence was imposed September 24, 2013.

2. Applicant's appeal is still pending. Counsel filed an brief for applicant on November 11, 2014. No. 03-13-723-CR.

3. This application was filed November 3, 2014, and must be dismissed because the appeal is still pending.

On the basis of the above findings and conclusions the court recommends that the application be DISMISSED because applicant's appeal is still pending.

The court hereby ORDERS that the District Clerk of Travis County prepare and transmit the record herein to the Court of Criminal Appeals.

JUDGE PRESIDING

Filed in The District Court
of Travis County, Texas

NOV 20 2014
At 3:00 P M.
Amalia Rodriguez-Mendoza, Clerk

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X **NOV 20 2014**

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

CORRIS VU

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

TRAVIS County District
CouRT CLERK
509 W 11th St Rm 1.4
Austin, TX 78701

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
*(Transfer from service label)*   7011 0470 0000 5935 8411

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

*Copy*

**OFFICE OF THE CHIEF DISCIPLINARY COUNSEL**
**STATE BAR OF TEXAS**
**GRIEVANCE FORM**

**I. GENERAL INFORMATION**

Before you fill out this paperwork, there may be a faster way to resolve the issue you are currently having with an attorney.

If you are considering filing a grievance against a Texas attorney for any of the following reasons:

~ You believe your attorney is neglecting your case.
~ Your attorney does not return phone calls or keep you informed about the status of your case.
~ You have fired your attorney but are having problems getting your file back from the attorney.

**You may want to consider contacting the Client-Attorney Assistance Program (CAAP) at 1-800-932-1900.**

CAAP was established by the State Bar of Texas to help people resolve these kinds of issues with attorneys quickly, without the filing of a formal grievance.

CAAP can resolve many problems without a grievance being filed by providing information, by suggesting various self-help options for dealing with the situation, or by contacting the attorney either by telephone or letter.

I have _____ I have not __X__ contacted the Client-Attorney Assistance Program.

**NOTE: Please be sure to fill out each section completely. Do not leave any section blank. If you do not know the answer to any question, write "I don't know."**

**II. INFORMATION ABOUT YOU – PLEASE KEEP CURRENT**

☒ Mr.
1. TDCJ/SID # 08928360 ☐ Ms. Name: Charles A. Malouff, Jr.
   Immigration # _____

   Address: #66089-179  FCI Bastrop

   P.O. Box 1010

   City: Bastrop      State: Texas      Zip Code: 78602

0411                                                               1

2. Employer: __Federal Bureau Of Prisons__

   Employer's Address: __1341 Hwy 95 North, Bastrop, TX 78602__

   _____

3. Telephone number: Residence _____ Work: __512.321.3903__
   Other: _____

4. Drivers License # __03770442__ Date of Birth __12.27.57__

5. Name, address, and telephone number of person who can always reach you.

   Name __Bradley Romine__ Address __1341 Hwy 95 North__

   __Bastrop, Texas 78602__ Telephone __512.321.3903__

6. Do you understand and write in the English language? __Yes__
   If no, what is your primary language? _____
   Who helped you prepare this form? __Self__
   Will they be available to translate future correspondence during this process? _____

7. **Are you a Judge?** __No__
   If yes, please provide Court, County, City, State: _____

III. INFORMATION ABOUT ATTORNEY

   <u>Note</u>: Grievances are not accepted against law firms. You must specifically name the attorney against whom you are complaining. A separate grievance form must be completed for each attorney against whom you are complaining.

1. Attorney name: __Tamara Needles__ Address: __2001 Key West Cove__

   City: __Austin__ State: __Texas__ Zip Code: __78746__

2. Telephone number: Work __512.329.9944__ Home _____ Other _____

3. Have you or a member of your family filed a grievance about this attorney previously?
   Yes ___ No _X_ If "yes", please state its approximate date and outcome. _____

   _____

0411                                                                                    2

Have you or a member of your family ever filed an appeal with the Board of Disciplinary Appeals about this attorney?

Yes _____ No _X_ If "yes," please state its approximate date and outcome.

_____

4. Please check one of the following:
   _____ This attorney was **hired** to represent me.
   ___X___ This attorney was **appointed** to represent me.
   _____ This attorney was hired to represent **someone else**.

Please give the date the attorney was hired or appointed. Appointed Co-Counsel Spring 2013

Please state what the attorney was hired or appointed to do. Defend me in state

court against a First Degree Felony _____

_____

5. What was your fee arrangement with the attorney? She was paid by the court

_____

How much did you pay the attorney? Whatever the judge authorized

_____

**If you signed a contract and have a copy, please attach.**
**If you have copies of checks and/or receipts, please attach.**
**Do not send originals.**

6. If you did not hire the attorney, what is your connection with the attorney? Explain briefly
   N/A

_____

7. Are you currently represented by an attorney? _Yes_
   If yes, please provide information about your current attorney: Ariel Payan

   1012 Rio Grande, Austin, Texas 78701 _____

8. Do you claim the attorney has an impairment, such as depression or a substance use disorder? If yes, please provide specifics (your **personal** observations of the attorney

such as slurred speech, odor of alcohol, ingestion of alcohol or drugs in your presence etc.. including the date you observed this, the time of day, and location).

No
_____

_____

9. Did the attorney ever make any statements or admissions to you or in your presence that would indicate that the attorney may be experiencing an impairment, such as depression or a substance use disorder? If so, please provide details.

No
_____

_____

IV. INFORMATION ABOUT YOUR GRIEVANCE

1. Where did the activity you are complaining about occur?

County: __Travis__    City: __Austin__

2. If your grievance is about a lawsuit, answer the following, if known:

a. Name of court  299th District Court, Travis County

b. Title of the suit   State of Texas v Charles A. Malouff, Jr.

c. Case number and date suit was filed  D-1-DC-13-902041 October 11, 2011

d. If you are not a party to this suit, what is your connection with it? Explain briefly.

N/A _____

If you have copies of court documents, please attach.

3. Explain in detail why you think this attorney has done something improper or has failed to do something which should have been done. Attach additional sheets of paper if necessary.

If you have copies of letters or other documents you believe are relevant to your grievance, please attach. Do not send originals.

Include the names, addresses, and telephone number of all persons who know something about your grievance.

# DETAILED EXPLAINATION WHY TAMARA NEEDLES VIOLATED THE TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT

According to Webster's Dictionary: **BLATANT** is defined as: Offensively conspicuous; obtrusive; obvious; blatant lie. **LIE** is defined as: A false statement or piece of information deliberately presented as being true; a falsehood. To present false information with the intention of deceiving. A condition of deceit. **DECEIT** is defined as: Misrepresentation, deception, falseness. **HONESTY** is defined as: The capacity or condition of being honest. Integrity. Trustworthiness. Truthfulness. Implies fairness in dealing and absence of fraud, deceit and dissembling. **FRAUD** is defined as: A deception deliberately practiced in order to secure unfair or unlawful gain. **MISREPRESENTATION** is defined as: To give an incorrect or misleading representation. To serve incorrectly or dishonestly as an official representation.

According to Black's Law Dictionary: **LIE** is defined as: To tell an untruth; to speak or write falsely. **DECEIT** is defined as: The act of intentionally giving a false impression; A false statement of fact made by a person knowingly or recklessly with the intent someone else will detrimentally rely on it. **FRAUD** is defined as: A knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment. **MISREPRESENTATION** is defined as: The act of making a false or misleading assertion about something usually with the intent to deceive. The word denotes not just written or spoken words, but also any other conduct that amounts to a false assertion.

Jackie Wood took over my case from Daniel H. Wannamaker in November 2011. She was told from the beginning of my representation that I was set up and that this case was a cover up by the U.S. Department of Energy, the Travis County District Attorney, the Texas Comptroller and the City of Jonestown, to the Destruction Of A Federally Funded Energy Project, and the other crimes of Attempted Murder, Theft of Trade Secrets, Abuse of Office, Destruction of Evidence, Official Oppression, Coercion, Falsifying Time Sheets, Malfeasance by Federal Agents, and other crimes. And, that the flash bang diversionary devices I was accused of being in illegally in possession of were planted in my shed, four days after I was arrested and still in jail, **AFTER** the District Attorney searched and trashed my house and the shed where they were located and found nothing. As second string co-counsel, Tamara Needles, brought in late after Wood's first co-counsel vacated, would have been informed of all of this in bringing her up to speed as part of the Defense Team.

I told Wood, in the presence of Tom Walsh, our investigator, Katrina, her paralegal, and her then co-counsel, who I do not remember her name, as she did not stay long on the case, and was replaced by Needles, that I could not get a fair trial because of the relationship of Judge Karen Sage, the trial judge, and Rosemary Lehmberg, the District Attorney, Kirk Watson, and other persons in the Capital Area Progressive Democrats. Wood told me then, that Karen Sage was

"**my best friend**" and their friendship was a good thing, referring to her judicial integrity. Tamara Needles is well versed in the personal "**best friend**" relationship between Jackie Wood and Karen Sage.

In almost one year of incarceration, Tamara Needles and Jackie Wood visited me either four or five times **total, collectively amounting to about 1.5 hours of official visitation.** The Travis County Jail has the official visitation records and there are NO recorded visits at FCI Bastrop. This was a capital crimes case that was over a month just on the prosecution side, and an expected up to six weeks of defense presentation.

In Jackie Wood's last visit with me in the Travis County Jail, just prior to trial, she again told me Karen Sage was her "**best friend**" and "**Karen has my back.**" While they may be "**best friends**", the way and meaning imposed on me by Jackie Wood, was that Sage would rule her decisions in favor of her "**best friend.**" I took it this way as Sage was so confident in her negligence to visit with me, after having told me "**no one knows more about this case than you do.**"

Tamara Needles and Jackie Wood **BLATANTLY LIED and DECEIVED me in their FRAUDULENT and MISREPRESENTED** (as defined above) relationship between Jackie Wood and the trial judge, Karen Sage, and Wood's expectation of decisions, regarding me and my case. Needles words, confidence, and intent were conduct that was impressed in a manor that exhibited in the confidence Sage would decide key judicial decisions in favor of her "**best friend.**" This reliance on the "**best friend**" relationship, based on the conduct of both Tamara Needles and Jackie Wood, stated below, falls on the **unethical and irresponsible** conduct of Tamara Needles.

According to the **Texas Disciplinary Rules of Conduct, Rule 8.02(a)** "A lawyer shall not make a statement the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or **integrity** of a judge." This statement alone, with it intended message that my trial counsel was expecting "**best friend**" favoritism from the trial judge in a capital crime case. Tamara Needles violated **Rule 8.02(a)** when she made the statements with **reckless disregard** as to their truth or falsity concerning the **integrity** of Judge Karen Sage.

Sage heard testimony the jury did not. She was privy to behind closed door conversations between the defense and the prosecutor. She listened to Travis County Sheriff's Deputy Toby Miller admit to falsifying timesheets and committing multiple felonies. She heard repeated arguments of ongoing (**and still ongoing**) Brady violations. She listened to Travis County District Attorney Investigator, Lori Carter admit to violating my Miranda and "targeting" me for **free speech, three major Constitutional violations.** She listened to other Government witnesses, some from agencies that have law enforcement Criminal Investigation sections that reviewed the grant, and searched Mary Jo Woodall's work computer **weeks before** Carter applied for her warrants, and the **DA's own forensic auditor** all say there was **no crime**, when

"she got it" as described by Needles and Wood, and visibly observed by me, by her throwing her head to the side and sitting back in her seat with a look of disgust. (Courtroom security cameras should have that on tape). On August 20th, Sage ruled that **Carter mislead the magistrate.** It was clear by the testimony of Carter and Miller, (in Sage's own words) this was a **"...travesty of justice."** Sage's failure to grant a mistrial, or dismiss with prejudice, and her rulings and failures to rule on other motion's, in contrast to my attorney's **expectation of favoritism** manifested an already **ongoing miscarriage of justice,** and rendering my trial so fundamentally unfair **it violated my due process.** Making this egregious unconstitutional situation worse, was the **irresponsible** and **unethical conduct** of Needles and Wood in using **"best friend" favoritism** as an excuse not to put on a defense.

Tamara Needles violated **Rule 8.04 (a) (1)** when she personally and, **through the acts of another,** Jackie Wood, in conference just prior to the Defense resting, violated **Rule 8.04 (3) engaged in conduct involving dishonesty, fraud, deceit and misrepresentation,** again impressing on me that Karen Sage **"got it!"** and **"Karen's got it!"** and Wood's statement, **"Karen's got my back!"** and both Needles and Wood saying **"trust me"** and **"we should rest"** violating **Rule 8.04 (a) (5) "state or imply an ability to influence improperly a government agency or official",** misrepresenting and deceiving me into believing, as Sage's **"best friend"** they had already arranged for favored decisions from Sage and that I should throw away my opportunity for a defense presentation that was **"several weeks"** worth of exculpatory witnesses and evidence. During this conversation I told both Needles and Wood I wanted to challenge prosecution witnesses and at least have several of the Defense witnesses testify. They continued to impress on me Karen Sage **"got it!"** and **"Karen's got it!"** and **"Karen's got my back!"** and **"trust me"** and **"we should rest"** There is **no ethical or responsible trial strategy** in **intentional deception** and **misrepresentation** of the expected conduct of a trial judge. As officers of the court, their statements and conduct can only be taken as **"true".** (See attached Judicial Misconduct complaint).

I am a decorated and Honorably Retired Chief of Police and Military Veteran (see attached resume and pardon petition that Sage heard testimony from me regarding the related case) and I do not make these allegations frivolously, or take the severity of this complaint lightly.

## VI. ATTORNEY-CLIENT PRIVILEGE WAIVER

I hereby expressly waive any attorney-client privilege as to the attorney, the subject of this grievance, and authorize such attorney to reveal any information in the professional relationship to the Office of Chief Disciplinary Counsel of the State Bar of Texas.

I understand that the Office of Chief Disciplinary Counsel maintains as confidential the processing of Grievances.

Signature: _____ Date: 28 MAY 14 _____

TO ENSURE PROMPT ATTENTION, THE GRIEVANCE SHOULD BE MAILED TO:

THE OFFICE OF CHIEF DISCIPLINARY COUNSEL
P.O. Box 13287
Austin, Texas 78711

## I.  GENERAL INFORMATION

**Before you fill out this paperwork, there may be a faster way to resolve the issue you are currently having with an attorney.**

If you are considering filing a grievance against a Texas attorney for any of the following reasons:

- ~  You believe your attorney is neglecting your case.
- ~  Your attorney does not return phone calls or keep you informed about the status of your case.
- ~  You have fired your attorney but are having problems getting your file back from the attorney.

**You may want to consider contacting the Client-Attorney Assistance Program (CAAP) at 1-800-932-1900.**

CAAP was established by the State Bar of Texas to help people resolve these kinds of issues with attorneys quickly, without the filing of a formal grievance.

CAAP can resolve many problems without a grievance being filed by providing information, by suggesting various self-help options for dealing with the situation, or by contacting the attorney either by telephone or letter.

I have _____ I have not _x___ contacted the Client-Attorney Assistance Program.

**NOTE: Please be sure to fill out each section completely.  Do not leave any section blank.  If you do not know the answer to any question, write "I don't know."**

## II.  INFORMATION ABOUT YOU -- PLEASE KEEP CURRENT

1.  TDCJ/SID # 08928360      ☒ Mr.  ☐ Ms.  Name: <u>Charles A. Malouff, Jr.</u>
    Immigration # _____

Address: <u>#66089-179  FCI Bastrop</u>

<u>P.O. Box 1010</u>

City: <u>Bastrop</u>       State: <u>Texas</u>       Zip Code: <u>78602</u>

2.   Employer: __Federal Bureau Of Prisons__

   Employer's Address: __1341 Hwy 95 North, Bastrop, TX 78602__

   _____

3.   Telephone number: Residence _____ Work: __512.321.3903__
   Other: _____

4.   Drivers License # __03770442__          Date of Birth __12.27.57__

5.   Name, address, and telephone number of person who can always reach you.

   Name __Bradley Romine__          Address __1341 Hwy 95 North__

   __Bastrop, Texas 78602__          Telephone __512.321.3903__

6.   Do you understand and write in the English language? __Yes__
   If no, what is your primary language? _____
   Who helped you prepare this form? __Self__
   Will they be available to translate future correspondence during this process? _____

7.   **Are you a Judge?** __No__
   If yes, please provide Court, County, City, State: _____

III.   INFORMATION ABOUT ATTORNEY

   Note:   Grievances are not accepted against law firms. You must specifically name the attorney against whom you are complaining. A separate grievance form must be completed for each attorney against whom you are complaining.

1.   Attorney name: __Jackie Wood__          Address: __805 W. 10th St., #101__

   City: __Austin__          State: __Texas__   Zip Code: __78701__

2.   Telephone number: Work __512.300.4428__ Home _____   Other _____

3.   Have you or a member of your family filed a grievance about this attorney previously?
   Yes ___ No _X_   If "yes", please state its approximate date and outcome. _____

   _____

Have you or a member of your family ever filed an appeal with the Board of Disciplinary Appeals about this attorney?

Yes _____ No __X__ If "yes," please state its approximate date and outcome.

_____

4.  Please check one of the following:
    _____    This attorney was **hired** to represent me.
    ___X___      This attorney was **appointed** to represent me.
    _____    This attorney was hired to represent **someone else.**

    Please give the date the attorney was hired or appointed. __November 2012__

    Please state what the attorney was hired or appointed to do. __Defend me__

    __in state court against a First Degree Felony__

    _____

5.  What was your fee arrangement with the attorney? __She was paid by the court__

    _____

    How much did you pay the attorney? __Whatever the judge authorized__

    _____

    **If you signed a contract and have a copy, please attach.**
    **If you have copies of checks and/or receipts, please attach.**
    **Do not send originals.**

6.  If you did not hire the attorney, what is your connection with the attorney?  Explain briefly
    __N/A_____

    _____

7.  Are you currently represented by an attorney? ___Yes_____ _____
    If yes, please provide information about your current attorney: __Ariel Payan__

    __1012 Rio Grande, Austin, Texas 78701__

8.  Do you claim the attorney has an impairment, such as depression or a substance use disorder?  If yes, please provide specifics (your **personal** observations of the attorney

0411                                                                                        3

such as slurred speech, odor of alcohol, ingestion of alcohol or drugs in your presence etc., including the date you observed this, the time of day, and location).

No

9. Did the attorney ever make any statements or admissions to you or in your presence that would indicate that the attorney may be experiencing an impairment, such as depression or a substance use disorder? If so, please provide details.

No

IV. INFORMATION ABOUT YOUR GRIEVANCE

1. Where did the activity you are complaining about occur?

County: Travis        City: Austin

2. If your grievance is about a lawsuit, answer the following, if known:

a. Name of court  299th District Court, Travis County

b. Title of the suit  State Of Texas v. Charles A. Malouff, Jr

c. Case number and date suit was filed  D-1-DC-13-902041 October 11, 2011

d. If you are not a party to this suit, what is your connection with it? Explain briefly.

N/A

If you have copies of court documents, please attach.

3. Explain in detail why you think this attorney has done something improper or has failed to do something which should have been done. Attach additional sheets of paper if necessary.

If you have copies of letters or other documents you believe are relevant to your grievance, please attach. Do not send originals.

Include the names, addresses, and telephone number of all persons who know something about your grievance.

0411                                                                 4

# DETAILED EXPLAINATION WHY JACKIE WOOD VIOLATED THE TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT

According to Webster's Dictionary: **BLATANT** is defined as: Offensively conspicuous; obtrusive; obvious; blatant lie. **LIE** is defined as: A false statement or piece of information deliberately presented as being true; a falsehood. To present false information with the intention of deceiving. A condition of deceit. **DECEIT** is defined as: Misrepresentation, deception, falseness. **HONESTY** is defined as: The capacity or condition of being honest. Integrity. Trustworthiness. Truthfulness. Implies fairness in dealing and absence of fraud, deceit and dissembling. **FRAUD** is defined as: A deception deliberately practiced in order to secure unfair or unlawful gain. **MISREPRESENTATION** is defined as: To give an incorrect or misleading representation. To serve incorrectly or dishonestly as an official representation.

According to Black's Law Dictionary: **LIE** is defined as: To tell an untruth; to speak or write falsely. **DECEIT** is defined as: The act of intentionally giving a false impression; A false statement of fact made by a person knowingly or recklessly with the intent someone else will detrimentally rely on it. **FRAUD** is defined as: A knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment. **MISREPRESENTATION** is defined as: The act of making a false or misleading assertion about something usually with the intent to deceive. The word denotes not just written or spoken words, but also any other conduct that amounts to a false assertion.

Jackie Wood took over my case from Daniel H. Wannamaker in November 2011, who was removed because of a Conflict of Interest. She was appointed by her "best friend", Karen Sage, the trial judge. She was told from the beginning of my representation that I was set up and that this case was a cover up by the U.S. Department of Energy, the Travis County District Attorney, the Texas Comptroller and the City of Jonestown, to the Destruction Of A Federally Funded Energy Project, and the other crimes of Attempted Murder, Theft of Trade Secrets, Abuse of Office, Destruction of Evidence, Official Oppression, Coercion, Falsifying Time Sheets, Malfeasance by Federal Agents, and other crimes. And, that the flash bang diversionary devices I was accused of being in illegally in possession of were planted in my shed, four days after I was arrested and still in jail, **AFTER** the District Attorney searched and trashed my house and the shed where they were located and found nothing. As second string co-counsel, Tamara Needles, brought in late after Wood's first co-counsel vacated, would have been informed of all of this in bringing her up to speed as part of the Defense Team.

I told Wood, in the presence of Tom Walsh, our investigator, Katrina, her paralegal, and her then co-counsel, who I do not remember her name, as she did not stay long on the case, and was replaced by Needles, that I could not get a fair trial because of the relationship of Judge Karen Sage, the trial judge, and Rosemary Lehmberg, the District Attorney, Kirk Watson, and other

applied for her warrants, and the **DA's own forensic auditor** all say there was **no crime**, when "**she got it**" as described by Needles and Wood, and visibly observed by me, by her throwing her head to the side and sitting back in her seat with a look of disgust. (Courtroom security cameras should have that on tape). On August 20th, Sage ruled that **Carter mislead the magistrate**. It was clear by the testimony of Carter and Miller, (in Sage's own words) this was a "**...travesty of justice.**" Sage's failure to grant a mistrial, or dismiss with prejudice, and her rulings and failures to rule on other motion's, in contrast to my attorney's **expectation of favoritism** manifested an already **ongoing miscarriage of justice,** and rendering my trial so fundamentally unfair **it violated my due process.** Making this egregious unconstitutional situation worse, was the **irresponsible and unethical conduct** of Needles and Wood in using "**best friend" favoritism** as an excuse not to put on a defense.

Jackie Wood violated **Rule 8.04 (a) (1)** when she personally and, **through the acts of another,** Tamara Needles, in conference just prior to the Defense resting, violated **Rule 8.04 (3) engaged in conduct involving dishonesty, fraud, deceit and misrepresentation,** again impressing on me that Karen Sage "**got it!**" and "**Karen's got it!**" and Wood's statement, "**Karen's got my back!**" and both Wood and Needles saying "**trust me**" and "**we should rest**" violating Rule 8.04 (a) (5) "**state or imply an ability to influence improperly a government agency or official**", **misrepresenting and deceiving** me into believing, as Sage's "**best friend**" they had already arranged for favored decisions from Sage and that I should throw away my opportunity for a defense presentation that was "**several weeks**" worth of exculpatory witnesses and evidence.

During this conversation I told both Wood and Needles I wanted to challenge prosecution witnesses and at least have several of the Defense witnesses testify. They continued to impress on me Karen Sage "**got it!**" and "**Karen's got it!**" and "**Karen's got my back!**" and "**trust me**" and "**we should rest**" There is no ethical or responsible "**trial strategy**" in intentional deception and **misrepresentation** of the expected conduct of a trial judge. As officers of the court, their statements and conduct can only be taken as "**true**". (See attached Judicial Misconduct complaint).

I am a decorated and Honorably Retired Chief of Police and Military Veteran (see attached resume and pardon petition that Sage heard testimony from me regarding the related case) and I do not make these allegations frivolously, or take the severity of this complaint lightly.

## VI. ATTORNEY-CLIENT PRIVILEGE WAIVER

I hereby expressly waive any attorney-client privilege as to the attorney, the subject of this grievance, and authorize such attorney to reveal any information in the professional relationship to the Office of Chief Disciplinary Counsel of the State Bar of Texas.

I understand that the Office of Chief Disciplinary Counsel maintains as confidential the processing of Grievances.

Signature: _____ Date: 28 MAY 14

TO ENSURE PROMPT ATTENTION, THE GRIEVANCE SHOULD BE MAILED TO:

THE OFFICE OF CHIEF DISCIPLINARY COUNSEL
P.O. Box 13287
Austin, Texas 78711

*Copy*

**AMENDED**

**OFFICE OF THE CHIEF DISCIPLINARY COUNSEL
STATE BAR OF TEXAS
GRIEVANCE FORM**

**I.    GENERAL INFORMATION**

Before you fill out this paperwork, there may be a faster way to resolve the issue you are currently having with an attorney.

If you are considering filing a grievance against a Texas attorney for any of the following reasons:

~    You believe your attorney is neglecting your case.
~    Your attorney does not return phone calls or keep you informed about the status of your case.
~    You have fired your attorney but are having problems getting your file back from the attorney.

You may want to consider contacting the Client-Attorney Assistance Program (CAAP) at 1-800-932-1900.

CAAP was established by the State Bar of Texas to help people resolve these kinds of issues with attorneys quickly, without the filing of a formal grievance.

CAAP can resolve many problems without a grievance being filed by providing information, by suggesting various self-help options for dealing with the situation, or by contacting the attorney either by telephone or letter.

I have _____ I have not __X___ contacted the Client-Attorney Assistance Program.

NOTE: Please be sure to fill out each section completely. Do not leave any section blank. If you do not know the answer to any question, write "I don't know."

**II.   INFORMATION ABOUT YOU -- PLEASE KEEP CURRENT**

X Mr.

1.   TDCJ/SID # _08928360_____   ⬜ Ms.  Name: __Charles A. Malouff, Jr.____
     Immigration # _____

     Address: _66089179   FCI Bastrop_____

     _____P.O. Box 1010_____

     City: ___Bastrop___   State: _Texas_____   Zip Code: __78602____

0411                                                                                      1

2. Employer: __Federal Bureau of Prisons__

   Employer's Address: __1341 Hwy. 95 North__

   __Bastrop, TX 78602__

3. Telephone number: Residence _____ Work: __(512) 321-3903__
   Other: _____

4. Drivers License # __03770442__          Date of Birth: __12-27-57__

5. Name, address, and telephone number of person who can always reach you.

   Name __B. Romine__          Address __1441 Hwy. 95 North__

   __Bastrop, TX 78602__     Telephone __(512) 321-3903__

6. Do you understand and write in the English language? __Yes__
   If no, what is your primary language? _____
   Who helped you prepare this form? __Self__
   Will they be available to translate future correspondence during this process? _____

7. **Are you a Judge?** __No__
   If yes, please provide Court, County, City, State: _____

III. INFORMATION ABOUT ATTORNEY

   Note: Grievances are not accepted against law firms. You must specifically name the attorney against whom you are complaining. A separate grievance form must be completed for each attorney against whom you are complaining.

1. Attorney name: __M. Ariel Payan__          Address: __1012 Rio Grande__

   City: __Austin__          State: __TX__          Zip Code: __78701__

2. Telephone number: Work _____ Home _____ Other _____

3. Have you or a member of your family filed a grievance about this attorney previously?
   Yes ____ No _X_ If "yes", please state its approximate date and outcome. _____

0411                                                                    2

Have you or a member of your family ever filed an appeal with the Board of Disciplinary Appeals about this attorney?

Yes _____ No _____ If "yes," please state its approximate date and outcome.

_____

4.  Please check one of the following:
    _____ This attorney was **hired** to represent me.
    ___X___ This attorney was **appointed** to represent me.
    _____ This attorney was hired to represent **someone else.**

    Please give the date the attorney was hired or appointed. __October, 2013__

    Please state what the attorney was hired or appointed to do. __Represent me in__

    __direct appeal against first degree felony._____

    _____

5.  What was your fee arrangement with the attorney? __He was appointed_____

    _____

    How much did you pay the attorney? __Whatever the judge authorized_____

    _____

    **If you signed a contract and have a copy, please attach.**
    **If you have copies of checks and/or receipts, please attach.**
    **Do not send originals.**

6.  If you did not hire the attorney, what is your connection with the attorney? Explain briefly
    _____N/A_____

    _____

7.  Are you currently represented by an attorney? __Yes_____
    If yes, please provide information about your current attorney: __This guy because he__

    __will not recuse himself._____

8.  Do you claim the attorney has an impairment, such as depression or a substance use
    disorder? If yes, please provide specifics (your **personal** observations of the attorney

such as slurred speech, odor of alcohol, ingestion of alcohol or drugs in your presence etc.. including the date you observed this, the time of day, and location).

No _____

_____

9.  Did the attorney ever make any statements or admissions to you or in your presence that would indicate that the attorney may be experiencing an impairment, such as depression or a substance use disorder?  If so, please provide details.

No _____

_____

IV. INFORMATION ABOUT YOUR GRIEVANCE

1.  Where did the activity you are complaining about occur?

County: __Travis__    City: __Austin__

2.  If your grievance is about a lawsuit, answer the following, if known:

a. Name of court __299th District Court, Travis County__

b. Title of the suit __State of Texas v. Charles A. Malouff, Jr.__

c. Case number and date suit was filed __D-1-DC-13-902041  10/11/2011  and__
                                        __03-13-00723-CR  9/19/2013__

d. If you are not a party to this suit, what is your connection with it?  Explain briefly.

N/A _____

If you have copies of court documents, please attach.

3.  Explain in detail why you think this attorney has done something improper or has failed to do something which should have been done.  Attach additional sheets of paper if necessary.

If you have copies of letters or other documents you believe are relevant to your grievance, please attach. Do not send originals.

Include the names, addresses, and telephone number of all persons who know something about your grievance.

0411                                                                  4

IV. 3

M. Ariel Payan is in violation of the American Bar Association Model Rules of Professional Conduct and Texas Disciplinary Rules of Professional Conduct, Rules 3.7, 8.2 and 8.3 creating such a Conflict of Interest in his failure to report these violations and Recuse himself, that he is knowningly and intentionaly violating my Rights of Due Process in accordance with the Texas and United States Constitutions.

On October 22, 2013, in a face to face conversation regarding Prosecutorial Misconduct and Judicial Misconduct resulting in decisions by Trial Judge Karen Sage, for Pecuinary Interest, a violation of both State and Federal laws. Payan told me "My wife works for the Prosecutor's Office", "We are friends with Holly Taylor and I know her husband". And, "We all talk." And, "it's a close knit group."

In the same conversation he told me, "The Judge's decisions were political." And, "The Judge is not likely to decide on something that can effect her election."

Earlier, Trial counsel, Jackie Wood, Sage's best friend, said Sage was not going to make decisions that would effect her getting votes and financial contributions in her upcoming re-election. Sage's campaign kicked off right after Payan was appointed.

Bar Rule 3.7 states "A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness.

Rule 8.02(a) states, "A lawyer shall not make a statement a lawyer knows to be false or with reckless disregard as to its truth or falsify concerning the qualification or integrity of a Judge."

Rule 8.3 states "A lawyer who knows another lawyer committed a violation of the Rules of Professional Conduct that raises a substantial question of that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority. Misconduct complaints on Sage were filed with the State Commission on Judicial Conduct, CJC No. 14-0826-D1 and the Texas Attorney General.

On October 1, 2014, in Federal Court, my prosecutor and

(5-A)

Payan's "friend", Holly Taylor, admitted on July 15, 2011, 3 months before there was any meaningful probable cause, she was out "investigating", gathering evidence, and interviewing witnesses. She also admitted to reviewing, several times, the Search Warrant Affidavit, which was inundated with patently false, misleading statements, and knew of material ommissions that would render the warrants invalid. And, earlier at my trial was formally accused of lying to the Tribunal by Trial Attorney Jackie Wood.

On March 21, 2014, Payan sent me an email acknowledging he and the two trial attorneys made those statements.

Payan, and his wife are material witnesses to the criminal conduct of Prosecutor Holly Taylor, and Judge Karen Sage under 18 U.S.C. 241 and 242, and Texas Penal Code for Abuse of Office and Offical Oppression, and he refuses to recuse himself from my case and report his, and the others misconduct to the appropriate authority.

He has committed such a Conflict of Interest I have been denied my Rights of Due Process in accordance wtih the Texas and United States Constitutions.

M. Ariel Payan was given until October 15, 2014, to recuse himself as Counsel after NUMEROUS requests and demands, in writing, to do his job and file formal objections, complaints and grievances with the Tribunal.

Payans relationship with Holly Taylor, the Travis County District Attorney who prosecuted me created a Conflict of Interest and his statements regarding the integrity of the Court proceedings in my trial, and that of 299th District Court Judge Karen Sage, made him an adversiarial material witness. His breach of fudiciary duty as my competent Counsel, and failure to recuse has demonstrated his furtherance of conduct to that of Co-Conspirator in the Obstruction of Justice, Deprivation of Rights Under Color of Law IAW Federal Law 18 USC 241 and 242, and the Texas Penal Code Abuse of Office and Official Oppression. Formal complaints through the Department of Justice and other criminal investigative agencies are being lodged. His conduct has resulted

(5-B)

in my unnecessary and ongoing false imprisonment since his becoming my appellate counsel! His negligent and criminal conduct required me to formally request help from Chief Justice Jones. See Attached Letters.

Also, please be advised that a copy of your grievance will be forwarded to the attorney named in your grievance.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

V.  HOW DID YOU LEARN ABOUT THE STATE BAR OF TEXAS' ATTORNEY GRIEVANCE PROCESS?

___    Yellow Pages
___    Internet
 X     Other

## VI. ATTORNEY-CLIENT PRIVILEGE WAIVER

I hereby expressly waive any attorney-client privilege as to the attorney, the subject of this grievance, and authorize such attorney to reveal any information in the professional relationship to the Office of Chief Disciplinary Counsel of the State Bar of Texas.

I understand that the Office of Chief Disciplinary Counsel maintains as confidential the processing of Grievances.

Signature: _____    Date: _November 10, 2014_

TO ENSURE PROMPT ATTENTION, THE GRIEVANCE SHOULD BE MAILED TO:

THE OFFICE OF CHIEF DISCIPLINARY COUNSEL
**P.O. Box 13287**
**Austin, Texas 78711**

0411

6

COPY

Honorable J. Woodfin Jones
Chief Justice, Court of Appeals
  Third District of Texas
P.O. Box 12547
Austin, Texas 78711-2547

7 October, 2014

**RE:** 03-13-00723-CR
STATE OF TEXAS v: CHARLES A. MALOUFF, JR.

Dear Judge Jones:

I am in dire straits, and I am pleading for help! M. Ariel Payan is my Attorney of Record, and I have an irrepairable Conflict Of Interest with Payan.

As you can see by the attached emails, Payan and his wife are material witnesses in criminal conduct and gross violations of State and Federal law, Texas and United States Constitution's Rights of Due Process, Judicial Misconduct on the State Trial Judge, Karen Sage, complaint no. CJC NO 14-0826-D1, and egregous violations of the American Bar Association Model Rules of Professional Conduct and the Texas Disciplinary Rules of Professional Conduct, by Travis County District Attorney's Holly Taylor, my Prosecutor, Susan Oswalt, Greg Coxx and Rosemary Lehmberg, and my two trial attorneys, Jackie Wood and Tamara Needles and Payan himself.

This fundamental **miscarriage of justice** and obscene deprivation of Rights not only to myself, but my co-defendant, Mary Jo Woodall, and the State's malicious and vindictive efforts to cover up mulitiple felonies, including **Attempted Murder**, through Payan's negligence and abandonment, caused me to file a 132 page Brief with over 1800 pages and photos, not including the two CD's of Trial Court Records in a 2254(d)(1) Writ of Habeas Corpus seeking an unbiased and fair judiciary.

In Preparation for a 2255 Evidentiary Hearing in Federal Court on 1 October, 2014, my appointed Federal Attorney, Oskar Nisimblat, unsuccessfully tried to contact Payan for consultation over the State Court Records and proceedings.

On October 1st, 2014, in a Evidentiary Hearing in Federal Court, aside from Travis County District Attorney Investigator,

Copy

Lori Carter, admitting for the second time she **"targeted"** me for Free Speech and violating my Miranda, Holly Taylor my Prosecutor, **admitted under oath** she was functioning as an "investigator" and not a prosecutor **on and after** July 15, 2011, over three months before there was any meaningful probable cause! If I am not mistaken its still unconstitutional to be my investigator and my prosecutor!

I cannot get rid of Payan! I **pray** for your assistance in assigning me a competent attorney not intimately involved with any of the people related to my case. Two **innocent** people have now been maliciously convicted and through my Rights of Due Process I want to prove it.

I have been eligible for early release from the Bureau of Prisons since February, 2014. However, because there is no appeal bond in the State matter, I remain needlessly imprisoned. Thanks to my negligent attorney.

Thank you for your consideration and assistance in helping me prevent a furtherance of a **miscarriage of justice.**

Respectfully,

Charlie Malouff
66089179
P.O. Box 1010
Bastrop, TX 78602

(2)

Copy

November 26, 2014

Honorable J. Woodfin Jones
Chief Justice, Court of Appeals
Third District of Texas
P.O. Box 12547
Austin, Texas 78711-2547

RE:   03-13-00723CR
      D-1-DC-13-904021-A

Dear Judge Jones:

On November 3rd, 2014, I filed a Writ of Habeas Corpus in accordance with CCP ART. 11.07.

This Writ was previously hand carried to the Court of Appeals who re-directed my delivery person to the Travis County District Court Clerk, the Court of conviction.

On October 7th, 2014, I wrote you regarding my Conflict of Interest with Appellant Counsel Ariel Payan. At that time no appellate brief had been filed.

As you can see, the Writ of Habeas Corpus contains a 129 page Brief with over 1100 pages of supporting exhibits and refers to Trial Court Records (D-1-DC-13-904021-A) arguing Judicial, Prosecutorial, Police, and Professional Misconduct and numerous Constitutional and criminal violations depriving me of my Constitutional Rights in exposing **Criminal Conduct** committed by **Police, Prosecutor and Judge.**

In addition, a motion for Bond For Certain Applicants, in accordance with CCP ART 11.65 was submitted by mail from FCI, but not filed until November 24, 2014.

This motion for bond was submitted because, in this particular case, CCP ART. 44.04(b) Bond Pending Appeal prevents me from bond.

There are so many actual **Constitutional** and **Criminal Violations** in this miscarriage of justice that are part of the record, and need to be made part of the record, not identified by Appellate Counsel Payan in his brief. The Writ was filed before his Brief, and Appellate Counsel Payan is a criminal co-conspirator through he and his wife's relationship with the District Attorney and his conduct, and lack thereof, on my case.

On November 19, 2014, the Trial Judge, Karen Sage, whom the Judicial Misconduct is directed at, dismissed the Writ of Habeas Corpus effectively nullifying, according to the Code of Criminal Procedure, my only hope of getting bond until this case is finally resolved.

I ask for your intercession in some form of bond. I am being unreasonably detained at FCI Bastrop because of this State case. I have been eligible for early/supervised release since February 2, 2014.

Respectfully,

Charlie Malouff

CHARLES A. MALOUFF, JR          §
AKA: CHARLIE MALOUFF

                                §

        v.                      §    CASE NO. 03-13-00723CR
                                     D-1-DC-13-904021 A
                                §
        STATE OF TEXAS          §

                                §

---

## MOTION FOR BOND FOR CERTAIN APPLICANTS

---

### TO THE HONORABLE JUDGE OF SAID COURT

Now comes, Applicant, Charlie Malouff, pro se, in the
interest of justice to move the Honorable Court to GRANT Appli-
cant's prayer for bond under Article 11.65, Code of Criminal Pro-
cedure, while seeking relief from judgement in the above criminal
case.

### DISCUSSION

Applicant was convicted of Securing A Document By Deception
in State Court. A motion to remove Appellate Counsel M. Ariel
Payan resulting from an irrepairable Conflict of Interest, was
entered at the Third Court of Appeals on October 30, 2014. An
Application for Writ of Habeas Corpus Seeking Relief From Final
Felony Conviction Under Code of Criminal Procedure, Article 11.07,
As A Result of Violations of Article 1, Sections 8, 9, and 10 of
the Texas Constitution and the First, Fourth, Fifth, Sixth, Ninth
and Fourteenth Amendments to the United States Constitution Re-
sulting from Police, Prosecutorial, Judicial and Professional Mis-
conduct was filed with the District Court of Travis County, Texas,

Filed in The District Court
of Travis County, Texas

NOV 24 2014

At _____ 9:30 _____ M.
Amalia Rodriguez-Mendoza, Clerk

D-1-DC-13-904021-A

## IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## SEEKING RELIEF FROM FINAL FELONY CONVICTION
## UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

NAME: __Charles A. Malouff, Jr.__

DATE OF BIRTH: __December 27, 1957__
PLACE OF CONFINEMENT: __F.C.I. Bastrop, Bastrop, TX 78602__

TDCJ-CID NUMBER: __08928360__ SID NUMBER: __Same__

(1)   This application concerns (check all that apply):

    ☒    a conviction         ☐    parole

    ☐    a sentence         ☐    mandatory supervision

    ☐    time credit         ☐    out-of-time appeal or petition for discretionary review

(2)   **What district court entered the judgment of the conviction you want relief from?** (Include the court number and county.)

   299th District Court, Travis County

(3)   **What was the case number in the trial court?**

   D-1-DC-13-9020 41

(4)   **What was the name of the trial judge?**

   Karen Sage

Revised: September 1, 2011

1

Filed in the
at
NOV 03 2014
1:40 p.m.
M
Amalia Rodriguez-Mendoza, Clerk

Amalia Rodriguez-Mendoza
Travis County District Clerk
Travis County Courthouse Complex
P.O. Box 679003
Austin, Texas 78767-9004



November 20, 2014

Charles Anthony Malouff Jr
TDC#0892836
F. C. I #66089179
P. O. Box 1010
Bastrop, Texas 78602

Re: D-1-DC-13-904021-A

THE STATE OF TEXAS VS. Charles Anthony Malouff Jr.

DEAR SIR OR MADAM:

{ }    YOUR REQUEST FOR COPIES IN THE ABOVE CASE(S) HAS BEEN RECEIVED. COST FOR COPIES ARE
_____ AND WE WILL FORWARD YOUR COPIES UPON RECEIPT OF _____, FOR TOTAL
COST. PLEASE MAKE CHECK PAYABLE TO AMALIA RODRIGUEZ-MENDOZA, DISTRICT CLERK OF TRAVIS
COUNTY, TEXAS.

{ }    YOUR REQUEST FOR THE TRANSCIPT OF YOUR CRIMINAL PROCEEDING(S) HAS BEEN RECEIVED. YOU ARE
HEREBY ADVISED THAT IT WILL BE NECESSARY FOR YOU TO CONTACT THE OFFICAL COURT REPORTER OF
THE     DISTRICT COURT AT PO BOX 1748, AUSTIN, TEXAS 78767. HE/SHE CAN DISCUSS HIS/HER COURT
COST AND PAYMENT PROCEDURE WITH YOU CONCERNING A TRANSCRIPT.

{ X }   ATTACHED ARE COPIES REGARDING YOUR APPLICATION FOR POST CONVICTION WRIT OF HABEAS
CORPUS:
_____ ORDER DESIGNATING ISSUES
_____ AFFIDAVIT IN RESPONSE TO APPLICATION FOR WRIT OF HABEAS CORPUS
_____ STATE'S ORIGINAL ANSWER
__x_ FINDINGS OF FACT, RECOMMENDATION, AND ORDER TO
TRANSMIT HABEAS CORPUS RECORD (POST CONVICTION APPLICATION)
_____ ORDER TO TRANSMIT
_____ OTHER:

{ }    YOUR REQUEST IS BEING RETURNED, AS WE ARE UNABLE TO DETERMINE, WITH UNCERTAINTY, WHAT
YOU ARE ASKING. PLEASE BE MORE SPECIFIC AS TO YOUR NEEDS.

RESPECTFULLY,
AMALIA RODRIGUEZ MENDOZA
DISTRICT CLERK OF TRAVIS COUNTY, TEXAS

## NO. D-1-DC-13-904021-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 299TH JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CHARLES A MALOUFF, JR. | § | TRAVIS COUNTY, TEXAS |

### FINDINGS OF FACT, RECOMMENDATION, AND
### ORDER TO TRANSMIT HABEAS CORPUS RECORD
### (POST CONVICTION APPLICATION)

ON THIS 19th day of November, 2014, came on to be considered the Application for Writ of Habeas Corpus in the above cause. The court makes the following findings of fact and conclusions of law.

1. A jury found applicant guilty of securing execution of a document by deception. The court assessed punishment at confinement for fifteen years. Sentence was imposed September 24, 2013.

2. Applicant's appeal is still pending. Counsel filed an brief for applicant on November 11, 2014. No. 03-13-723-CR.

3. This application was filed November 3, 2014, and must be dismissed because the appeal is still pending.

On the basis of the above findings and conclusions the court recommends that the application be **DISMISSED** because applicant's appeal is still pending.

The court hereby **ORDERS** that the District Clerk of Travis County prepare and transmit the record herein to the Court of Criminal Appeals.

JUDGE PRESIDING

Filed in The District Court
of Travis County, Texas

NOV 20 2014

Amalia Rodriguez-Mendoza, Clerk

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

**OFFICIAL BUSINESS**
**STATE OF TEXAS**
**PENALTY FOR**
**PRIVATE USE**



**11/24/2014**
**MALOUFF, CHARLES A Jr.**   Tr. Ct. No. D-1-DC-13-904021-A   **WR-82,475-01**
On this day, the application for 11.07 Writ of Habeas Corpus has been received
and presented to the Court.

Abel Acosta, Clerk

CHARLES A MALOUFF JR.
F.C.I. BASTROP
1341 STATE HIGHWAY 95
BASTROP, TX 78602

EBN3B 78602

Copy

November 26, 2014

Jeffrey D. Kyle
Clerk
Third Court of Appeals
P.O. Box 12547
Austin, TX 78711

Dear Mr. Kyle,

My Appellate Counsel M. Ariel Payan has again failed in his duties and responsibilities. Please send me a copy of everything he has filed with the Court. Thank you.

Respectfully,

Charlie Malouff
66089179
P.O. Box 1010
Bastrop, TX 78602

*Copy*

Honorable J. Woodfin Jones                    1 December, 2014
Chief Justice, Court of Appeals
Third District of Texas
P.O. Box 12547
Austin, TX 78711-2547


RE: 03-13-00723-CR
    STATE OF TEXAS V. CHARLES A. MALOUFF, JR.


Dear Judge Jones,

     Again I come to you in an attempt at preventing a furtherance
of a miscarriage of justice.

     I have not been conferred with over, nor provided a copy of
Appellate Counsel M. Ariél Payan's Brief. However, I have been in-
formed through outside sources that he has made several **patently
false** and **malicious** statements in the Brief that must be adamantly
objected to.

     According to what was provided to me, Payan wrote, "Assisted by
his friend Mary Jo Woodall, he succeeded in encourging the City of
Jonestown to apply for a Grant of Federal Funds under the Distributed
Renewable Energy Technology Program through the Texas Comptroller of
Public Accounts." This is **patently false!** As stated by me in the
Sentencing phase of the Trial, I have been involved in Federal Grants
and Research and Development Projects since 1993. The Instant Program,
also known as ARRA STIMULUS, was highly publicized by the President
of the United States for over a year before this specific Grant was
published, and it was also promoted at Energy Conferences all across
the State. Furthermore, I had personally and independently addressed
Grant opportunities in my business plan and face-to-face meetings
when I first approached the City of Jonestown as a place to locate
my Corporate Headquarters almost two years prior.

     Mary Jo Woodall had **absolutely nothing** to do with helping me
encourage the City of Jonestown. I was told Payan also wrote "...
but eventually the Prosecutors caught on that Mary Jo Woodall, the
Comptroller's Grant Coordinator was violating the law by wearing
two hats. Appellant was caught up in the ensuing prosecution for

for fraud." Again, this is a patently false and **maliciously disparaging** statement against an **absolutely innocent woman.** Mary Jo's supervisors and co-workers testified she was doing her job. Mary Jo Woodall **never** violated Policy or the Law. As testified by her supervisor, Pam Groce, she could have written the Grant if she was asked. In addition, there were numerous fail safe procedures for fraud set in place to prevent this very thing. Toby Miller and Lori Carter **maliciously attacked** Mary Jo Woodall as part of a concerted effort to cover up Miller, Cook and others criminal conduct in theft, **attempted murder** and other felonies. Again, I vehemently object to Payan's statement.

I was told Payan also wrote, "... Frankly, Appellant was not an easy man to work for. Charismatic and engaging, he could also be imperious and mercurial. He alienated his daughter (the Company CEO) and many underpaid employees, one of whom, a Travis County Sheriff's Deputy..." I would not call $46 / hour underpaid. I would not call $22 - 25 per hour for an inexperienced Technician underpaid.

I am not an easy man to work for. I **am** a Decorated and Honorably Retired Chief of Police and Decorated Disabled Veteran with 29 years of service to my Country. I have **never tolerated** crooked cops and thieves. Dana McCoy, my daughter, is the one who alienated herself when she emphetically gave me the ultimatum of severing our parent child relationship if I took action to remove and file on Travis County Sheriff's Deputy Toby Miller, Jonestown Police Officer Michelle Cook and others for falsifying Grant time sheets and other fraudulent acts, and criminal conduct against the Government and the Company. Payan has wtisted the facts and one more time I vehemently object to his Brief.

In the Interest of Justice and in furtherance of attempting to prevent more miscarriage of justice, I again adamantly object to anything Payan has done in my representation. In addition to my letters to you, I field an original Bar Grievance on Payan on October 16, 2014 and an amended Grievance on November 10, 2014. On November 26th, I filed a formal Criminal Civil Rights Complaint with the FBI in Washington, DC and Payan is part of that Complaint. (See attached Documents supporting this letter.)

Respectfully,

Charlie Malouff

(2)

*Copy*

I. GENERAL INFORMATION

Before you fill out this paperwork, there may be a faster way to resolve the issue you are currently having with an attorney.

If you are considering filing a grievance against a Texas attorney for any of the following reasons:

~ You believe your attorney is neglecting your case.
~ Your attorney does not return phone calls or keep you informed about the status of your case.
~ You have fired your attorney but are having problems getting your file back from the attorney.

You may want to consider contacting the Client-Attorney Assistance Program (CAAP) at 1-800-932-1900.

CAAP was established by the State Bar of Texas to help people resolve these kinds of issues with attorneys quickly, without the filing of a formal grievance.

CAAP can resolve many problems without a grievance being filed by providing information, by suggesting various self-help options for dealing with the situation, or by contacting the attorney either by telephone or letter.

I have _____ I have not __X__ contacted the Client-Attorney Assistance Program.

NOTE: Please be sure to fill out each section completely. Do not leave any section blank. If you do not know the answer to any question, write "I don't know."

II. INFORMATION ABOUT YOU -- PLEASE KEEP CURRENT

☒ Mr.

1. TDCJ/SID # 08928360 ☐ Ms. Name: Charles A. Malouff, Jr.
   Immigration # ˑˑˑˑˑˑˑ

   Address: 66089179 FCI Bastrop

   _____ P.O. Box 1010

   City: Bastrop State: Texas Zip Code: 78602

0411

I

2.  Employer:  Federal Bureau of Prisons

    Employer's Address: 1341 Hwy. 95 North

    Bastrop, TX 78602

3.  Telephone number: Residence _____ Work: (512) 321-3903
    Other: _____

4.  Drivers License # 03770442         Date of Birth  12-27-57

5.  Name, address, and telephone number of person who can always reach you.

    Name  B. Romine                    Address 1441 Hwy. 95 North

    Bastrop, TX 78602           Telephone (512) 321-3903

6.  Do you understand and write in the English language?  Yes
    If no, what is your primary language? _____
    Who helped you prepare this form?  Self
    Will they be available to translate future correspondence during this process? _____

7.  Are you a Judge?  No
    If yes, please provide Court, County, City, State: _____

III.  INFORMATION ABOUT ATTORNEY

    Note:  Grievances are not accepted against law firms.  You must specifically name the attorney against whom you are complaining.  A separate grievance form must be completed for each attorney against whom you are complaining.

1.  Attorney name: M. Ariel Payan          Address: 1012 Rio Grande

    City: Austin             State: TX          Zip Code: 78701

2.  Telephone number: Work _____ Home _____ Other _____

3.  Have you or a member of your family filed a grievance about this attorney previously?
    Yes ___ No X  If "yes", please state its approximate date and outcome. _____

0411

2

Have you or a member of your family ever filed an appeal with the Board of Disciplinary Appeals about this attorney?

Yes _____ No _____ If "yes," please state its approximate date and outcome.

_____

4. Please check one of the following:

_____ This attorney was **hired** to represent me.
___X___ This attorney was **appointed** to represent me.
_____ This attorney was hired to represent **someone else.**

Please give the date the attorney was hired or appointed. __October, 2013__

Please state what the attorney was hired or appointed to do. __Represent me in__

__direct appeal against first degree felony.__

_____

5. What was your fee arrangement with the attorney? __He was appointed__

_____

How much did you pay the attorney? __Whatever the judge authorized__

_____

If you signed a contract and have a copy, please attach.
If you have copies of checks and/or receipts, please attach.
**Do not send originals.**

6. If you did not hire the attorney, what is your connection with the attorney? Explain briefly
__N/A__

_____

7. Are you currently represented by an attorney? __Yes__
If yes, please provide information about your current attorney: __This guy because he__

__will not recuse himself.__

8. Do you claim the attorney has an impairment, such as depression or a substance use disorder? If yes, please provide specifics (your **personal** observations of the attorney

0411                                                                    3

such as slurred speech, odor of alcohol, ingestion of alcohol or drugs in your presence etc., including the date you observed this, the time of day, and location).

No

9. Did the attorney ever make any statements or admissions to you or in your presence that would indicate that the attorney may be experiencing an impairment, such as depression or a substance use disorder? If so, please provide details.

No

## IV. INFORMATION ABOUT YOUR GRIEVANCE

1. Where did the activity you are complaining about occur?

County: __Travis__    City: __Austin__

2. If your grievance is about a lawsuit, answer the following, if known:

   a. Name of court __299th District Court, Travis County__

   b. Title of the suit __State of Texas v. Charles A. Malouff, Jr.__

   c. Case number and date suit was filed __D-1-DC-13-902041  10/11/2011__ and
      __03-13-00723-CR  9/19/2013__

   d. If you are not a party to this suit, what is your connection with it? Explain briefly.

   N/A

   If you have copies of court documents, please attach.

3. Explain in detail why you think this attorney has done something improper or has failed to do something which should have been done. Attach additional sheets of paper if necessary.

   If you have copies of letters or other documents you believe are relevant to your grievance, please attach. Do not send originals.

   Include the names, addresses, and telephone number of all persons who know something about your grievance.

0411                                                                 4

IV.  3

M. Ariel Payan is in violation of the American Bar Association Model Rules of Professional Conduct and Texas Disciplinary Rules of Professional Conduct, Rules 3.7, 8.2 and 8.3 creating such a Conflict of Interest in his failure to report these violations and Recuse himself, that he is knowningly and intentionaly violating my Rights of Due Process in accordance with the Texas and United States Constitutions.

On October 22, 2013, in a face to face conversation regarding Prosecutorial Misconduct and Judicial Misconduct resulting in decisions by Trial Judge Karen Sage, for Pecuinary Interest, a violation of both State and Federal laws.  Payan told me "My wife works for the Prosecutor's Office", "We are friends with Holly Taylor and I know her husband".  And, "We all talk."  And, "it's a close knit group."

In the same conversation he told me, "The Judge's decisions were political."  And, "The Judge is not likely to decide on something that can effect her election."

Earlier, Trial counsel, Jackie Wood, Sage's best friend, said Sage was not going to make decisions that would effect her getting votes and financial contributions in her upcoming re-election. Sage's campaign kicked off right after Payan was appointed.

Bar Rule 3.7 states "A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness.

Rule 8.02(a) states, "A lawyer shall not make a statement a lawyer knows to be false or with reckless disregard as to its truth or falsify concerning the qualification or integrity of a Judge."

Rule 8.3 states "A lawyer who knows another lawyer committed a violation of the Rules of Professional Conduct that raises a substantial question of that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority.  Misconduct complaints on Sage were filed with the State Commission on Judicial Conduct, CJC No. 14-0826-D1 and the Texas Attorney General.

On October 1, 2014, in Federal Court, my prosecutor and

(5-A)

Payan's "friend", Holly Taylor, admitted on July 15, 2011, 3 months before there was any meaningful probable cause, she was out "investigating", gathering evidence, and interviewing witnesses. She also admitted to reviewing, several times, the Search Warrant Affidavit, which was inundated with patently false, misleading statements, and knew of material ommissions that would render the warrants invalid. And, earlier at my trial was formally accused of lying to the Tribunal by Trial Attorney Jackie Wood.

On March 21, 2014, Payan sent me an email acknowledging he and the two trial attorneys made those statements.

Payan, and his wife are material witnesses to the criminal conduct of Prosecutor Holly Taylor, and Judge Karen Sage under 18 U.S.C. 241 and 242, and Texas Penal Code for Abuse of Office and Offical Oppression, and he refuses to recuse himself from my case and report his, and the others misconduct to the appropriate authority.

He has committed such a Conflict of Interest I have been denied my Rights of Due Process in accordance wtih the Texas and United States Constitutions.

Also, please be advised that a copy of your grievance will be forwarded to the attorney named in your grievance.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

V. **HOW DID YOU LEARN ABOUT THE STATE BAR OF TEXAS' ATTORNEY GRIEVANCE PROCESS?**

\_\_\_   Yellow Pages

\_\_\_   Internet

_X_   Other

## VI. ATTORNEY-CLIENT PRIVILEGE WAIVER

I hereby expressly waive any attorney-client privilege as to the attorney, the subject of this grievance, and authorize such attorney to reveal any information in the professional relationship to the Office of Chief Disciplinary Counsel of the State Bar of Texas.

I understand that the Office of Chief Disciplinary Counsel maintains as confidential the processing of Grievances.

Signature: _____  Date: _October 16, 2014_

TO ENSURE PROMPT ATTENTION, THE GRIEVANCE SHOULD BE MAILED TO:

THE OFFICE OF CHIEF DISCIPLINARY COUNSEL
P.O. Box 13287
Austin, Texas 78711

0411

6

*Copy*

**OFFICE OF THE CHIEF DISCIPLINARY COUNSEL**
**STATE BAR OF TEXAS**
**GRIEVANCE FORM**

**I.   GENERAL INFORMATION**

**Before you fill out this paperwork, there may be a faster way to resolve the issue you are currently having with an attorney.**

If you are considering filing a grievance against a Texas attorney for any of the following reasons:

~   You believe your attorney is neglecting your case.
~   Your attorney does not return phone calls or keep you informed about the status of your case.
~   You have fired your attorney but are having problems getting your file back from the attorney.

**You may want to consider contacting the Client-Attorney Assistance Program (CAAP) at 1-800-932-1900.**

CAAP was established by the State Bar of Texas to help people resolve these kinds of issues with attorneys quickly, without the filing of a formal grievance.

CAAP can resolve many problems without a grievance being filed by providing information, by suggesting various self-help options for dealing with the situation, or by contacting the attorney either by telephone or letter.

I have _____ I have not __X__ contacted the Client-Attorney Assistance Program.

**NOTE: Please be sure to fill out each section completely. Do not leave any section blank. If you do not know the answer to any question, write "I don't know."**

**II.  INFORMATION ABOUT YOU — PLEASE KEEP CURRENT**

☒ Mr.
1.   TDCJ/SID # _08928360_____ ☐ Ms. Name: **Charles A. Malouff, Jr.**_____
     Immigration # _____

     Address: _66089179   FCI Bastrop_____

     _____P.O. Box 1010_____

     City: ___Bastrop_____ State: _Texas_____ Zip Code: _78602___

2. Employer: __Federal Bureau of Prisons__

   Employer's Address: __1341 Hwy. 95 North__

   __Bastrop, TX 78602__

3. Telephone number: Residence _____ Work: __(512) 321-3903__
   Other: _____

4. Drivers License # __03770442__ Date of Birth __12-27-57__

5. Name, address, and telephone number of person who can always reach you.

   Name __B. Romine__ Address __1441 Hwy. 95 North__

   __Bastrop, TX 78602__ Telephone __(512) 321-3903__

6. Do you understand and write in the English language? __Yes__
   If no, what is your primary language? _____
   Who helped you prepare this form? __Self__
   Will they be available to translate future correspondence during this process? _____

7. Are you a Judge? __No__
   If yes, please provide Court, County, City, State: _____

III. INFORMATION ABOUT ATTORNEY

   Note: Grievances are not accepted against law firms. You must specifically name the attorney against whom you are complaining. A separate grievance form must be completed for each attorney against whom you are complaining.

1. Attorney name: __M. Ariel Payan__ Address: __1012 Rio Grande__

   City: __Austin__ State: __TX__ Zip Code: __78701__

2. Telephone number: Work _____ Home _____ Other _____

3. Have you or a member of your family filed a grievance about this attorney previously?
   Yes ___ No _X_ If "yes", please state its approximate date and outcome. _____

Have you or a member of your family ever filed an appeal with the Board of Disciplinary Appeals about this attorney?

Yes _____ No _____ If "yes," please state its approximate date and outcome.

_____

4. Please check one of the following:
   _____ This attorney was hired to represent me.
   ___X___ This attorney was appointed to represent me.
   _____ This attorney was hired to represent someone else.

   Please give the date the attorney was hired or appointed. __October, 2013__

   Please state what the attorney was hired or appointed to do. __Represent me in__

   __direct appeal against first degree felony.__

   _____

5. What was your fee arrangement with the attorney? __He was appointed__

   _____

   How much did you pay the attorney? __Whatever the judge authorized__

   _____

   If you signed a contract and have a copy, please attach.
   If you have copies of checks and/or receipts, please attach.
   Do not send originals.

6. If you did not hire the attorney, what is your connection with the attorney? Explain briefly
   __N/A__

   _____

7. Are you currently represented by an attorney? __Yes__
   If yes, please provide information about your current attorney: __This guy because he__

   __will not recuse himself.__

8. Do you claim the attorney has an impairment, such as depression or a substance use disorder? If yes, please provide specifics (your personal observations of the attorney

such as slurred speech, odor of alcohol, ingestion of alcohol or drugs in your presence etc.. including the date you observed this, the time of day, and location).

No

9. Did the attorney ever make any statements or admissions to you or in your presence that would indicate that the attorney may be experiencing an impairment, such as depression or a substance use disorder? If so, please provide details.

No

## IV. INFORMATION ABOUT YOUR GRIEVANCE

1. Where did the activity you are complaining about occur?

County: __Travis__     City: __Austin__

2. If your grievance is about a lawsuit, answer the following, if known:

a. Name of court __299th District Court, Travis County__

b. Title of the suit __State of Texas v. Charles A. Malouff, Jr.__

c. Case number and date suit was filed __D-1-DC-13-902041 10/11/2011 and 03-13-00723-CR 9/19/2013__

d. If you are not a party to this suit, what is your connection with it? Explain briefly.

N/A

If you have copies of court documents, please attach.

3. Explain in detail why you think this attorney has done something improper or has failed to do something which should have been done. Attach additional sheets of paper if necessary.

If you have copies of letters or other documents you believe are relevant to your grievance, please attach. Do not send originals.

Include the names, addresses, and telephone number of all persons who know something about your grievance.

IV. 3

M. Ariel Payan is in violation of the American Bar Association Model Rules of Professional Conduct and Texas Disciplinary Rules of Professional Conduct, Rules 3.7, 8.2 and 8.3 creating such a Conflict of Interest in his failure to report these violations and Recuse himself, that he is knowningly and intentionaly violating my Rights of Due Process in accordance with the Texas and United States Constitutions.

On October 22, 2013, in a face to face conversation regarding Prosecutorial Misconduct and Judicial Misconduct resulting in decisions by Trial Judge Karen Sage, for Pecuinary Interest, a violation of both State and Federal laws. Payan told me "My wife works for the Prosecutor's Office", "We are friends with Holly Taylor and I know her husband". And, "We all talk." And, "it's a close knit group."

In the same conversation he told me, "The Judge's decisions were political." And, "The Judge is not likely to decide on something that can effect her election."

Earlier, Trial counsel, Jackie Wood, Sage's best friend, said Sage was not going to make decisions that would effect her getting votes and financial contributions in her upcoming re-election. Sage's campaign kicked off right after Payan was appointed.

Bar Rule 3.7 states "A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness.

Rule 8.02(a) states, "A lawyer shall not make a statement a lawyer knows to be false or with reckless disregard as to its truth or falsify concerning the qualification or integrity of a Judge."

Rule 8.3 states "A lawyer who knows another lawyer committed a violation of the Rules of Professional Conduct that raises a substantial question of that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority. Misconduct complaints on Sage were filed with the State Commission on Judicial Conduct, CJC No. 14-0826-D1 and the Texas Attorney General.

On October 1, 2014, in Federal Court, my prosecutor and

(5-A)

Payan's "friend", Holly Taylor, admitted on July 15, 2011, 3 months before there was any meaningful probable cause, she was out "investigating", gathering evidence, and interviewing witnesses. She also admitted to reviewing, several times, the Search Warrant Affidavit, which was inundated with patently false, misleading statements, and knew of material ommissions that would render the warrants invalid. And, earlier at my trial was formally accused of lying to the Tribunal by Trial Attorney Jackie Wood.

On March 21, 2014, Payan sent me an email acknowledging he and the two trial attorneys made those statements.

Payan, and his wife are material witnesses to the criminal conduct of Prosecutor Holly Taylor, and Judge Karen Sage under 18 U.S.C. 241 and 242, and Texas Penal Code for Abuse of Office and Offical Oppression, and he refuses to recuse himself from my case and report his, and the others misconduct to the appropriate authority.

He has committed such a Conflict of Interest I have been denied my Rights of Due Process in accordance wtih the Texas and United States Constitutions.

M. Ariel Payan was given until October 15, 2014, to recuse himself as Counsel after NUMEROUS requests and demands, in writing, to do his job and file formal objections, complaints and grievances with the Tribunal.

Payans relationship with Holly Taylor, the Travis County District Attorney who prosecuted me created a Conflict of Interest and his statements regarding the integrity of the Court proceedings in my trial, and that of 299th District Court Judge Karen Sage, made him an adversiarial material witness. His breach of fudiciary duty as my competent Counsel, and failure to recuse has demonstrated his furtherance of conduct to that of Co-Conspirator in the Obstruction of Justice, Deprivation of Rights Under Color of Law IAW Federal Law 18 USC 241 and 242, and the Texas Penal Code Abuse of Office and Official Oppression. Formal complaints through the Department of Justice and other criminal investigative agencies are being lodged. His conduct has resulted

(5-B)

in my unnecessary and ongoing false imprisonment since his be-
coming my appellate counsel! His negligent and criminal conduct
required me to formally request help from Chief Justice Jones.
See Attached Letters.

Also, please be advised that a copy of your grievance will be forwarded to the attorney named in your grievance.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

V. **HOW DID YOU LEARN ABOUT THE STATE BAR OF TEXAS' ATTORNEY GRIEVANCE PROCESS?**

___    Yellow Pages
___    Internet
_X_    Other

## VI. ATTORNEY-CLIENT PRIVILEGE WAIVER

I hereby expressly waive any attorney-client privilege as to the attorney, the subject of this grievance, and authorize such attorney to reveal any information in the professional relationship to the Office of Chief Disciplinary Counsel of the State Bar of Texas.

I understand that the Office of Chief Disciplinary Counsel maintains as confidential the processing of Grievances.

Signature: _____  Date: *November 10, 2014*

TO ENSURE PROMPT ATTENTION, THE GRIEVANCE SHOULD BE MAILED TO:

THE OFFICE OF CHIEF DISCIPLINARY COUNSEL
P.O. Box 13287
Austin, Texas 78711

0411

6

# City of Jonestown

18649 FM 1431, Ste. 4-A
Jonestown, Texas 78645
512-267-3243

Dana McCoy                                                              August 17, 2010
President
CM Alternative Energies, Inc.
P.O. Box 5337
18649 FM 1431, Ste., 19-A
Jonestown, Texas 78645

The City of Jonestown Wind Project is a federally funded Project under the ARRA Funding- Distributed Renewable Energy Program through RFA-RE-AG1-2010 from the Department of Energy through the Texas Comptroller of Public Accounts, State Energy Conservation Office. CM Alternative Energies, Inc. (CMAEI) has been subcontracted by the City to perform the task of conducting an Environmental Assessment of each site location.

Section One, Scope and Description of the Subcontractor's Agreement specifically states: By this Agreement, the parties create a Contractor/Subcontractor relationship to seek out and develop or implement, renewable energy projects affecting the City of Jonestown. This Agreement is in compliance with the request by the U.S. Department of Energy to perform a full Environmental Assessment Report prior to the execution of the applied for Distributed Energy Grant, Comptroller of Public Accounts, RFA No. RE-AG1-2010 (hereinafter referred to as the "Project"). All work necessary under this Agreement shall be conducted in the name of the City of Jonestown, and CM Energies shall perform as a subcontractor to the Project and maintain operational control of CM Energies Wind Energy Systems.

There has been a serious lack of communication and breach of fiduciary responsibilities between your office and my office. Employees of CMAEI have taken it upon themselves to draft Assessment reports and contact permitting agencies, both federal and state, on behalf of the City, without the review, approval, or authorization of the City, a gross violation of this Agreement and contractor/subcontractor protocols. In addition, your Contracts Manager has yet to contact to me to discuss these problems. This violation of Scope and protocols in the way these actions occurred has placed the Project at risk.

To remain in any favorable standing by the City and bring this Project back on track, the City insists CMAEI take the immediate following courses of action:

1. Removal of Toby Miller, Michelle Cook, and Eric Graham from the Jonestown Wind Project and all activities related to the City of Jonestown;

2. All future activities, correspondence, or other issues between CMAEI and the City be directed through the CMAEI Project Manager, Justin Shepherd, the City's appointed technology writer, and myself, and in that order.

3. No final action be taken on the part of CMAEI related to the City without my personal approval and authorization.

4. A formal response indicating the dates and times the actions taken.

1

1-4

WIND-00007483

Sincerely,

Dan Dodson
City Administrator

1-5

2

WIND-00007484

CHARLES' RESUME

HIS COLORS DON'T RUN

# *Charles A. Malouff, Jr., (Ret. M.P.O., M.B.O).*

*P.O. Box 118*
*Cedar Park, Texas 78630*

(512)796-7000                                                    *charlie@cmenergies.com*

## SUMMARY

Chief Executive Officer responsible for management and corporate development and implementation of domestic and international Alternative Energy programs in the United States and Mexico. Domestic and International Patents holder of CM Energies' Vertical Axis Wind Energy System. Honorably Retired Chief of Police and Emergency Services Specialist with over 29 years of diverse experience and background that encompasses law enforcement, maritime and military law, counter-terrorism, education, management, and international private business services. Proven performance in leadership, management, highly advanced investigations and examinations of violations of law including Maritime laws, contract negotiations, research, strategic planning, development, quality assurance, general and specialized presentations, presentation and evaluation of commercial and specialized products and training.

**Key skills include:**

- Experience in corporate upper-level management
- Experience in international business development
- Experience in successful NEPA Environmental Assessments and Environmental Impact Studies related to wind energy projects
- Experience in upper-level management in state, county and municipal law enforcement
- Over 20 years supervisory and management experience
- Over 10 years experience in successful grant writing
- Senior Sea Marshal, U.S. Coast Guard, Port of Houston
- Supervisory Reservist, U.S. Coast Guard, Special Missions Team, Galveston
- Executive Board Member and multiple term Vice-President South Region, Texas Narcotic Officers Association
- Graduate Chief's Developmental Program Series I-II-LEMIT
- Graduate of the Coast Guard Maritime Law Enforcement Boarding Officers School (Leadership and Command Course) with more than 29 years law enforcement experience
- Instructor certification and experience in numerous areas, including financial crimes, grant writing, identity theft, field training, firearms, cultural diversity, maritime interdiction, counter-terrorism, organized crime, defensive tactics/less lethal and impact weapons
- Completed training and demonstrated experience in US Department of Labor Facilitation Management
- Experience in strategic planning involving multi jurisdictions and geographic areas
- Experience in training coordination, planning, development, delivery and evaluation
- Experience in budget development and fiscal responsibility
- Experience in commercial/military sales, business management, and multi-organizational research and development
- Extensive experience in emergency services, dealing with crisis situations regularly
- Extensive experience in Organized Crime, Public Integrity, Fraud and other Criminal Investigations
- Key coordinator between Coast Guard and civilian law enforcement agencies
- Experience with FBI Joint Terrorism Task Forces, US Attorney Anti-Terrorism Task Forces
- 10 year Guest Lecturer Criminal Justice Department Advanced Criminal Investigations Texas State University

1-1

**Awards and Achievements**

Honorably Retired Chief of Police. Master Peace Officer. Silver Star for Gallantry. Purple Heart. U. S. Air Force Outstanding Unit Award, Presidential Citation, assigned to dignitary protection detail for Shah of Iran, 1979. U.S. Coast Guard Commandants Letter of Commendation, for investigating and identifying Eastern Bloc foreign operative (Russian Spy) operating in Port of Houston. Coast Guard Commendation Medal (2). U.S. Coast Guard District 9 Life Saving Award. Command Letter of Appreciation for performance during Counter-Smuggling operations, U.S.-Canadian Border. Graduate of Law Enforcement Management Institute of Texas, Chief's Development Program Series I and II. Graduate of the Coast Guard Maritime Law Enforcement Boarding Officers School. Over 3,150 hours TCLEOSE recognized training, and 160 college credit hours, Majoring in Criminal Justice. Participant-Operation Iraqi Freedom. Participant-Operation Enduring Freedom. Senior Enlisted Supervisor, Physical Security Team, Coast Guard Special Missions Team, MSST 91104. Boarding Team Supervisor. First Sea Marshal, Port of Houston. Senior Sea Marshal Port of Houston. Outside Agency Coordinator. Member U.S. Attorney's Office Anti-Terrorist Task Force. Member FBI Joint Terrorism Task Force (JTTF). Rewrote Coast Guard Tactical Operations and Defensive Tactics-Post 911. Other pre-911 duties included Maritime Investigations, MSO Houston. Responsible for closing 163 out of 166 narcotic cases against mariners between 1999 and 2000. Staff Member, Planning Division MSO Houston. Developed USCG Gulf Coast Hurricane Planning Committee Operations Plan For Regional Gulf Coast Area Emergency Operations 2000. Created and developed initial Strategic Threat Assessment Against the Port of Houston 2000-2001. Multi-Agency (Federal, State and local) Coordinator for 1122 and 1033 Programs (1988-2005). TCLEOSE Law Enforcement Instructor. Specialized instruction in Organized Crime, Money Laundering, Identity Theft, Narcotics, Terrorism, Undercover Operations, Ballistic Shield Tactics. Recognized expert in ballistic materials and applications. Maritime Law Enforcement Boarding Officer-Instructor. Master Instructor, Precision Ordnance Products, including Less Lethal and Explosive devices. ASP Instructor. Tactical Training Instructor. Advanced FBI Firearms Instructor. TCLEOSE Firearms Instructor. NRA Police Firearms Instructor. Personal Protection Instructor. Home Firearms Responsibility Instructor experienced in static and dynamic firearms training. ASP Baton Instructor. OC Chemical Restraint Instructor. Less Lethal and Explosive Devices Instructor. Defensive Tactics Instructor. Guest Lecturer to Southwest Texas State University Criminal Justice Division on "Conspiracy, the Making of an Organized Crime" (1997-2005). Guest Instructor Texas Hispanic Peace Officers Association 2005. Texas Municipal Police Association Member (2003- ). Staff Instructor, Cypress Creek Advanced Tactical Team Tactical Emergency Medical Services Training Unit (CCATT/TEMS), Houston, Texas (2000-2005). Member U. S. Attorney's Anti-Terrorism Task Force. Vice-President, South Region, Texas Narcotic Officers Association (2005-2006). Vice-President, South Region, Texas Narcotic Officers Association (2004-2005). Regional Director, South Region, Texas Narcotic Officers Association (2002-2004). Training Coordinator, South Region, Texas Narcotic Officers Association (2001-2002), Member, Texas Narcotic Officers Association (1997-2006), Assigned to dignitary protection details for Pope Paul, and President Reagan. Analyzed, developed, and published three-part article on tactical vehicle assaults published in Command Magazine 1998. Published article on Ballistic Shield Usage in Command Magazine 1996. Presented Special Confidential Report(Organized Crime and Money Laundering) to the Treasurer, State of Texas, 1990. Lead Agent in coordination, development, and operation of multi-agency Organized Crime Task Force in Fort Worth area, 1991-92. Created and developed Confrontation Management Course instructing in traditional Riot Control, and Confrontation Management techniques

*/-2*

and Field Force Options for the Director of Criminal Justice Division, Lamar University, Beaumont, Texas. One of five civilian tactical instructors invited by U.S. Air Force Security Police to participate as staff instructors in 'Urban Tactics" (advanced SWAT) Course at Fort Dix, New Jersey. Former faculty member of "Top Gun" Investigation and Prosecution of Drug Cases, Sea Girt, New Jersey. Former member of U.S. Air Force's first Anti-Terrorist Tactical Neutralization Team. Former member of American Society of Law Enforcement Trainers (A.S.L.E.T.). Former member of National Rifle Association (N.R.A.). One of two participants in review and modification of Chapters 154 and 155, Texas Tax Code resulting in Legislative changes directed toward black market of cigarettes, 1990. Former representative to FBI's Central Texas Terrorist Working Group. Former member, Dallas/Fort Worth Retail Merchants Security Association. Former alternate member of Regional Organized Crime Information Center. Former member, Texas District and County Attorneys Association. Former member, Combined Law Enforcement Association of Texas.

Vietnam Era Veteran.


September 01, 2005

To whom it may concern:

Allow me to introduce to you Chief Charlie Malouff.

Chief Malouff served the City of Hico for about 4 months. He came on board and departed under unique circumstances: he came to work on very short notice when the previous Chief departed suddenly for service in Iraq, and now the City of Hico is contracting with Hamilton County for Police services through the Sheriff's Office.

During his tenure here, Chief Malouff was indefatigable in serving the City. He participated in everything from attending luncheons at the Senior Citizens' Center to coordinating all security activities for the Annual Steak Cook-off event, which drew thousands of visitors to our City.

I cannot recommend Chief Malouff highly enough: please give him every consideration.

Sincerely,

Lambert Little
Hico City Administrator

PATTIE HUBERT BOOTH
800 N. SHORELINE BLVD., SUITE 500
CORPUS CHRISTI, TEXAS 78401

July 22, 2004

Don Lane
Special Agent in Charge
Coast Guard Investigative Service
Gulf Region
Hale Boggs Federal Building, Room 1140
500 Poydras Street
New Orleans, LA 70130-3310

SAC Lane:

I would like to recommend Petty Officer Charles Malouff, USCGR, for the position of Investigator with the Coast Guard Investigative Service.

I was introduced to Petty Officer Malouff in February 2003. Petty Officer Malouff was assigned to the Intelligence Branch, Marine Safety Office Corpus Christi, Texas, providing security for the personnel, vessels and equipment to be deployed overseas. He began working regularly with our office on intelligence and criminal matters. In addition, he was actively involved in the Anti-Terrorism Task Force ("ATAC", formerly know as "ATTF") and other intelligence and security related meetings hosted by this office and the Coast Guard.

Petty Officer Malouff is third generation Lebanese and would bring an insight and understanding to this position that so desperately is needed at this crucial time. During his time in Corpus Christi, numerous reports were received of possible terrorist activity directed at military resources and the Port. Petty Officer Malouff's expertise was instrumental in dealing with the possible threats to the area.

While assigned to the United States Attorney's Anti-Terrorist Task Force he directly assisted the FBI's Joint Task Force in the investigation and enforcement of suspected Terrorist activities and financial fraud cases. In addition, he assisted the United States Attorney's office, the Anti-Terrorism Task Force, and the Joint Anti-Terrorism Task Force (JTTF) in the execution of search warrants and arrest warrant of an individual by the name of Rizzaw Hassan. Hassan has been indicted and convicted of fraud and money laundering.

Petty Officer Malouff is personable, intelligent, self-motivated, and diligent in his desire and ability to take on complex tasks, assist other agents, and develop information and evidence

for prosecution. It is these characteristics that I feel will make him a great asset to the Coast Guard Investigative Service. I whole-heartedly recommend Petty Officer Malouff.

Sincerely,

Patti Hubert Booth

**U.S. Department of
Homeland Security**

**United States
Coast Guard**



Commanding Officer
United States Coast Guard
Maritime Safety & Security Team 91104

7707 Harborside Drive
Galveston, TX 77554
Staff Symbol: a
Phone: (409) 941-8100
FAX: (409) 740-3844

1600
18 Sep 2003

# MEMORANDUM

From:  B. P. Thompson, LCDR
       MSST 91104

To:    PS1 Charles A. Malouff, Jr., USCGR

Subj:  LETTER OF APPRECIATION

1.  I note with pride and am pleased to commend you for your performance of duty, commitment, and dedication while recalled to active duty at MSST 91104 from 19 February through 19 September 2003.

2.  During this period, you were involuntarily recalled to active duty in support of Operation ENDURING FREEDOM. Although assigned to MSST 91104, you were involuntarily dispatched TDY to MSO/Group Corpus Christi to assist with Military Out Load Operations. You accepted your orders and displayed exemplary professionalism despite being deployed away from your parent unit. Your continued commitment to mission accomplishment and "can-do" attitude was exemplary and contributed in no small measure to the overall success of the out load operations.

3.  Upon return to MSST 91104 in March, you continually demonstrated outstanding leadership and performance in your duties with the Physical Security Team. In July, you deployed for three weeks, on a multi-agency operation. Again you demonstrated quality leadership in your role as a senior petty officer. The dedication, pride and professionalism you consistently display bring credit upon yourself, your team, and the United States Coast Guard.

4.  Your high level of performance and enthusiasm is sincerely appreciated. I look forward to your continued presence here at the unit. Keep up the good work!

#

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**



Commander
Ninth Coast Guard District

1240 East 9th Street
Cleveland, OH 44199-2060
Staff Symbol: (osr)
Phone: (216)902-6111
Fax: (216)902-6121
Email: ppreusse@d9.uscg.mil

3130

JUL 15 2003

# MEMORANDUM

From: P. A. PREUSSE, CAPT
CGD NINE (osr)

Reply to  D9(aosr)
Attn of:  LCDR K. Willis
(216)902-6135

To:     CG GP Buffalo

Subj:   SAR TEAM 9 AWARD

1. Please convey my appreciation to USBP agent William Reed, PS1 Charles Malouff, BM3 Artre Rusk and SNPS Josh Way, for their outstanding efforts in the rescue of Mr. Steven Coville from the waters along the St. Lawrence River adjacent to St. Lawrence Park, Canada.

2. At approximately 1815, July 6, 2003, USBP Agent William Reed, coxswain on a jointly crewed USBP boat, was showing BM3 Rusk and SNPS Way known smuggler departure points along the Canadian border, specifically around the Brockville/St. Lawrence Park area. They were traveling west, passing the main parts of the Brockville downtown area approaching the St. Lawrence Park when they observed numerous people swimming in the adjacent waters including a lone male, later identified as Mr. Steven Coville, swimming across the channel to Mile Island. As the boat crew moved within 50 yards of Mr. Colville, they observed him suddenly begin to flail his arms and briefly yell for help. BM3 Rusk and SNPS Way rushed to the front of the boat while agent Reed expertly maneuvered the 27-foot Sea Ark against a strong current that pulled Mr. Coville and the boat in opposite directions. The boat crew observed Mr. Coville go under and resurface. As he resurfaced, agent Reed repositioned the boat bow-on as BM3 Rusk attempted to grab Mr. Coville. Strong currents once again thwarted their efforts and Mr. Colville was swept back under the water, bobbing back to the surface. Throughout the rescue, agent Reed continued to expertly maneuver the boat, careful not to strike Mr. Coville while staying close enough to affect the rescue. As soon as Mr. Coville resurfaced for the third time, SNPS Way threw Mr. Coville a line he was able to grab. Both BM3 Rusk and SNPS Way got a hold of Mr. Coville and pulled him into the boat. It was obvious that he was suffering from hypothermia and shock as he was shaking uncontrollably. The crew immediately began emergency warming procedures. Mr. Coville stated he had tired rapidly against the current and could no longer swim. Agent Reed contacted emergency medical assistance and transferred Mr. Colville to the awaiting constable at Gilbert's Marine in Brockville, Ontario.

3. Coast Guard Search and Rescue (SAR) operations were clearly enhanced by the persistence, diligence and professionalism exhibited by the crew of the USBP boat crew. By virtue of their efforts, they have joined the prestigious ranks of SAR Team 9, a network of individuals who perform search and rescue on the Great Lakes. Please accept these certificates and pins as a token of our appreciation for a job well done!

#

Enclosure:   SAR Team 9 Certificate and Pin



06 September 2002

From: Commandant
To:   PS1 Charles Malouff, USCGR

Subj:  LETTER OF COMMENDATION

1.  I note with pride and am pleased to commend you for your performance of duty from September 2001 to September 2002 while serving in the Sea Marshal Branch of the Homeland Security Department at MSO Houston-Galveston. Following the tragic events of the 11 September 2001 "Attack on America" you were recalled to serve your country in the newly created Homeland Security Department during Operation Noble Eagle. You began your duty in the Base Security Branch, logging over 200 hours of security patrols that were instrumental in the overall protection of the base and it's personnel. You were the lead watchstander supervising over 45 day and nighttime watches when you resolved over 20 potential trespass attempts, including a series of suspicious vehicles in the vicinity of the main gate. When Coast Guard priorities changed and new security missions evolved, you volunteered to serve on one of the Coast Guard's first Sea Marshal teams. Your relentless drive and considerable Coast Guard law enforcement experience played a vital role in the new operational mission as you oversaw the escort of 65 High Interest Vessels. In March 2002, upon receiving reports of a possible stowaway, you fought drenching rains, high winds and 8-foot seas in order to reach the suspect vessel. Once on board, you conducted a comprehensive search ruling out the presence of the potential threat, and then provided an armed escort during the vessel's twelve-hour transit into port. In December 2002, you aggressively investigated an incident involving a suspicious crewmember of a foreign vessel taking photographs of the Houston Ship Channel and it's critical infrastructure. Your quick actions led to immediate interviews with the crew and a federal law enforcement analysis of the photographs, circumventing any potential threat to the port. Your rapid patriotic response and participation in the most extensive mobilization of reserve forces since World War II greatly contributed to the rapid establishment of our current heightened national maritime security posture.

2.  You are commended for your outstanding performance of duty. By your meritorious service you have upheld the highest traditions of the United States Coast Guard.

3.  You are hereby authorized to wear the Commandant's Letter of Commendation Ribbon Bar. The Operational Distinguishing Device is authorized.

For the Commandant

KEVIN S. COOK
Captain, U.S. Coast Guard
Commanding Officer, Marine Safety Office Houston-Galveston
Safety Office Houston-Galveston

Entry Type: Performance and Discipline

Reference: None

Responsible Level: Unit

Entry: (General-Positive)

26DEC01:   PS2 Malouff is recognized for his outstanding and significant accomplishment in identifying and handling of the preliminary espionage investigation of a suspected Eastern Bloc operative on December 26, 2001. PC Malouff was part of a Sea Marshal Team onboard the vessel UMIAVUT when it was brought to their attention  that one of the crew members had taken an excessive amount of security related pictures throughout the Houston Ship Channel.   Upon closer investigation of this individual by the FBI, no wrongdoing could be proven.   PO Malouff is commended for his professionalism, dedication and expertise. Job well done, Bravo Zulu.

M.R. Riley, CWO4, USCG

18JAN02:   I acknowledge the above entry.

C.A. Malouff

| 1. NAME OF PERMANENT UNIT | 2. NAME OF UNIT PREPARING THIS FORM | | | |
|---|---|---|---|---|
| MSO Houston-Galveston | MSO Houston-Galveston | | | |
| 3. NAME OF MEMBER (Last, First, MI) | 4. SOCIAL SECURITY NO. | 5. GRADE/RATE | 6. PAGE 7 | |
| Malouff Charles A. | 456  21  3151 | PS2 | | |

PREVIOUS EDITION MAY BE USED

Page 2 - File in Service Record

# NOMINATION FOR SILVER STAR FOR BRAVERY





# American Police Hall of Fame

## SILVER STAR FOR BRAVERY

### IS HEREBY PRESENTED TO

## *Charles A. Malouff*

For Unselfish Line of Duty Heroism in which this Law Enforcement Officer, at perilous risk to his own life, performed his duty in such a manner as to reflect courage, dedication and initiative becoming to the professional law enforcement officer.

Issued by the National Board of Trustees upon
the recommendation of the Awards Committee
this **30th** day of **June, 2006**

**PRESIDENT**



**T/M RS**
TEXAS MUNICIPAL RETIREMENT SYSTEM

RECEIVED
APR 06 2006
TCI OSE

March 31, 2006

Mr. Charles Anthony Malouff Jr.
PO Box 26041
Austin, TX 78755

RE:  City of Hico
     TMRS ID: 216475

Dear Mr. Malouff:

Your application for Occupational Disability has been approved.

| Contact TMRS if any information is incorrect. | | |
|---|---|---|
| **Retirement Date** | February 28, 2006 | |
| **Retirement Option** | CASH OUT | *Lump-sum payment will be the only payment due.* |
| **Check mailed** | March 31, 2006 | |
| **Supplemental Death Benefit** | *Co-Beneficiaries:* Dana M. Malouff-McCoy & Kristy D. Malouff | You may change your beneficiary designation at anytime. |

If you have any questions or if we can be of any assistance, please feel free to contact our Retirement Department at 1/800-924-8677.

Sincerely,

Gary W. Anderson
Executive Director
GWA/jcw

Copy: City of Hico

TMRS
P.O. Box 149153
Austin, Texas 78714-9153                www.TMRS.com                512.476.7577
                                                                Toll-Free 800.924.8677
                                                                Fax 512.476.5576

# American Police Hall Of Fame

## National Law Enforcement Purple Heart Award

### For Line of Duty Injury

This will certify that

**Charles A. Malouff**

Hico, TX Police



has served in the entire system of the 'Purple Heart in recognition of the grievous injuries sustained while in the performance of duties and have truly exemplified all the highest ideals of our profession. Awarded this Department this

to wear this official medal and service bar. Issued by the American Police Hall Of Fame

This **30th** day of June, 2006

President



August 15, 2003

Mr. Charles Malouff
P.O. Box 26041
Austin, Texas 78755

Dear Charlie:

I would like to say Thank You for taking time out of your busy schedule to hold class for my Deputies earlier this week. Everyone commented that your presentation was very informative, useful and fun. In fact, they have requested that I only use you as an instructor in the future.

Once again, I appreciate you, and look forward to our next meeting.

Sincerely,

Bosque County Sheriff's Department

Charles E. Jones.
Sheriff

CEJ/ko

Department of
Criminal Justice



March 10, 2000

TO WHOM IT MAY CONCERN:

I have known Mr. Charles Malouff for the past five years in both a professional and personal capacity. In all instances I have found him to be an intelligent, articulate and energetic colleague. He has consistently impressed me with his thorough preparation, determined approach, and by his ability to integrate the conceptual structures of theory with the demands of reality for effective problem resolution. Because of a variety of factors, I feel that he is an excellent candidate for a police administrative position.

First, Mr. Malouff brings a wide variety of experience in law enforcement. While with the State of Texas as an investigator he worked in several job environments with progressively increasing responsibilities. These experiences have given him some other substantive knowledge of varying law enforcement situations. They have also provided him with an accurate and realistic sense of values for the workplace and has instilled an unusually strong work ethic.

Second, I have had the opportunity to see Mr. Malouff develop in the academic world. While employed full-time as a police officer, he has continuously pursued his degree. While pursuing this goal he never took away time from his family and church commitments and managed to participate in various community programs. These experiences have forced him to budget his time wisely.

Third, Mr. Malouff's record as a criminal investigator speaks for itself. His clearance and conviction rate were unsurpassed. Such a record indicates that he was able to not only obtain the relevant information for prosecution, but he was also able to do so within the legal parameters established by the judicial system

Southwest Texas State University

601 University Drive · San Marcos, Texas 78666-4616
Criminal Justice · 512-245-2174

Re: Mr. Charles Malouff                                    March 20, 2000


Finally, on a more personal level, I have found that his most admirable traits are an unimpeachable integrity and a persevering desire to see the final function of his efforts. I feel that he is quick to realize any personal limitations and is willing to seek assistance when necessary.

I highly recommend Mr. Malouff and feel that he will be a definite asset to any law enforcement organization. Should you have any questions or wish to discuss the matter in more detail, please feel free to contact me at my office (512/245-2347) or at home (512/236-7212).

                                Sincerely,




                                Mr. James C. Vijaxxx

CAPTAIN ALLEN FREEMAN

Spartanburg County Detention Facility
950 California Avenue
Spartanburg, South Carolina 29303



**State of New Jersey**
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
25 MARKET STREET
CN 085
TRENTON, NJ 08625-0085
TELEPHONE: (609) 984-6500

DEBORAH T. PORITZ
ATTORNEY GENERAL

TERRENCE P. FARLEY
DIRECTOR

May 14, 1996

Jeffrey Shultz, President
Centurion Ballistic Shield Corp.
Tremont on the Common
151 Tremont St.
Boston, Mass.  02111

Dear Mr. Shultz:

I am writing to express my appreciation for your allowing Charlie Malouff to travel to New Jersey for Top Gun Class 7, held from April 12-19, 1996 at the New Jersey Police/Criminal Justice Academy at Sea Girt.  I was quite pleased when Charlie offered to attend, having previously met him at the Urban Tactics Course conducted at Fort Dix.  Charlie originally offered to present a lunchtime Shield Seminar for the Top Gun Class of approximately 96 sworn Officers.  As it turned out, Charlie saved our bacon when he was able to fill in a 3-hour block of instruction, when other instructors were unavoidably delayed.  In addition, Charlie was able to share his expertise in tactics and use of the shields during our raid practicals.

On behalf of the Top Gun Faculty, I would like to thank you for allowing Charlie to participate.  His dedication and professionalism reflect very well upon you and the Centurion Ballistic Shield Corporation.  I have provided Charlie with the dates of upcoming Top Gun Classes, and extend through you an open invitation to him to attend whenever it is practical.  Should you wish to speak to me at some point, my telephone number is 609-530-3401.

Very truly yours,

John Robin R. Gabula
Deputy Attorney General
Statewide Narcotics Task Force

c: SDAG T. Barry Goas

New Jersey Is An Equal Opportunity Employer

DELEGATED EXAMINATING UNIT
PERSONNEL DIVISION
FEDERAL LAW ENFORCEMENT TRAINING CENTER
GLYNCO, GEORGIA 31524
NOTICE OF RATING

Charles A. Malouff, Jr.
5408 Scout Island Circle South
Austin, TX 78731

SOCIAL SECURITY NUMBER: 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
ANNOUNCEMENT NUMBER: 92-68
VETERANS PREFERENCE: 5
FINAL SCORE: 96
REGISTRATION DATE: 12-8-92
POSITION TITLE: Training Instructor (Law Enforcement)
GRADE: GS-1712-12
* IF YOU RECEIVED AN INELIGIBLE RATING, IT WAS BASED ON:

**THIS IS NOT A JOB OFFER.** It is a notice of your rating for the announcement shown above and reflects information contained in your record as it appears in our files. You should carefully review this information to assure that it is correct. If any information is incorrect or has changed since you submitted your application, you should notify this office in writing. Requests for change will be acknowledged. Due to the nature and confidentiality of information contained on applications for employment, inquiries should be addressed to this office in writing.

**VETERANS PREFERENCE:** You must qualify for a job (that is, meet minimum experience and/or education requirements) before veterans preference points are added to your score. The score reflected above includes additional points if you are entitled to veterans preference.

**REQUEST FOR REVIEW OF RATING:** If you disagree with your rating and desire a re-evaluation of your application, you must submit your request in writing to this office **WITHIN 30 DAYS OF THE REGISTRATION DATE SHOWN ABOVE.** You should include specific information about your experience/training and an explanation of why you believe you meet the qualification requirements of the position or should have a higher rating. Your request will be considered and you will be notified in writing of the results.

**LENGTH OF ELIGIBILITY:** Your eligibility will entitle you to active consideration in accordance with your standing on the list of eligibles for 90 days from the above registration date. **ELIGIBILITY IS RESTRICTED TO THE ANNOUNCEMENT FOR WHICH YOU APPLIED.**



TREASURY DEPARTMENT
P. O. BOX 12608 CAPITOL STATION
AUSTIN, TEXAS 78711

· KAY BAILEY HUTCHISON
TREASURER
STATE OF TEXAS

LBJ STATE OFFICE BUILDING
CONGRESS AT 17TH ST.
(512) 463-6000

August 20, 1992

**TO WHOM IT MAY CONCERN:**

I have known and worked with Charles Malouff for the last two years. In my personal opinion, he has many positive qualities that make him a valuable employee in his field.

Charlie is a very energetic and creative individual. He is a hard working person who willingly devotes more than forty hours a week to his job. He is also creative, and frequently comes up with different ways to approach situations, with the goal of doing his job better. Charlie is also very knowledgeable about law enforcement training and procedures.

Therefore, I personally recommend him for your consideration.

Sincerely,

Alicia M. Fechtel
General Counsel
Texas State Treasury Department

AMF/jas

ROSE-MICHEL MUNGUIA
P. O. Box 266
Austin, Texas 78767

August 8, 1992

Re:   Charles A. Malouff, Jr.

To Whom It May Concern:

I have had the pleasure of knowing Charles A. Malouff, Jr., his wife, Brenda, and their children since 1986. Mr. Malouff and his wife have proven to be loyal, dependable and upstanding close personal friends.

In 1989, the Texas Legislature conferred the enforcement responsibility of the Cigarette and Tobacco Products Tax Act on the Texas State Treasury Department (the "Treasury"). As a staff attorney at the Treasury, I recommended Mr. Malouff for one of the enforcement officer positions because I am familiar with his excellent record as an officer in other positions he has held. My specific job duties at the Treasury have not afforded me the opportunity to work directly with the Cigarette and Tobacco Products Tax Division, however, it is well known that Mr. Malouff is highly regarded by his superiors and his collegues as a proficient and valuable enforcement officer.

Mr. Malouff is extremely knowledgeable of theories, principles, and practices of professional criminal and civil investigations. He is also well trained in the area of civil rights legislation and he is sensitive to its potential impact in law enforcement situations. Mr. Malouff has the ability to coordinate, motivate and manage his subordinates and peers in enforcement programs and to communicate his thoughts and objectives effectively to his superiors and others.

I highly recommend Mr. Malouff for any position for which he applies. I feel that he is more than adequately educated and trained to assume a position that requires his particular experience and credentials. In addition, I sincerely believe that he has the potential to successfully meet the criteria of a higher level position than the one he currently holds.

I hope that you will seriously consider Mr. Malouff as a qualified candidate for the position for which he applies.

Sincerely,

Rose-Michel Munguia, Esq.



LETTER OF REFERENCE:

CHARLIE MALOUFF

As Division Loss Prevention Manager for the Texas Division of 7-Eleven Stores (A Division of The Southland Corporation), I have had the good fortune of working with Charlie Malouff in his capacity of Special Agent for the Tobacco Products Division of the Texas Treasury Department over the last several years.

As Special Agent, Charlie has been exceptionally responsive to the problems of the retail industry in Texas concerning the theft and black marketing of cigarettes and tobacco products. Charlie, along with other Special Agents in the team, have helped retailers immensely in investigating and prosecuting those responsible for the illegal and costly trafficking of stolen cigarettes.

Charlie's willingness to listen to the public he serves, his ability to pull together the efforts of various law enforcement agencies, his ability to "sell" a program or course of action to his superiors, and carry it out, is a unique and valuable asset in law enforcement or any industry.

Charlie has a refreshing ability to establish a working relationship with just about anyone, instill trust and confidence in those he works with and for, and delivers on his promises.

Needless to say that this is not the case with all law enforcement officials all the time, but Charlie seems to be able to rise above titles and politics, and gets the job done.

Please feel free to contact me personally if you require further information.

Jeff Feldman
Division Loss Prevention Manager
The Texas Division
7-Eleven Stores
A Division of The Southland Corporation

7-Eleven Stores / Texas Division 1649
2201 North Central Expressway / Suite 171 / Richardson, TX 75080 / Phone (214) 907-0711

DIVISION OF
THE SOUTHLAND
CORPORATION



Charles A. Malouff
801 Fairchild Street
San Antonio, TX 78236

Dear Charles

I was extremely pleased to hear of your quick thinking and actions to protect government property on 18 May 1976. As you know there are many in our midst that have less than the desired regard for both personal and government property.

There are those that may ridicule and criticize you for your action but they are the same ones that complain because we are losing so many of our benefits. These recalcitrant individuals are the last to realize that benefits cost money and when government property is destroyed, it must be replaced. Far too often the money set aside for our benefits must be diverted to repair or replace maliciously damaged property.

You are a credit to your family and a definite asset to our community. This display of courage and just plain "guts" lets my generation know that your generation will do well when it's your turn to run our country.

LARRY V. GIRTON, Colonel, USAF
Base Commander



TREASURY DEPARTMENT
P. O. BOX 12608, CAPITOL STATION
AUSTIN, TEXAS 78711

- KAY BAILEY HUTCHISON
TREASURER
STATE OF TEXAS

LBJ STATE OFFICE BUILDING
CONGRESS AT 17TH ST.
(512) 463-6000

August 20, 1992

**TO WHOM IT MAY CONCERN:**

I have known and worked with Charles Malouff for the last two years. In my personal opinion, he has many positive qualities that make him a valuable employee in his field.

Charlie is a very energetic and creative individual. He is a hard working person who willingly devotes more than forty hours a week to his job. He is also creative, and frequently comes up with different ways to approach situations, with the goal of doing his job better. Charlie is also very knowledgeable about law enforcement training and procedures.

Therefore, I personally recommend him for your consideration.

Sincerely,

Alicia M. Fechtel
General Counsel
Texas State Treasury Department

AMF/jas

WALTER FELLERS
SHERIFF

**COMAL COUNTY**

SHERIFF'S DEPARTMENT

October 6, 1983

NEW BRAUNFELS, TEXAS 78130
Phone 625-9141
625-9142

Mr. Burney Boeck
Chief of Police
New Braunfels Police Dept
111 W. Garden
New Braunfels, Texas 78130

Dear Chief Boeck:

It has come to my attention that one of my jailers, Charles Malouff, has applied for a patrol job for the city of New Braunfels. Although I hate to loose Mr. Malouff I can understand his wanting to move on to something that he prefers, which is being a patrol officer. Therefore, I would like to take this opportunity to recommend Mr. Malouff for the position of patrolman. During the time that he has been working at the Comal County Jail he has been an asset to this department. Mr. Malouff is a good worker, a good listener and is willing to learn. Whenever someone is needed to take care of some extra work or put in some extra time Mr. Malouff is always willing to help out, and I know the job will then be done right. As you well know, when you need a job done you want someone that you can trust to do it the way it must be done.

If you have any questions about Charles Malouff please do not hesitate to contact me.

Yours truly,

JOHN JENKINS
Jail Administrator

JJ/kc



TREASURY DEPARTMENT
P. O. BOX 12608, CAPITOL STATION
AUSTIN, TEXAS 78711

**KAY BAILEY HUTCHISON**
TREASURER
STATE OF TEXAS

LBJ STATE OFFICE BUILDING
CONGRESS AT 17TH ST
(512) 463-6000

May 22, 1992

Mr. Charlie Malouff
5408 Scout Island Circle
Austin, Texas 78731

Dear Charlie:

I recently received a letter from Malcolm Kirkland of the Grocery Supply Company commending you for your help in investigating an incident of stolen cigarettes within the Grocery Supply Company.

I always appreciate hearing about employees of the Texas Treasury whose hard work is making such a difference to people throughout the state. It is efforts such as yours which will help us to eliminate the cigarette black market and save taxpayers millions of dollars.

Thank you again for a job well done.

Sincerely,

Kay Bailey Hutchison
State Treasurer

KBH/dcr/rc

cc:   Donna Reynolds

AN EQUAL OPPORTUNITY EMPLOYER



## GROCERY SUPPLY COMPANY
### A GSC ENTERPRISE

P. O. Box 638, 130 Hillcrest
Sulphur Springs, Texas 75453-0638
(903) 885-7621
1-800-231-1936
FAX (903) 439-3249

May 7, 1992

RECEIVED

MAY 1 1 1992

TREASURY DEPARTMENT
EXECUTIVE ADMIN.

Ms. Kay Bailey Hutchison
State Treasurer
P. O. Box 12608, Capitol Station
Austin, Texas 78711

Dear Ms. Hutchison,

This letter is to say "Thank You" to you as State Treasurer and your Department, specifically Mr. David Boatright and Mr. Charlie Malouff, for your assistance in investigating a recent incident of stolen cigarettes within our Company. Mr. Boatright was very responsive to our needs in arranging the investigation and, according to my people, Mr. Malouff was outstanding in handling the investigation.

Ms. Hutchison, we, Grocery Supply Company, have worked together with your Department in the past and hope that we have been some benefit to your efforts. Please know that we stand ready to assist you in the future if needed and that we really appreciate Mr. Boatright's and Mr. Malouff's recent assistance to us and you for allowing them to respond so effectively and efficiently. Thank you again.

Respectfully,

Malcolm Kirkland
Division President

MK:sm

# ⊛TREASURY INTEREST

A MONTHLY PUBLICATION FOR THE EMPLOYEES OF THE TEXAS STATE TREASURY DEPARTMENT



## FROM THE TREASURER'S DESK ...

Plans for the Treasury picnic are well underway! Our hard-working Activity Committee it is already secured the date, the time and the place and now all we need is you! The picnic is planned for Saturday, June 13th and we will all be meeting at Brentwood Park at 10:00 a.m. to make sure we get a good spot.

Brentwood has a swimming pool, softball field, sand volleyball, tennis courts and two playscapes, so there will be plenty of fun activities in which to participate. We will also have a dunking booth where you can dunk a deputy or a division director! Please bring blankets and any lawn furniture you will need as well as any necessary sports equipment (tennis rackets, bathing suits etc.). The Activity Committee will also provide the drinks and potato chips, but you will need to provide your own beverage.

The following Activity Committee members have generously volunteered their time to organize the important elements of our picnic:

Cooking/Barbecue Pit - Doug Prince
Children's Activities - Joyce Sisley
Menu Planning - Rebecca Contreras and Yvette Viveta
Softball/Volleyball - Richard Green and Steve Bazan
Future Commissar - Doug Prince

Please contact your Activity Committee member if you have any fun ideas or if you would like to help out!

Ray and I are really looking forward to seeing you all there with your families. We do not have many opportunities to get together and get to know each other in such a relaxing atmosphere, so please take advantage of this one!
See you on the 13th!

*Kay Bailey Hutchison*

 Printed on 100% Recycled Paper

## TOBACCO TAX CRACK DOWN

Our Tobacco Tax Division is celebrating yet another success in saving the state of Texas losses in cigarette and tobacco tax revenues.

Felony charges have been filed against a 51 year old Fannin County woman who is accused of purchasing untaxed cigarettes in Oklahoma and transporting them to Texas. The arrest culminated a two-week investigation by Treasury agents, Fannin County Precinct 1 Constable Craig Nichols and the Texas Alcoholic Beverage Commission.

By joining our forces and making this arrest, we are conveying the message to cigarette bootleggers that we are serious about enforcing Texas' cigarette and tobacco tax laws. Thanks to David Boatright and his fine staff for ensuring that this investigation was a successful one!



Directions to Brentwood Park:

From I-35:
Driving North, take the 290 exit and head West on Koenig Lane past Lamar Blvd. Take a right on Arroyo Seca and drive North several blocks to Brentwood Avenue. Make a left on Brentwood, drive one block to Yates and take a right. The school parking lot is half a block on the right side of the street.

From Mopac:
Take the North and exit. Go East on Northland past Burnet Road. Turn left at Arroyo Seca and follow the directions above.

# ⊛TREASURY INTEREST

A MONTHLY PUBLICATION FOR THE EMPLOYEES OF THE TEXAS STATE TREASURY DEPARTMENT

## FROM THE TREASURER'S DESK . . .

It's that time of year again in Texas! The time when we deliver great news to thousands of people through the Treasury's Unclaimed Money Fund program. On Sunday, March 1st, four million copies of the eighth annual Unclaimed Property publication will go out to the public in thirty-five newspapers across the state to inform people that we have something that belongs to them.

Last fiscal year, we returned more money to missing owners than ever before in the program's history. Since this year's publication contains over 100,000 names representing more than $86 million, we are expecting another monumental year. Each year the number of mail and phone inquiries goes up due to the increasing popularity of this Treasury public service. In fact, over 170,000 pieces of mail and 130,000 phone calls are becoming routine.

Clearly, making this all happen is no simple task. The work begins in November and it involves many areas of the Treasury. Requests for Proposals (RFP's) must go out for printing bids; computer lists must be generated and edited in order to get a clean tape to send to the winning bidder; public service announcements must be prepared and sent to TV stations; camera ready art work and information must be prepared for the printer; lists and final draft copies must be proofed; and temporary staff must be tested, hired and trained.

The effort generally involves all of the Unclaimed Property staff, most of Information Resources, Facilities Services and Planning, and various others. Some special thanks also must go to Sarah Marlow, Director of Unclaimed Property, and Eleanor Roe, Assistant Director of Unclaimed Property; Doug Prince, Manager of Public Outreach, whose job it is to see that the publication is printed and distributed; Sally Quereau, Jim Ross, Henry Rodriguez, Stephen Bright, Tina Newstrom and Mark Toohey. Each of you was instrumental in ensuring that this process ran smoothly and efficiently, and I am so proud of your hard work.

The list frequently contains names of people we all know, including Treasury employees. Look for your name. Who knows? We might have something for you!

*Kay Bailey Hutchison*

## CIGARETTE RING SHATTERED IN FORT WORTH

February 11, 1992 marked the Treasury's largest and most successful cigarette bust in recent history when an estimated $50,000 worth of stolen cigarettes and $30,000 in cash, weapons and vehicles were confiscated in Fort Worth.

Treasury special agents traveled to Fort Worth to work in conjunction with Fort Worth police, Department of Public Safety officials and the Tarrant County District Attorney's Office to make the arrests.

The arrests and confiscations culminated a three-month investigation into stolen cigarette trafficking in Tarrant County. At 4 a.m., twenty-five arrest warrants and eight search warrants were issued. At least twenty suspects will face felony charges ranging from engaging in organized criminal activity to theft over $750.

Special agents Charlie Malouff and Alex Pena worked directly with the Fort Worth Police Department during the undercover operation, under the supervision of Tobacco Tax Director Alicia Fechtel and Assistant Director David Boatright. Treasury agents Tommy Adams, Jeff Bishop, Barbara Foreman, Lance Idol and Calvin Lee assisted in the pre-dawn arrests and seizures. They also conducted Treasury inspections of the targeted locations where stolen goods had been purchased. Thanks to all of you for helping to make this major sting operation such a tremendous success!



Lieutenant A. J. Allen of the Fort Worth Police Department displays some of the cigarettes seized as part of the investigation.

 Printed on 100% Recycled Paper



# TEXAS ALCOHOLIC BEVERAGE COMMISSION

Post Office Box 13127, Capitol Station, Austin, Texas 78711-3127   (512) 458-2500   Jeannene Fox, Acting Administrator

1206 Manor Drive
Victoria, Texas 77901
December 3, 1991

Ms. Kay Bailey Hutchison, Treasurer
Treasury Department
P. O. Box 12608
Austin, Texas 78711

Dear Ms. Hutchison:

I want to take this opportunity to commend two of your Special Agents in your Tobacco Tax Division for their work and cooperation in a joint venture we conducted with your department on November 22, 1991.

Special Agents Charlie Malouff and Jeff Bishop were invaluable to us in investigating and ultimately seizing bootlegged, untaxed cigarettes and alcoholic beverages brought from Old Mexico and sold in Victoria, Texas. Without these two agents expertise, our job would have been more difficult. I also convey to them my thanks.

Sincerely,

Bob Hatcher
District Supervisor
Victoria District #19

BLH:al

cc - Charlie Malouff
     Jeff Bishop

Louis M. Pearce, Jr., Chairman          Allan Shivers, Jr., Member          Renee Higginbotham-Brooks, Member
        Houston                                Austin                                 Fort Worth

<u>RETURN RECEIPT REQUESTED</u>

May 5, 2014

General Greg Abbott
Attorney General
300 W. 15TH ST.
Austin, TX 78701

RE: ABUSE OF OFFICE BY A TRIAL JUDGE, ARISING FROM PERSONAL PECUNIARY INTEREST FOR MAKING DECISIONS RESULTING IN WRONGFUL CONVICTIONS, IN VIOLATIONS OF THE TEXAS CONSTITUTION, CODE OF CRIMINAL PROCEDURE, AND THE TEXAS PENAL CODE

Dear General Abbott:

My name is Charlie Malouff. I am a decorated, honorably retired, chief of police and decorated Texas Veteran with 29 years of service to my country. This complaint is in regards to the **Abuse of Office for Pecuniary Interest leading to wrongful imprisonment,** by Travis County 299th District Court Judge Karen Sage.

The court is supposed to be the instrument to advance the ends of justice. When the trial judge, for **personal pecuniary interest**, makes decisions contrary to, and involved unreasonable application of clearly established state and federal laws as determined by both Supreme Courts and the Constitutions of both Texas and the United States, resulting in wrongful imprisonment, the judge surrenders their right to immunity under the color of law and subjects themself to the laws of the State of Texas.

According to Sage's best friend, attorney Jackie Wood, and another independent attorney, Arial Payan, whose wife works for the Travis County District Attorney, Karen Sage made decisions for votes and contributions in her then upcoming re-election, March 4, 2014, in denying dismissal, mistrial, Franks Hearings, and other defense motions. Her decisions, resulted in my **arbitrary, selective, vindictive, malicious, and unethical prosecution** for "Securing Execution of a Document by Deception", between August and October, 2013, that was committed in violation's of the First, Fourth, Fifth, Sixth, Eighth, Fourteenth Amendments to the United States Constitution; the Texas Constitution; the Code of Criminal Procedure; and the Texas Penal Code in the covering up of crimes by the police, and the Travis County District Attorney's Office Public Integrity Unit, including, but not limited to, "targeting" me for my "freedom of speech" (admitted to under oath by TCDA Investigator Lori Carter), Attempted Murder, Industrial Espionage, Destruction of a Federally Funded Energy Project, Destruction of Evidence, Theft of Trade Secrets, Abuse of Office, Official Oppression, Coercion,

Falsifying Time Sheets, Corruption, ongoing Brady, and Prosecutorial and Judicial Misconduct.

There are **over 4 Terrabytes**, of exculpatory evidence, motions, and an additional **several thousand pages** of trial transcripts supporting this complaint. This evidence and trial transcripts reveal the Governments arbitrary, selective, vindictive and malicious misconduct. Sage was privy to testimony, evidence and motions the jury was not. In addition, the statements made by two independent officers of the court (see attached) support this Abuse of Office. This egregious violation of law has resulted in the wrongful convictions of not one person, but two. The other, Mary Jo Woodall, a 57 year old woman who never committed anything other than a traffic violation at age 17, and who, because of the Abuse of Office by Karen Sage, never had a chance at a fair trial.

In 2006, I was convicted in violation of 26 USC Sec 5812, 5861(e), 5871 Unlawful Transfer of a Firearm in the United States District Court, Southern District of Texas, Cr. No. H-06-237-001. At that same time, but unbeknownst to me, the United States attempted to prosecute Sgt. James V. Vest, Illinois State Police, for the exact same thing. Sgt. Vest sought out the **congressional intent** of the law; **see 132 Cong. Rec. S5358-04, 1986 WL 774609, 99th Congress, 2nd Session, specifically statements from Senator's Hatch, Dole and McClure regarding this issue.** Stating in part, Senator Dole said, §922 "is somewhat ambiguous language." Senator Hatch stated "This amendment was designed to deal with *crime guns*, not weapons used to fight crime on a domestic or international scale." Senator McClure added, "The end result has been the entrapment of otherwise honest people into violations that neither hurt anyone, nor contribute to violent crime." The Vest Court found "the law was not intended to apply to police officers, but instead its purpose was to eliminate the use of machine guns and other various weapons used to commit crimes. It does not appear that this statute was designed to criminalize police officers even if they may be guilty of mere technical violations." It went on to state, "Those (police officers) are under a reasonable belief that the person handing them that weapon, an instructor, is imbued with the authority to have that weapon and provide it to them. " Furthermore, the Court ruled the statues were unconstitutionally vague and allowed for arbitrary enforcement. It stated the legislative history indicated it was aimed at criminal possession and not the use of weapons by law enforcement. United States District Judge David Herndon dismissed Vest's case with prejudice. (See attached). I found the Vest case researching case law for my 2255 Motion to Vacate in my instant case on April 2, 2014.

My case was a result of the independent criminal conduct of Eugene H. Williams, Jr., and FBI Special Agent Mark Tilton using the US Attorney's Office in Houston, to retaliate for being called on the carpet when I, as a U. S. Coast Guardsman, on call up after 9-11, caught a Russian Spy in the Houston Ship Channel, and to suppress Tilton's failures as a supervisor, in both that case (he was the supervisor of the FBI Russian

2

Desk) and as the FBI Houston SWAT Team Leader, and those of the ATF in his and their conduct, or the lack thereof, in the Eugene H. Williams, Jr. case. (See attached letter to OPR, Pardon Petition).

The FBI/ATF debacle again raised its head in October, 2011 when multiple flash bang grenades, traced back to the Williams case, were **planted** at my house, and found four days after I was arrested, and still in jail, conveniently by Travis County Deputy Toby Miller, the complainant in this case. This was after my house and shed were trashed and no evidence was found. The ATF, US Attorney and FBI refused to conduct a thorough investigation to keep from re-addressing these issues (see 2255 Motion to Vacate). Sage heard about this when I testified at trial. In addition, she was visibly shaken regarding the injustice. All this should be on the camera in the court security files.

According to the Constitution, I, as a Citizen of the United States, have the right to contact the President of the United States directly to apply for a Pardon. Not knowing anything about Vest, but knowing what the FBI and US Attorney were doing to me was wrong, I sought a Presidential Pardon. My Pardon Petition was, on its merits, hand carried to the President on December 24, 2008 and was turned away, **not denied,** because of a non-related political debacle regarding another's pardon application (see attached Tussi article). General Abbott, **I am not now, nor have I ever been, a criminal minded person.** (see attached resume).

The Stimulus Act was to stimulate the economy and bring jobs and income back to Americans in the United States of America. I, as an American, created a company that was owned by Americans, for Americans, using innovative technology, not only made in America, but made by Americans with no foreign parts, and I spent considerable time getting my On-the-Job Training Program approved by the Veteran's Administration, so I could employ as many Veteran's as possible, including handicapped. Anything taken to another country was done with the pride of knowing the product would be made in America by Americans. And that, Sir, is something I, as a Disabled Veteran, am very proud of!

I have yelled, screamed and jumped up and down in the graphic voice I was trained in as both a Drill Sgt., and sailor, since the day of my arrest, arguing I was not only set up, by Travis County Sheriff's Deputy, Toby Miller, who was caught red handed falsifying time sheets for himself, another police officer and others employed for the Grant, and who was **identified as a suspect in the sabotage and destruction of a Federally funded energy project (see attached police reports),** but there was no way I would get a fair trial under Karen Sage. When Jackie Wood became my attorney, she told me right off, Sage was her "best friend" and "not to worry." Prior to the defense resting in my case, Wood **repeatedly** told me to "trust me" and "Karen has my back." That "trust"

*Copy*

aside, what is more important to this complaint is Wood's statement in the holding cell that "her decisions were political" referring to her upcoming re-election. Shortly thereafter, to be told the same thing by Payan (see attached sworn affidavit and other documents), two people who are, as officers of the court and ethically sworn to tell the truth regarding the conduct and integrity of a judge, can only be taken as true statements and that Sage abused her office, wrongfully imprisoning me for monetary and other pecuniary interests.

I pray, after you read the attached documents, you cannot help but see our convictions were brought about unconstitutional, unethical and criminal methods that offend any rational person's sense of justice, and identify the extreme malfunction in the administration of justice in both mine and Mary Jo Woodall's case's.

I PRAY there still remains ethical and honest Government advocates in your Public Integrity Unit, and in your consideration of my complaint.

Respectfully Submitted,

Charlie Malouff
66089-179
P.O. Box 1010
Bastrop, TX 78602

4

May 19, 2014

Honorable Bob Goodlatte
Chairman, House Judiciary Committee
2309 Rayburn HOB
Washington, DC 20515

RE: **DESTRUCTION OF A FEDERALLY FUNDED ENERGY PROJJECT; POLICE MISCONDUCT IN COVERING UP MULTIPLE FELONIES BY A SHERIFF DEPUTY AND OTHER POLICE, INCLUDING AN ASSISTANT DISTRICT ATTORNEY; MISCARRIAGE OF JUSTICE THROUGH ARBITRARY, SELECTIVE AND VINDICTIVE PROSECUTION, PROSECUTORIAL MISCONDUCT; CONSTITUTIONAL VIOLATION'S OF THE FIRST, FOURTH, FIFTH, SIXTH, EIGHTH, FOURTEENTH AMENDMENTS, AND ARTICLE I AND II TO THE CONSTITUTION AND OTHER FEDERAL LAWS**

Dear Mr. Chairman:

My name is Charlie Malouff. I am a decorated, honorably retired, chief of police and decorated Veteran with 29 years of service to my country. I come to you in a plea for help. The House Judiciary Committee has jurisdiction relating to the administration of justice in the courts and over law enforcement agencies.

Without making this letter lengthy and repetitious, this plea for help is in response to what a God faring man would claim the "beyond description" misconduct of the U.S. Attorney in Houston, Texas, the U.S. Attorney in Austin, Texas, DOE OIG Criminal Investigators, and Agents of the ATF and FBI, the Travis County District Attorney and local law enforcement in Austin, Texas.

In 2006, I was convicted in violation of 26 USC Sec 5812, 5861(e), 5871 Unlawful Transfer of a Firearm in the United States District Court, Southern District of Texas, Cr. No. H-06-237-001. At that same time, but unbeknownst to me, the United States attempted to prosecute Sgt. James V. Vest, Illinois State Police, for the exact same thing. Sgt. Vest sought out the **congressional intent** of the law; **see 132 Cong. Rec. S5358-04, 1986 WL 774609, 99th Congress, 2nd Session, specifically statements from Senator's Hatch, Dole and McClure regarding this issue.** Stating in part, Senator Dole said §922 "is somewhat ambiguous language." Senator Hatch stated "This amendment was designed to deal with *crime guns*, not weapons used to fight crime on a domestic or international scale." Senator McClure added, "The end result has been the entrapment of otherwise honest people into violations that neither hurt anyone, nor

contribute to violent crime." The Vest Court found "the law was not intended to apply to police officers, but instead its purpose was to eliminate the use of machine guns and other various weapons used to commit crimes. It does not appear that this statute was designed to criminalize police officers even if they may be guilty of mere technical violations." It went on to state, "Those (police officers) are under a reasonable belief that the person handing them that weapon, an instructor, is imbued with the authority to have that weapon and provide it to them. " Furthermore, the Court ruled the statues were unconstitutionally vague and allowed for arbitrary enforcement. It stated the legislative history indicated it was aimed at criminal possession and not the use of weapons by law enforcement. United States District Judge David Herndon dismissed Vest's case with prejudice. (See attached). I found the Vest case researching case law for my 2255 Motion to Vacate in my instant case on April 2, 2014.

My case was a result of the independent criminal conduct of Eugene H. Williams, Jr., and FBI Special Agent Mark Tilton using the US Attorney's Office in Houston, to retaliate for being called on the carpet when I, as a U. S. Coast Guardsman, on call up after 9-11, caught a Russian Spy in the Houston Ship Channel, and to suppress Tilton's failures as a supervisor, in both that case (he was the supervisor of the FBI Russian Desk) and as the FBI Houston SWAT Team Leader, and those of the ATF in his and their conduct, or the lack thereof, in the Eugene H. Williams, Jr. case. (See attached letter to OPR, Pardon Petition).

The FBI/ATF debacle again raised its head in October, 2011 when multiple flash bang grenades, traced back to the Williams case, were planted at my house, and found four days after I was arrested, and still in jail. This was after my house and shed were trashed and no evidence was found. The ATF, US Attorney and FBI refused to conduct a thorough investigation to keep from re-addressing these issues. This failure to properly investigate and rush to get a conviction, has led to the **arbitrary, selective, vindictive, malicious, and unethical prosecution** for "Felon in Possession of a Firearm", in the United States District Court, Western District of Texas. Further compounding this **egregious deprivation constitutional rights**, I was charged and convicted of "Securing Execution of a Document by Deception" in the 299th District Court, Travis County, Texas, in violation's of the First, Fourth, Fifth, Sixth, Eighth, Fourteenth Amendments to the Constitution, Code of Federal Regulations, State and Federal laws, Rules of Professional Conduct, in the cover up of Attempted Murder, Industrial Espionage, **Destruction of a Federally Funded Energy Project**, Destruction of Evidence, Theft of Trade Secrets, Abuse of Office, Official Oppression, Coercion, Falsifying Time Sheets, Malfeasance by Federal Agents, Corruption, Withholding Discovery, and Prosecutorial and Judicial Misconduct (see attached documents). Additionally, the U.S. Department of Energy has compounded these felonious crimes in unethical, unprofessional, deficient, negligent and biased conduct through its field

employees, management, Criminal Investigator's, and other's acts. (See attached letter to DOE). Further compounding this already complex and complicated case were my own attorney's deficient and negligent conduct. (See 2255 Motion to Vacate and Judicial Misconduct)

According to the Constitution, I, as a Citizen of the United States, have the right to contact the President of the United States directly to apply for a Pardon. Not knowing anything about Vest, but knowing what the FBI and US Attorney were doing to me was wrong, I sought a Presidential Pardon. My Pardon Petition was, on its merits, hand carried to the President on December 24, 2008 and was turned away, **not denied,** because of a non-related political debacle regarding another's pardon application (see attached Tussi article). Mr. Chairman, **I am not now, nor have I ever been, a criminal minded person.**

The Stimulus Act was to stimulate the economy and bring jobs and income back to Americans in the United States of America. I, as an American, created a company that was owned by Americans, for Americans, using innovative technology, not only made in America, but made by Americans with no foreign parts, and I spent considerable time getting my On-the-Job Training Program approved by the Veteran's Administration, so I could employ as many Veteran's as possible, including handicapped. Anything taken to another country was done with the pride of knowing the product would be made in America by Americans. And that, Sir, is something I, as a Disabled Veteran, am very proud of!

I have yelled, screamed and jumped up and down in the graphic voice I was trained in as both a Drill Sgt., and sailor, since the day of my arrest, arguing I was not only set up, by Travis County Sheriff's Deputy, Toby Miller, who was caught red handed falsifying time sheets for himself, another police officer and others employed for the Grant, and who was **identified as a suspect in the sabotage and destruction of a Federally funded energy project (see attached police reports),** but the federal government was quietly directing the Travis County District Attorney in this prosecution. The instant case stems from an ARRA Stimulus Distributed Renewable Energy Grant. This was a federally funded energy project, under the constant and direct supervision and audit of federal agencies, primarily the Department of Energy, which was **sabotaged** and negligently investigated by the DOE, ATF and FBI, and subsequently **destroyed** by the City of Jonestown **under the direction** of the Travis County District Attorney and DOE OIG Special Agent Rosemary Peterson. This was the **physical evidence** to the **sabotage.**

I **PRAY,** after you read the attached documents, you cannot help but see my conviction's were brought about unconstitutional, unethical and criminal methods that offend any rational person's sense of justice, and identify the extreme malfunction in the

3

administration of justice in both mine and Mary Jo Woodall's case's. Mary Jo Woodall is a 57 year old woman who never committed anything other than a traffic violation at age 17, and who, because of the Judicial Misconduct of the state trial judge, Karen Sage, who denied Brady motions, motions for mistrial and dismissal, and other motions for political contributions and votes in her re-election, March 4, 2014, never had a chance at a fair trial (see Judicial Misconduct).

**I also PRAY** there still remains ethical and honest Government advocates in you and the Committee, and you consider my plea for help.

Respectfully Submitted,

Charlie Malouff
66089-179
P.O. Box 1010
Bastrop, TX 78602

4

November 22, 2014

Ms. Leslie Caldwell
Assistant Attorney General
Civil Rights Division
Criminal Section
950 Pennsylvania Ave. NW
Washington, D.C. 20530

RE: DEPRIVATION OF RIGHTS UNDER COLOR OF LAW COVERING UP THE
CRIMES OF MISPRISON OF FELONY; ATTEMPTED MURDER; DESTRUCTION
OF A FEDERALLY FUNDED ENERGY PROJECT; THEFT; TAMPERING WITH
EVIDENCE; INDUSTRIAL ESPIONAGE; SELECTIVE AND VINDICTIVE
PROSECUTION; ABUSE OF OFFICE; OFFICAL OPPRESSION; PROSECU-
TORIAL AND JUDICIAL MISCONDUCT; AND OTHER FEDERAL LAWS; AND,
VIOLATIONS OF THE FIRST, FOURTH, FIFTH, SIXTH, EIGHTN, NINTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Dear Ms. Caldwell,

My name is Charlie Malouff. I am a Decorated, Honorably Re-
tired, Chief of Police and Decorated Disabled Veteran with 29 years
service to my country.

I am coming to you with this **Formal Criminal Complint of De-
privation of Rights Under Color Of Law and Conspiracy** to commit
these deprivations in accordance with 18 USC 241 and 242, involving
several Assistant U.S. Attorneys, and FBI Agents because their con-
duct and according to the FBI Web Site Civil Rights Complaints,
this falls on you.

From 1975-1982, I was an Air Force Security Policeman. My
duties involved dignitary protection and counter-espionage (emp-
hasis on Russian and Chinese), activities.

After 9-11, I was Activated with the Coast Guard in the Port
of Houston. In December, 2001, I received information about a
"Russian Spy" in the Houston Ship Channel. After notifying the
Command, I took a Boarding Team and located the vessel. Sub-

sequently, the case, with over 100 high security risk photos, was turned over to the Houston FBI Russian Desk who **negliglently** failed to act. Six months later, John Ashcroft made an announcement on National TV elevating National Security Levels resulting from a "**credible threat** to Pasadena,(TX)". The Coast Guard was put on notice.

With a very real possibility of Congressional Inquiry looming, the Command sent a Lieutenant Commander and myself over to the FBI Russian Desk where we met with FBI Supervisory Special Agent Mark Tillton, who introduced himself as the head of that Desk. The Commander, in no uncertain terms, relayed the message, if Congress came down on the Coast Guard, the Coast Guard was coming down on the FBI for their **failure to act.** (See Pardon Petition and Coast Guard Commendations for this incident.)

I personally knew Tilton from his role with the FBI Regional SWAT Team, and their affiliation with the Cypress Creek Advanced Tactical Team, the by MOU, FBI Regional SWAT Paramedics for Houston.

Over a period of time, former ATF Agent Eugene Williams, CCATT Operations Manager and Paramedics Team Leader, was engaged in multiple newsworthy horseplay adventures involving flash bangs taken from training. I had nothing to do with any of Williams oddball activities.

Williams, **FBI** and **ATF** ignored, conduct led to the incident where he blew part of a foot off of Steven Cosby at his bachelor's party with flash bangs taken from training. Even though I was nowhere near Williams or Houston, and had no idea that he took them from training, or that horseplay was involved until much later,

2

search warrant at Mary Jo's.

I have put all of my supporting documentation on CD. The intimate details of the beginning of this horrific nightmare are found in the Coram Nobis, followed by the Writ of Habeas Corpus and 2255 Motion to Vacate.

This is a **Formal Complaint for Deprivation of Rights Under Color of Law**, against:

> Assistant U.S. Attorney Jimmy Kitchen
> Assistant U.S. Attorney Daniel Guess
> John Doe Assistant U.S. Attorneys-Houston
> John Doe Assistant U.S. Attorneys-Austin
> FBI Supervisory Special Agent Mark Tilton
> FBI Supervisiory Special Agent Charlie Rasner
> John Doe FBI Supervisory Special Agent-Austin
> John Doe FBI Special Agents involved in this investigation
> Travis County Sheriffs Deputy Toby Miller
> Former Jonestown Police Officer Michelle Cook
> John Doe Travis County Sheriffs Deputies
> Travis County District Attorney Investigator Lori Carter
> Travis County Assistant District Attorney Holly Taylor
> Travis County Assistant District Attorney-Susan Oswalt
> Travis County Assistant District Attorney-Greg Cox
> Travis County District Attorney-Rosemary Lehmberg
> DOE OIG Special Agent Rosemary Peterson
> John Doe DOE OIG Supervisors and Agents
> Jonestown Mayor-Deane Armstrong
> Jonestown City Council
> Travis County District Judge Karen Sage

My name is not Travon Martin, or Michael Brown. I am not an unarmed black boy who was beat on by the police. I am an **Honorably Retired law Enforcement Officer, and Military Veteran** who has been persecuted for doing his job! Through the negligence of the FBI, Miller, the U.S. Attorneys involved, and their Good Ole Boy buddies listed above, who hid behind their badges seeking revenge, Mary Jo Woodall and myself have suffered unconstitutional crminal and civil abuses.

While I cannot speak for Mary Jo, it does not take a rocket

4

scientist to see the criminal abuse put upon this **innocent** woman.

Ms. Caldwell, I took multiple oaths solemnly swearing to "Defend the Constitution against all enemies foreign and Domestic."

I intend to do just that! One thing I will find out is how far "no integrity" and **egregious cover up** goes up in my Government.

I will be in Washington DC with a camera crew to address the Department of Energy, Office of Professional Responsibility and the FBI's tyranical, negligent and oppressive acts so that I can present this to a Congressional Committee over the malicious destruction of a Federally Funded Energy Project and the subsequent **oppressive conduct** by Government officials in keeping these Unconstitutional and illegal acts covered up. (See letters to DOE and OPR).

To make sure my voice is heard, I will be exercising my Constitutional Rights of Free Speech and to redress my Government by reaching out to the 22 million Veteran's who solemnly swore to **defend the Constitution**, and others FED-UP with the Governments Misconduct.

I will be contacting **your** office and FBI Director Comey's Office to follow up on this formal Criminal Complaint.

Respectfully,

Charlie Malouff

5

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ☐ Agent
☐ Addressee

B. Received by ( *Printed Name* ) | C. Date of Delivery

1. Article Addressed to:

⇔66089-179⇔
Leslie Caldwell
DOJ Civil Rights-Criminal
950 Pennsylvania AVE NW
Washington, DC 20530
United States

CIVIL RIGHTS Complaint

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

DEC 09 2014

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number
(*Transfer from service label*)
7011 3500 0002 9715 1691

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

*Copy*

November 22, 2014

Director James B. Comey
Federal Bureau of Investigation
935 Pennsylvania Ave., NW
Washington, DC 20535

RE: DEPRIVATION OF RIGHTS UNDER COLOR OF LAW COVERING UP THE
    CRIMES OF MISPRISON OF FELONY; ATTEMPTED MURDER; DESTRUCTION
    OF A FEDERALLY FUNDED ENERGY PROJECT; THEFT; TAMPERING WITH
    EVIDENCE; INDUSTRIAL ESPIONAGE; SELECTIVE AND VINDICTIVE
    PROSECUTION; ABUSE OF OFFICE; OFFICAL OPPRESSION; PROSECU-
    TORIAL AND JUDICIAL MISCONDUCT; AND OTHER FEDERAL LAWS; AND,
    VIOLATIONS OF THE FIRST, FOURTH, FIFTH, SIXTH, EIGHTH, NINTH
    AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Dear Director Comey:

My name is Charlie Malouff.  I am a decorated, Hornorably
Retired, Chief of Police and decorated Disabled Veteran with 29
years service to my country.

I am coming to you with this **Formal Criminal Complaint of
Deprivation of Rights Under Color of Law** and **Conspiracy** to commit
these deprivations in accordance with 18 USC 241 and 242, in-
volving several FBI Agents, because their conduct and the "Inte-
grity" of the Bureau falls directly on you.

From 1975-1982 I was an Air Force Security Policeman.  My
duties involved dignitary protection and counter-espionage
(emphasis on Russian and Chinese) activities.

After 9-11 I was Activated with the Coast Guard in the Port
of Houston.  In December 2001 I received information about a
"Russian Spy" in the Houston Ship Channel.  After notifying the
Command, I took a Boarding Team and located the vessel.  Subse-
quently, the case, with over 100 high security risk photos, was
turned over to your Russian Desk who **negligently** failed to act.

Six months later, John Ashcroft made an announcement on national TV elevating National Security Levels resulting from a "**credible threat** to Pasadena". The Coast Guard was put on notice.

With a very real possibility of Congressional Inquiry looming, the Command sent a Lieutenant Commander and myself over to your Russian Desk where we met with Supervisory Special Agent Mark Tilton, who introduced himself as the head of that Desk. The Commander, in no uncertain terms, relayed the message, if Congress came down on the Coast Guard, the Coast Guard was coming down on the **FBI** for your **Failure To Act**. (See Pardon Petition for more informaton and Coast Guard Commendations for this incident).

I personally knew Tilton from his role with the **FBI** Regional **SWAT** Team, and their affiliation with the Cypress Creek Advanced Tactical Team, your, by **MOU**, **SWAT** Paramedics for Houston.

Over a period of time, former ATF Agent Eugene Williams, CCATT Operations Manager and Paramedics Team Leader, was engaged in multiple newsworthy horseplay adventures involving flash bangs taken from training. I had nothing to do with any of William's oddball activities.

Williams, FBI and ATF ignored conduct led to the incident where he blew part of a foot off Steven Cosby at his bachelor's party with flash bangs taken from training. Even though I was no where near Williams, or Houston, and had no idea that he took them from training, or that horseplay was involved until much later, with the help of Houston AUSA Jimmy Kitchen and Tilton's HRT buddy, FBI Austin JTTF Supervisory Special Agent Charlie Rasner, I was subsequently charged and convicted for Unlawful

2

Transfer Of A Firearm as a "**Present From The FBI**." (See Coram Nobis).

In 2010, I caught Travis County Sheriff's Deputy Toby Miller, and Jonestown Police Officer Michelle Cook falsifying Federal Energy Grant timesheets on a $1.836 Million ARRA Stimulus Grant, and subsequently their respective Department time sheets as well.

Miller was also identified to the Jonestown Police as a suspect in Attempted Murder, Theft and the sabotaging of windmills on the Federal Grant, and by his own admission in Court, illegal use of the NCIC, his police equipment and vehicle, industrial espionage, Theft of Trade Secrets and **more**. Miller, to cover his own crimes, got his girlfriend, Travis County District Attorney Investigator, Lori Carter, with the help of Assistant District Attorney, Holly Taylor to falsify a search warrant affidavit and pursue criminal charges against myself, and another **innocent** woman, Mary Jo Woodall. (See Writ of Habeas Corpus and 2255 Motion to Vacate for intimate details.)

This outlandish, disgusting and oppressive ongoing **unconstitutional** behavior has been compounded, again by **your** office, the ATF and the U.S. Attorney's involved in an effort to suppress the Houston incident, as flash bangs from that case conviently showed up at my home **four days** after my house was trashed and **nothing found**, and while I was **still incarcerated** in the Travis County Jail. **Your** Austin office **still refuses** to identify the FBI Agent and his supervisor taht were involved in the execution of the search warrant at Mary Jo's.

I have put all of my supporting documents on CD. The intimate

3

details of the beginning of this horrific nightmare are found in the coram nobis, followed by the Writ of Habeas Corpus and 2255 Motion to Vacate.

This is a **Formal Complaint** for Deprivation Of Rights Under Color of Law against:

FBI Supervisory Special Agent Mark Tilton
FBI Supervisory Special Agent Charlie Rasner
John Doe FBI Supervisory Special Agent-Austin
John Doe FBI Special Agent-Austin
John Doe FBI Special Agents involved in this investigation
Assistant U.S. Attorney Jimmy Kitchen
Assistant U.S. Attorney Daniel Guess
John Doe Assistant U.S. Attorneys-Austin
John Doe Assistant U.S. Attorneys-Houston
Travis County Sheriff's Deputy Toby Miller
Former Jonestown Police Officer Michelle Cook
John Doe Travis County Sheriff's Deputies
Travis County District Attorney Investigator Lori Carter
Travis County Assistant District Attorney Holly Taylor
Travis County Assistant District Attorney-Susan Oswalt
Travis County Assistant District Attorney-Greg Cox
Travis County District Attorney-Rosemary Lehmberg
Jonestown Mayor-Deane Armstrong
Jonestown Ciry Council
COE OIG Special Agent Rosemary Peterson
John Doe DOE OIG Supervisors and Agents
Travis County District Judge Karen Sage

My name is not Trayvon Martin, or Michael Brown. I am not an unarmed black boy who was beat on by the Police. I **am** an **Honorably** Retired Law Enforcement Officer, and Military Veteran, who has been persecuted for doing his job! Through the negligence of your Agents, Miller and their Good Ole Boy buddies listed above, who have hid behind their badges seeking revenge, Mary Jo Woodall and myself have suffered unconstitutional criminal and civil abuses.

While I cannot speak for Mary Jo, it does not take a rocket scientist to see the criminal abuse put upon this **innocent** woman!

Mr. Director, I took multiple oaths, solemnly swearing to

4

"defend the Constitution against all enemies foreign and domestic". I intend to do just that! One thing I will find out, is how far "no integrity" goes up the chains. I will be in Washington, DC with a camera crew to address the Department of Energy, the Office of Professional Responsibility's and the U.S. Attorney General's tyranical, negligent and oppressive acts so that I can present this to a Congressional Committee over the malicious Destruction Of A Federally Funded Energy Project, and subsequent **oppressive conduct** by Government Officials in keeping these unconstitutional and illegal acts covered up. (See letters to DOE and OPR)

To make sure my voice is heard, I will be exercising my Constitutional Rights of Free Speech and to redress my Government by reaching out to the 22 million Veteran's who solemnly swore to **Defend the Constitution**, and others fed up with Government misconduct.

I will be contacting your office and Ms. Leslie Caldwell at the Attorney General Civil Rights Division to follow up on this formal criminal complaint.

Respectfully,

Charlie Malouff

5

# Charles A. Malouff, Jr., *(Ret. M.P.O., M.B.O).*

P.O. Box 118

Cedar Park, Texas 78630

(512)796-7000                                                                      charlie@cmenergies.com

## SUMMARY

Chief Executive Officer responsible for management and corporate development and implementation of domestic and international Alternative Energy programs in the United States and Mexico. Domestic and International Patents holder of CM Energies' Vertical Axis Wind Energy System. Honorably Retired Chief of Police and Emergency Services Specialist with over 29 years of diverse experience and background that encompasses law enforcement, maritime and military law, counter-terrorism, education, management, and international private business services. Proven performance in leadership, management, highly advanced investigations and examinations of violations of law including Maritime laws, contract negotiations, research, strategic planning, development, quality assurance, general and specialized presentations, presentation and evaluation of commercial and specialized products and training.

**Key skills include:**

- Experience in corporate upper-level management
- Experience in international business development
- Experience in successful NEPA Environmental Assessments and Environmental Impact Studies related to wind energy projects
- Experience in upper-level management in state, county and municipal law enforcement
- Over 20 years supervisory and management experience
- Over 10 years experience in successful grant writing
- Senior Sea Marshal, U.S. Coast Guard, Port of Houston
- Supervisory Reservist, U.S. Coast Guard, Special Missions Team, Galveston
- Executive Board Member and multiple term Vice-President South Region, Texas Narcotic Officers Association
- Graduate Chief's Developmental Program Series I-II-LEMIT
- Graduate of the Coast Guard Maritime Law Enforcement Boarding Officers School (Leadership and Command Course) with more than 29 years law enforcement experience
- Instructor certification and experience in numerous areas, including financial crimes, grant writing, identity theft, field training, firearms, cultural diversity, maritime interdiction, counter-terrorism, organized crime, defensive tactics/less lethal and impact weapons
- Completed training and demonstrated experience in US Department of Labor Facilitation Management
- Experience in strategic planning involving multi jurisdictions and geographic areas
- Experience in training coordination, planning, development, delivery and evaluation
- Experience in budget development and fiscal responsibility
- Experience in commercial/military sales, business management, and multi-organizational research and development
- Extensive experience in emergency services, dealing with crisis situations regularly
- Extensive experience in Organized Crime, Public Integrity, Fraud and other Criminal Investigations
- Key coordinator between Coast Guard and civilian law enforcement agencies
- Experience with FBI Joint Terrorism Task Forces, US Attorney Anti-Terrorism Task Forces
- 10 year Guest Lecturer  Criminal Justice Department Advanced Criminal Investigations Texas State University

*1-1*

**Awards and Achievements**

Honorably Retired Chief of Police. Master Peace Officer. Silver Star for Gallantry. Purple Heart. U. S. Air Force Outstanding Unit Award, Presidential Citation, assigned to dignitary protection detail for Shah of Iran, 1979. U.S. Coast Guard Commandants Letter of Commendation, for investigating and identifying Eastern Bloc foreign operative (Russian Spy) operating in Port of Houston. Coast Guard Commendation Medal (2). U.S. Coast Guard District 9 Life Saving Award. Command Letter of Appreciation for performance during Counter-Smuggling operations, U.S.-Canadian Border. Graduate of Law Enforcement Management Institute of Texas, Chief's Development Program Series I and II. Graduate of the Coast Guard Maritime Law Enforcement Boarding Officers School. Over 3,150 hours TCLEOSE recognized training, and 160 college credit hours, Majoring in Criminal Justice. Participant-Operation Iraqi Freedom. Participant-Operation Enduring Freedom. Senior Enlisted Supervisor, Physical Security Team, Coast Guard Special Missions Team, MSST 91104. Boarding Team Supervisor. First Sea Marshal, Port of Houston. Senior Sea Marshal Port of Houston. Outside Agency Coordinator. Member U.S. Attorney's Office Anti-Terrorist Task Force. Member FBI Joint Terrorism Task Force (JTTF). Rewrote Coast Guard Tactical Operations and Defensive Tactics-Post 911. Other pre-911 duties included Maritime Investigations, MSO Houston. Responsible for closing 163 out of 166 narcotic cases against mariners between 1999 and 2000. Staff Member, Planning Division MSO Houston. Developed USCG Gulf Coast Hurricane Planning Committee Operations Plan For Regional Gulf Coast Area Emergency Operations 2000. Created and developed initial Strategic Threat Assessment Against the Port of Houston 2000-2001. Multi-Agency (Federal, State and local) Coordinator for 1122 and 1033 Programs (1988-2005). TCLEOSE Law Enforcement Instructor. Specialized instruction in Organized Crime, Money Laundering, Identity Theft, Narcotics, Terrorism, Undercover Operations, Ballistic Shield Tactics. Recognized expert in ballistic materials and applications. Maritime Law Enforcement Boarding Officer-Instructor. Master Instructor, Precision Ordnance Products, including Less Lethal and Explosive devices. ASP Instructor. Tactical Training Instructor. Advanced FBI Firearms Instructor. TCLEOSE Firearms Instructor. NRA Police Firearms Instructor. Personal Protection Instructor. Home Firearms Responsibility Instructor experienced in static and dynamic firearms training. ASP Baton Instructor. OC Chemical Restraint Instructor. Less Lethal and Explosive Devices Instructor. Defensive Tactics Instructor. Guest Lecturer to Southwest Texas State University Criminal Justice Division on "Conspiracy, the Making of an Organized Crime" (1997-2005). Guest Instructor Texas Hispanic Peace Officers Association 2005. Texas Municipal Police Association Member (2003-  ). Staff Instructor, Cypress Creek Advanced Tactical Team Tactical Emergency Medical Services Training Unit (CCATT/TEMS), Houston, Texas (2000-2005). Member U. S. Attorney's Anti-Terrorism Task Force. Vice-President, South Region, Texas Narcotic Officers Association (2005-2006). Vice-President, South Region, Texas Narcotic Officers Association (2004-2005). Regional Director, South Region, Texas Narcotic Officers Association (2002-2004). Training Coordinator, South Region, Texas Narcotic Officers Association (2001-2002), Member, Texas Narcotic Officers Association (1997-2006), Assigned to dignitary protection details for Pope Paul, and President Reagan. Analyzed, developed, and published three-part article on tactical vehicle assaults published in Command Magazine 1998. Published article on Ballistic Shield Usage in Command Magazine 1996. Presented Special Confidential Report(Organized Crime and Money Laundering) to the Treasurer, State of Texas, 1990. Lead Agent in coordination, development, and operation of multi-agency Organized Crime Task Force in Fort Worth area, 1991-92. Created and developed Confrontation Management Course instructing in traditional Riot Control, and Confrontation Management techniques

and Field Force Options for the Director of Criminal Justice Division, Lamar University, Beaumont, Texas. One of five civilian tactical instructors invited by U.S. Air Force Security Police to participate as staff instructors in 'Urban Tactics" (advanced SWAT) Course at Fort Dix, New Jersey. Former faculty member of "Top Gun" Investigation and Prosecution of Drug Cases, Sea Girt, New Jersey. Former member of U.S. Air Force's first Anti-Terrorist Tactical Neutralization Team. Former member of American Society of Law Enforcement Trainers (A.S.L.E.T.). Former member of National Rifle Association (N.R.A.). One of two participants in review and modification of Chapters 154 and 155, Texas Tax Code resulting in Legislative changes directed toward black market of cigarettes, 1990. Former representative to FBI's Central Texas Terrorist Working Group. Former member, Dallas/Fort Worth Retail Merchants Security Association. Former alternate member of Regional Organized Crime Information Center. Former member, Texas District and County Attorneys Association. Former member, Combined Law Enforcement Association of Texas.

Vietnam Era Veteran.

--------------------------------------------------------------------------------

FROM: 66089179
TO: Harris, Stacey
SUBJECT: PAYAN
DATE: 10/02/2014 07:48:05 PM


Please forward:

2 October, 2014
Mr. Payan:
On May 26th, 2014, I sent you an email telling you that you and your wife are a material witnesses in the suspected criminal conduct of Judge Karen Sage, and that because of your failure to address violations of law and the ABA and TDRPC with the Court and Bar, you have compromised my appeal process, and to get off of my case and find me an attorney that is not engaged in an intimate relationship with relative parties. You have since failed to recuse yourself or file for a new trial or file complaints with the Bar. In addition, as you said, you and your wife, who works with Taylor are good friends and I am sure Taylor has bragged about her "win" in my case. Again, you two are material witnesses that will be called in Federal court and any other court I can subpoena Taylor and Sage in.

Mr. Oskar Nisimblat, my appointed Federal Attorney for my 2255, has repeatedly tried to contact you for information regarding my State case and appeal and you have repeatedly refused to respond.

On September 19th, as a result of your negligence and abandonment, I filed a 2254 Writ of Habeas Corpus in the Western District of Texas, Case No. 1:14-cv-882-LY. I have filed a 132 page Memorandom Brief and included approximately 1800 pages including photos, and copies of the two CD's of Court Transcripts of the State case you sent me. The Judicial, Prosecutorial, and Professional Misconduct Grievances of my attorney are in that filing. I have not filed anything to do with the sufficiency of evidence. Only violations of Constitutional and Federal law under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments, 18 USC 241 and 242, and ABA and TDRPC. 132 pages worth of case law and arguments.

On 1 October, 2014, I had an Evidentiary Hearing in Federal Court over my 2255. In that hearing, Holly Taylor and Lori Carter were both put on the stand and both admitted UNDER OATH, that HOLLY TAYLOR was OUT INVESTIGATING, TAKING PICTURES AND GATHERING EVIDENCE, BEFORE THERE WAS ANY MEANINGFUL PROBABLE CAUSE, and as a result, VIOLATED ABA and TDRPC Rule 3.7 and MANY OTHERS!! HOLLY TAYLOR CANNOT BE MY JUDGE JURY AND EXECUTIONER..WHEN SHE WITHHOLDS EXCULPATORY AND EXONERATING EVIDENCE, admits to reviewing the search warrant affidavit but HIDES BEHIND HER "WORK PRODUCT" on MATERIAL OMMISSIONS, AS AN IMPEACHABLE WITNESS, SHE BECOMES ALL THREE.

As you are still my ATTORNEY OF RECORD, AND UNDER PROTEST, I AM DEMANDING you get copies of yesterday's transcripts, the 2254 AND ALL ATTACHMENTS AND YOU FILE THIS INFORMATION WITH THE APPEALS COURT IMMEDIATELY WITH A MOTION FOR AN IMMEDIATE VACATE AND REMAND FOR A NEW TRIAL, OR DISMISSAL WITH PREJUDICE!!! IF NOT, GET OFF MY CASE AND GET ME SOMEONE WHO IS NOT GOING TO CONTINUE TO FUCK MY STATE APPEAL PROCESS.

I told you early on that I will be an intimate part of the appeal process. Please provide me the name of our Appellate Judge as soon as possible.
Thank you,
Charlie Malouff



# The City of Hico

September 01, 2005

To whom it may concern:

Allow me to introduce to you Chief Charlie Malouff.

Chief Malouff served the City of Hico for about 4 months. He came on board and departed under unique circumstances: he came to work on very short notice when the previous Chief departed suddenly for service in Iraq, and now the City of Hico is contracting with Hamilton County for Police services through the Sheriff's Office.

During his tenure here, Chief Malouff was indefatigable in serving the City. He participated in everything from attending luncheons at the Senior Citizens' Center to coordinating all security activities for the Annual Steak Cook-off event, which drew thousands of visitors to our City.

I cannot recommend Chief Malouff highly enough; please give him every consideration.

Sincerely,

Lambert Little
Hico City Administrator

PATTIE HUBERT BOOTH
800 N. SHORELINE BLVD., SUITE 500
CORPUS CHRISTI, TEXAS 78401


July 22, 2004


Don Lane
Special Agent in Charge
Coast Guard Investigative Service
Gulf Region
Hale Boggs Federal Building, Room 1140
500 Poydras Street
New Orleans, LA 70130-3310

SAC Lane:

I would like to recommend Petty Officer Charles Malouff, USCGR, for the position of Investigator with the Coast Guard Investigative Service.

I was introduced to Petty Officer Malouff in February 2003. Petty Officer Malouff was assigned to the Intelligence Branch, Marine Safety Office Corpus Christi, Texas, providing security for the personnel, vessels and equipment to be deployed overseas. He began working regularly with our office on intelligence and criminal matters. In addition, he was actively involved in the Anti-Terrorism Task Force ("ATAC", formerly know as "ATTF") and other intelligence and security related meetings hosted by this office and the Coast Guard.

Petty Officer Malouff is third generation Lebanese and would bring an insight and understanding to this position that so desperately is needed at this crucial time. During his time in Corpus Christi, numerous reports were received of possible terrorist activity directed at military resources and the Port. Petty Officer Malouff's expertise was instrumental in dealing with the possible threats to the area.

While assigned to the United States Attorney's Anti-Terrorist Task Force he directly assisted the FBI's Joint Task Force in the investigation and enforcement of suspected Terrorist activities and financial fraud cases. In addition, he assisted the United States Attorney's office, the Anti-Terrorism Task Force, and the Joint Anti-Terrorism Task Force (JTTF) in the execution of search warrants and arrest warrant of an individual by the name of Rizzaw Hassan. Hassan has been indicted and convicted of fraud and money laundering.

Petty Officer Malouff is personable, intelligent, self-motivated, and diligent in his desire and ability to take on complex tasks, assist other agents, and develop information and evidence

for prosecution. It is these characteristics that I feel will make him a great asset to the Coast Guard Investigative Service. I whole-heartedly recommend Petty Officer Malouff.

Sincerely,

Patti Hubert Booth

**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commanding Officer
United States Coast Guard
Maritime Safety & Security Team 91104

7707 Harborside Drive
Galveston, TX 77554
Staff Symbol: a
Phone: (409) 941-8100
FAX: (409) 740-3844

1600
18 Sep 2003

## MEMORANDUM

From: B. P. Thompson, LCDR
MSST 91104

To:     PS1 Charles A. Malouff, Jr., USCGR

Subj:   LETTER OF APPRECIATION

1.  I note with pride and am pleased to commend you for your performance of duty, commitment, and dedication while recalled to active duty at MSST 91104 from 19 February through 19 September 2003.

2.  During this period, you were involuntarily recalled to active duty in support of Operation ENDURING FREEDOM. Although assigned to MSST 91104, you were involuntarily dispatched TDY to MSO/Group Corpus Christi to assist with Military Out Load Operations. You accepted your orders and displayed exemplary professionalism despite being deployed away from your parent unit. Your continued commitment to mission accomplishment and "can-do" attitude was exemplary and contributed in no small measure to the overall success of the out load operations.

3.  Upon return to MSST 91104 in March, you continually demonstrated outstanding leadership and performance in your duties with the Physical Security Team. In July, you deployed for three weeks, on a multi-agency operation. Again you demonstrated quality leadership in your role as a senior petty officer. The dedication, pride and professionalism you consistently display bring credit upon yourself, your team, and the United States Coast Guard.

4.  Your high level of performance and enthusiasm is sincerely appreciated. I look forward to your continued presence here at the unit. Keep up the good work!

#

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
Ninth Coast Guard District

1240 East 9th Street
Cleveland, OH 44199-2060
Staff Symbol: (osr)
Phone: (216)902-6111
Fax: (216)902-6121
Email: ppreusse@d9.uscg.mil

3130

JUL 15 2003

# MEMORANDUM

From:   P. A. PREUSSE, CAPT
CGD NINE (osr)

Reply to    D9(aosr)
Attn of:    LCDR K. Willis
(216)902-6135

To:     CG GP Buffalo

Subj:   SAR TEAM 9 AWARD

1. Please convey my appreciation to USBP agent William Reed, PS1 Charles Malouff, BM3 Artre Rusk and SNPS Josh Way, for their outstanding efforts in the rescue of Mr. Steven Coville from the waters along the St. Lawrence River adjacent to St. Lawrence Park, Canada.

2. At approximately 1815, July 6, 2003, USBP Agent William Reed, coxswain on a jointly crewed USBP boat, was showing BM3 Rusk and SNPS Way known smuggler departure points along the Canadian border, specifically around the Brockville/St. Lawrence Park area. They were traveling west, passing the main parts of the Brockville downtown area approaching the St. Lawrence Park when they observed numerous people swimming in the adjacent waters including a lone male, later identified as Mr. Steven Coville, swimming across the channel to Mile Island. As the boat crew moved within 50 yards of Mr. Colville, they observed him suddenly begin to flail his arms and briefly yell for help. BM3 Rusk and SNPS Way rushed to the front of the boat while agent Reed expertly maneuvered the 27-foot Sea Ark against a strong current that pulled Mr. Coville and the boat in opposite directions. The boat crew observed Mr. Coville go under and resurface. As he resurfaced, agent Reed repositioned the boat bow-on as BM3 Rusk attempted to grab Mr. Coville. Strong currents once again thwarted their efforts and Mr. Colville was swept back under the water, bobbing back to the surface. Throughout the rescue, agent Reed continued to expertly maneuver the boat, careful not to strike Mr. Coville while staying close enough to affect the rescue. As soon as Mr. Coville resurfaced for the third time, SNPS Way threw Mr. Coville a line he was able to grab. Both BM3 Rusk and SNPS Way got a hold of Mr. Coville and pulled him into the boat. It was obvious that he was suffering from hypothermia and shock as he was shaking uncontrollably. The crew immediately began emergency warming procedures. Mr. Coville stated he had tired rapidly against the current and could no longer swim. Agent Reed contacted emergency medical assistance and transferred Mr. Colville to the awaiting constable at Gilbert's Marine in Brockville, Ontario.

3. Coast Guard Search and Rescue (SAR) operations were clearly enhanced by the persistence, diligence and professionalism exhibited by the crew of the USBP boat crew. By virtue of their efforts, they have joined the prestigious ranks of SAR Team 9, a network of individuals who perform search and rescue on the Great Lakes. Please accept these certificates and pins as a token of our appreciation for a job well done!

#

Enclosure:    SAR Team 9 Certificate and Pin



06 September 2002

From: Commandant
To: PS1 Charles Malouff, USCGR

Subj: LETTER OF COMMENDATION

1. I note with pride and am pleased to commend you for your performance of duty from September 2001 to September 2002 while serving in the Sea Marshal Branch of the Homeland Security Department at MSO Houston-Galveston. Following the tragic events of the 11 September 2001 "Attack on America" you were recalled to serve your country in the newly created Homeland Security Department during Operation Noble Eagle. You began your duty in the Base Security Branch, logging over 200 hours of security patrols that were instrumental in the overall protection of the base and it's personnel. You were the lead watchstander supervising over 45 day and nighttime watches when you resolved over 20 potential trespass attempts, including a series of suspicious vehicles in the vicinity of the main gate. When Coast Guard priorities changed and new security missions evolved, you volunteered to serve on one of the Coast Guard's first Sea Marshal teams. Your relentless drive and considerable Coast Guard law enforcement experience played a vital role in the new operational mission as you oversaw the escort of 65 High Interest Vessels. In March 2002, upon receiving reports of a possible stowaway, you fought drenching rains, high winds and 8-foot seas in order to reach the suspect vessel. Once on board, you conducted a comprehensive search ruling out the presence of the potential threat, and then provided an armed escort during the vessel's twelve-hour transit into port. In December 2002, you aggressively investigated an incident involving a suspicious crewmember of a foreign vessel taking photographs of the Houston Ship Channel and it's critical infrastructure. Your quick actions led to immediate interviews with the crew and a federal law enforcement analysis of the photographs, circumventing any potential threat to the port. Your rapid patriotic response and participation in the most extensive mobilization of reserve forces since World War II greatly contributed to the rapid establishment of our current heightened national maritime security posture.

2. You are commended for your outstanding performance of duty. By your meritorious service you have upheld the highest traditions of the United States Coast Guard.

3. You are hereby authorized to wear the Commandant's Letter of Commendation Ribbon Bar. The Operational Distinguishing Device is authorized.

For the Commandant

KEVIN S. COOK
Captain, U.S. Coast Guard
Commanding Officer, Marine Safety Office Houston-Galveston
Safety Office Houston-Galveston

Entry Type: Performance and Discipline

Reference: None

Responsible Level: Unit

Entry: (General-Positive)

26DEC01: PS2 Malouff is recognized for his outstanding and significant accomplishment in identifying and handling of the preliminary espionage investigation of a suspected Eastern Bloc operative on December 26, 2001. PO Malouff was part of a Sea Marshal Team onboard the vessel UMIAVUT when it was brought to their attention that one of the crew members had taken an excessive amount of security related pictures throughout the Houston Ship Channel. Upon closer investigation of this individual by the FBI, no wrongdoing could be proven. PO Malouff is commended for his professionalism, dedication and expertise. Job well done, Bravo Zulu.

M.R. Riley, CWO4, USCG

18JAN02: I acknowledge the above entry.

C.A. Malouff

| 1. NAME OF PERMANENT UNIT | 2. NAME OF UNIT PREPARING THIS FORM | | | |
|---|---|---|---|---|
| MSO Houston-Galveston | MSO Houston-Galveston | | | |
| 3. NAME OF MEMBER (Last, First, MI) | 4. SOCIAL SECURITY NO. | 5. GRADE/RATE | 6. PAGE 7 | |
| Malouff Charles A. | 456 \| 21 \| 3151 | PS2 | | |

PREVIOUS EDITION MAY BE USED

Page 2 - File in Service Record

# NOMINATION FOR SILVER STAR FOR BRAVERY

On 25 June, 2005, a blistering 100 degree summer day, at approximately 1530hrs., returning from a Police Chief Development Course in Huntsville, Texas, Hico Police Chief Charles A. Malouff, survived a multi-fatality, automobile accident just south of Briggs, Texas on U.S. Highway 183 and while seriously injured, unselfishly attempted to extract and rescue the other vehicle occupants.

Rafat Saulat, driving northbound in her 2000 Toyota four-door sedan, left the road causing her to over correct and cross into the southbound lane. Unable to take evasive action, Chief Malouff broadsided the Toyota resulting in a fiery crash engulfing both vehicles. After several minutes of being trapped inside his burning 2005 Ford Pick-UP and ignoring his own serious internal injuries, Chief Malouff was able to kick his way out of the passenger side window and proceed around to the Saulat's vehicle. Chief Malouff forced his way through shattered glass and flames in the back seat and pulled Sajid, a 14-year-old boy, out of the burning vehicle and placed him in the grass away from the flames and scorching asphalt. Looking back at the wreckage, Chief Malouff observed two bodies still inside the vehicle. Chief Malouff noticed two young males attempting to open the Saulat's driver's door, but to no avail. Chief Malouff went over to the vehicle and also attempted to open the door, but to no avail. Chief Malouff then went up to several of the gathering vehicles and secured two shovels and a pry bar. Chief Malouff broke both shovels on the driver's door and one of the men assisting bent the pry bar. The flames had now engulfed the inside of the Saulat's vehicle and the men assisting moved away from the vehicle. Chief Malouff went back into the flames and attempted to open the door. Unable to open the door, Chief Malouff attempted to pull Mrs. Saulat and her daughter Arshia, out of the vehicle through the window. Unable to do so, Chief Malouff returned to the gathered vehicles and secured a rope. Chief Malouff went back into the burning vehicle and tied the rope to the driver's doorframe and to a bumper of a truck that had moved into a closer position. Assisted by the two men, Chief Malouff guided the truck forward where the driver's doorframe broke, leaving the lower portion of the door in the locked position. Chief Malouff went back to the burning vehicle and attempted one more time to extract Mrs. Saulat. The flames became so intense, Chief Malouff had to finally back away. The flames spread around the vehicles and headed for Sajid. Chief Malouff picked up Sajid and carried him to a vehicle where he was placed in the rear away from the flames. 22 minutes after the accident and shortly thereafter, the first fire truck and other emergency vehicles arrived on scene.

The Saulat's were all pronounced dead at the scene. Chief Malouff was transported to the area trauma center and later diagnosed with permanent disabling injuries.

Chief Malouff's heroic acts and indefatigable conduct, while himself seriously injured, exemplify the traditions of a Peace Officer's commitment to unselfishness and public safety.





# American Police Hall of Fame

## SILVER STAR FOR BRAVERY

### IS HEREBY PRESENTED TO

*Charles A. Malouff*

For Unselfish Line of Duty Heroism in which this Law Enforcement Officer, at perilous risk to his own life, performed his duty in such a manner as to reflect courage, dedication and initiative becoming to the professional law enforcement officer.

Issued by the National Board of Trustees upon
the recommendation of the Awards Committee
this **30th** day of **June, 2006**

**PRESIDENT**



**TEXAS MUNICIPAL RETIREMENT SYSTEM**

RECEIVED
APR 0 6 2006
TCLKOSE

March 31, 2006

Mr. Charles Anthony Malouff Jr.
PO Box 26041
Austin, TX 78755

RE:    City of Hico
       TMRS ID:  216475

Dear Mr. Malouff:

Your application for Occupational Disability has been approved.

| Contact TMRS if any information is incorrect. | | |
|---|---|---|
| Retirement Date | February 28, 2006 | |
| Retirement Option | CASH OUT | Lump-sum payment will be the only payment due. |
| Check mailed | March 31, 2006 | |
| Supplemental Death Benefit | Co-Beneficiaries:  Dana M. Malouff-McCoy & Kristy D. Malouff | You may change your beneficiary designation at anytime. |

If you have any questions or if we can be of any assistance, please feel free to contact our Retirement Department at 1/800-924-8677.

Sincerely,

Gary W. Anderson
Executive Director
GWA/jcw

Copy: City of Hico

TMRS
P.O. BOX 149153
AUSTIN, TEXAS 78714-9153                    WWW.TMRS.COM

512.476.7577
TOLL-FREE 800.924.8677
FAX 512.476.5576

# NOMINATION FOR POLICE PURPLE HEART

On 25 June, 2005, a blistering 100 degree summer day, at approximately 1530hrs., returning from a Police Chief Development Course in Huntsville, Texas, Hico Police Chief Charles A. Malouff, survived a multi-fatality, automobile accident just south of Briggs, Texas on U.S. Highway 183 and while seriously injured, unselfishly attempted to extract and rescue the other vehicle occupants.

Rafat Saulat, driving northbound in her 2000 Toyota four-door sedan, left the road causing her to over correct and cross into the southbound lane. Unable to take evasive action, Chief Malouff broadsided the Toyota resulting in a fiery crash engulfing both vehicles. After several minutes of being trapped inside his burning 2005 Ford Pick-UP and ignoring his own serious internal injuries, Chief Malouff was able to kick his way out of the passenger side window and proceed around to the Saulat's vehicle. Chief Malouff forced his way through shattered glass and flames in the back seat and pulled Sajid, a 14-year-old boy, out of the burning vehicle and placed him in the grass away from the flames and scorching asphalt. Looking back at the wreckage, Chief Malouff observed two bodies still inside the vehicle. Chief Malouff noticed two young males attempting to open the Saulat's driver's door, but to no avail. Chief Malouff went over to the vehicle and also attempted to open the door, but to no avail. Chief Malouff then went up to several of the gathering vehicles and secured two shovels and a pry bar. Chief Malouff broke both shovels on the driver's door and one of the men assisting bent the pry bar. The flames had now engulfed the inside of the Saulat's vehicle and the men assisting moved away from the vehicle. Chief Malouff went back into the flames and attempted to open the door. Unable to open the door, Chief Malouff attempted to pull Mrs. Saulat and her daughter Arshia, out of the vehicle through the window. Unable to do so, Chief Malouff returned to the gathered vehicles and secured a rope. Chief Malouff went back into the burning vehicle and tied the rope to the driver's doorframe and to a bumper of a truck that had moved into a closer position. Assisted by the two men, Chief Malouff guided the truck forward where the driver's doorframe broke, leaving the lower portion of the door in the locked position. Chief Malouff went back to the burning vehicle and attempted one more time to extract Mrs. Saulat. The flames became so intense, Chief Malouff had to finally back away. The flames spread around the vehicles and headed for Sajid. Chief Malouff picked up Sajid and carried him to a vehicle where he was placed in the rear away from the flames. 22 minutes after the accident and shortly thereafter, the first fire truck and other emergency vehicles arrived on scene.

The Saulat's were all pronounced dead at the scene. Chief Malouff was transported to the area trauma center and later diagnosed with permanent disabling injuries.

Chief Malouff's heroic acts and indefatigable conduct, while himself seriously injured, exemplify the traditions of a Peace Officer's commitment to unselfishness and public safety.



# American Police Hall Of Fame
# Law Enforcement Purple Heart Award

### For Line of Duty Injury

This Will Certify That **Charles A. Malouff**

of the Hico, TX Police Department has

been elected to the Police Legion of the Purple Heart in recognition of the grievous injuries

sustained while in the performance of duties as a law enforcement officer and is hereby authorized

to wear the official medal and service bar. Issued by the American Police Hall of Fame,



This 30th day of June, 2006

*President*

797/1MB



August 15, 2003

Mr. Charles Malouff
P.O. Box 26041
Austin, Texas 78755

Dear Charlie:

I would like to say Thank You for taking time out of your busy schedule to hold class for my Deputies earlier this week. Everyone commented that your presentation was very informative, useful and fun. In fact, they have requested that I only use you as an instructor in the future.

Once again, I appreciate you, and look forward to our next meeting.

Sincerely,

Bosque County Sheriff's Department

Charles E. Jones,
Sheriff

CEJ/ko



Department of
Criminal Justice

# SWT

March 22, 2000

**TO WHOM IT MAY CONCERN:**

I have known Mr. Charles Malouff for the past five years in both a professional and personal capacity. In all instances I have found him to be an intelligent, articulate and energetic colleague. He has consistently impressed me with his thorough preparation, determined approach, and by his ability to integrate the conceptualizations of theory with the demands of reality for effective problem resolution. Because of a variety of factors, I feel that he is an excellent candidate for a police administrative position.

First, Mr. Malouff brings a wide variety of experience in law enforcement. While with the State of Texas as an investigator he worked in several job environments with progressively increasing responsibilities. These experiences have given him more than substantive knowledge of varying law enforcement situations. They have also provided him with an accurate and realistic sense of values for the workplace and has instilled an unusually strong work ethic.

Second, I have had the opportunity to see Mr. Malouff develop in the academic world. While employed full-time as a police officer, he has continuously pursued his degree. While pursuing this goal he never took away time from his family and church commitments and managed to participate in various community programs. These experiences have forced him to budget his time wisely.

Third, Mr. Malouff's record as a criminal investigator speaks for itself. His clearance and conviction rate were unsurpassed. Such a record indicates that he was able to not only obtain the relevant information for prosecution, but he was also able to do so within the legal parameters established by the judicial system

## Southwest Texas State University

601 University Drive     San Marcos, Texas 78666-4616
Off: 512-245-2174     Fax: 512-245-8063

Re: Mr. Charles Malouff                              March 22, 2000


    Finally, on a more personal level, I have found that his most admirable traits are an unimpeachable integrity and a persevering desire to see the final fruition of his efforts. I feel that he is quick to realize any personal limitation and is willing to seek assistance when necessary.

    I highly recommend Mr. Malouff and feel that he will be a definite asset to any law enforcement organization. Should you have any questions or wish to discuss the matter in more detail, please feel free to contact me at my office (512/245-3347) or at home (512/288-7242).

        Sincerely,


        Dr. Tomas C. Mijares

# CAPTAIN ALLEN FREEMAN

Spartanburg County Detention Facility
950 California Avenue
Spartanburg, South Carolina 29303

AP & T INC.
502 BAYBERRY COURT
CEDAR PARK TEXAS 78613

DEAR CHARLIE MALOUFF

IT WAS A REAL PLEASURE MEETING AND GETTING TO SPEND SOME TIME
WITH YOU DURING THE 7TH ANNUAL SOUTHEASTERN SWAT CONFRENCE
AND TRAINING.
THANKS SO MUCH FOR PARTICIPATING AS A INSTRUCTOR AND HEAD
JUDGE. EVERYONE THAT ATTENDED YOUR TRAINING WAS VERY
IMPRESSED AND SPOKE HIGHLY OF YOUR TRAINING. CHARLIE I DON'T
THINK I NEED TO TELL YOU HOW MUCH WORK GOES INTO HOSTING THIS
EVENT AND WITHOUT THE HELP OF OUR SPONSERS IT WOULD NOT BE
POSSIBLE.
I TRUST THROUGH OUT THE YEAR YOU WILL KEEP IN TOUCH AND
PLEASE PASS THE WORD ONTO DEPARTMENTS THAT YOU COME IN
CONTACT WITH OR KNOW THAT WOULD BE INTERESTED IN THIS EVENT.
IT WOULD BE GREAT TO HAVE A TEAM FROM TEXAS NEXT YEAR SO
PLEASE PASS THIS ON TO YOUR NEIGHBORING DEPARTMENTS.
I LOOK FORWARD TO SEEING YOU  AGAIN NEXT YEAR SO TAKE CARE
AND DON'T BE A STRANGER.

SINCERELY CAPTAIN ALLEN FREEMAN



## State of New Jersey
### DEPARTMENT OF LAW AND PUBLIC SAFETY
### DIVISION OF CRIMINAL JUSTICE
25 MARKET STREET
CN 085
TRENTON, NJ 08625-0085
TELEPHONE: (609) 984-0500

**DEBORAH T. PORITZ**
**ATTORNEY GENERAL**

**TERRENCE P. FARLEY**
**DIRECTOR**

May 14, 1996

Jeffrey Shultz, President
Centurion Ballistic Shield Corp.
Tremont on the Common
151 Tremont St.
Boston, Mass.  02111

Dear Mr. Shultz:

I am writing to express my appreciation for your allowing Charlie Malouff to travel to New Jersey for Top Gun Class 7, held from April 12-19, 1996 at the New Jersey Police/Criminal Justice Academy at Sea Girt.  I was quite pleased when Charlie offered to attend, having previously met him at the Urban Tactics Course conducted at Fort Dix.  Charlie originally offered to present a lunchtime Shield Seminar for the Top Gun Class of approximately 96 sworn Officers.  As it turned out, Charlie saved our bacon when he was able to fill in a 3-hour block of instruction, when other instructors were unavoidably delayed.  In addition, Charlie was able to share his expertise in tactics and use of the shields during our raid practicals.

On behalf of the Top Gun Faculty, I would like to thank you for allowing Charlie to participate.  His dedication and professionalism reflect very well upon you and the Centurion Ballistic Shield Corporation.  I have provided Charlie with the dates of upcoming Top Gun Classes, and extend through you an open invitation to him to attend whenever it is practical.  Should you wish to speak to me at some point, my telephone number is 609-530-3401.

Very truly yours,

John-Robin M. Quelch
Deputy Attorney General
Statewide Narcotics Task Force

c: SDAG T. Barry Goas

*New Jersey Is An Equal Opportunity Employer*

DELEGATED EXAMINATING UNIT
PERSONNEL DIVISION
FEDERAL LAW ENFORCEMENT TRAINING CENTER
GLYNCO, GEORGIA  31524
NOTICE OF RATING

Charles A. Malouff, Jr.
5408 Scout Island Circle South
Austin, TX  78731

SOCIAL SECURITY NUMBER: 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
ANNOUNCEMENT NUMBER: 92-68
VETERANS PREFERENCE: 5
FINAL SCORE: 96
REGISTRATION DATE: 12-8-92
POSITION TITLE: Training Instructor (Law Enforcement)
GRADE: GS-1712-12
* IF YOU RECEIVED AN INELIGIBLE RATING, IT WAS BASED ON:


**THIS IS NOT A JOB OFFER.** It is a notice of your rating for the announcement shown above and reflects information contained in your record as it appears in our files.  You should carefully review this information to assure that it is correct.  If any information is incorrect or has changed since you submitted your application, you should notify this office in writing. Requests for change will be acknowledged.  Due to the nature and confidentiality of information contained on applications for employment, inquiries should be addressed to this office in writing.

**VETERANS PREFERENCE:** You must qualify for a job (that is, meet minimum experience and/or education requirements) before veterans preference points are added to your score.  The score reflected above includes additional points if you are entitled to veterans preference.

**REQUEST FOR REVIEW OF RATING:** If you disagree with your rating and desire a re-evaluation of your application, you must submit your request in writing to this office **WITHIN 30 DAYS OF THE REGISTRATION DATE SHOWN ABOVE.**  You should include specific information about your experience/training and an explanation of why you believe you meet the qualification requirements of the position or should have a higher rating.  Your request will be considered and you will be notified in writing of the results.

**LENGTH OF ELIGIBILITY:** Your eligibility will entitle you to active consideration in accordance with your standing on the list of eligibles for 90 days from the above registration date. **ELIGIBILITY IS RESTRICTED TO THE ANNOUNCEMENT FOR WHICH YOU APPLIED.**



TREASURY DEPARTMENT
P. O. BOX 12608 CAPITOL STATION
AUSTIN, TEXAS 78711

· RAY BAILEY HUTCHISON
TREASURER
STATE OF TEXAS

LBJ STATE OFFICE BUILDING
CONGRESS AT 17TH ST.
(512) 463-6000

August 20, 1992

**TO WHOM IT MAY CONCERN:**

I have known and worked with Charles Malouff for the last two years. In my personal opinion, he has many positive qualities that make him a valuable employee in his field.

Charlie is a very energetic and creative individual. He is a hard working person who willingly devotes more than forty hours a week to his job. He is also creative, and frequently comes up with different ways to approach situations, with the goal of doing his job better. Charlie is also very knowledgeable about law enforcement training and procedures.

Therefore, I personally recommend him for your consideration.

Sincerely,

Alicia M. Fechtel
General Counsel
Texas State Treasury Department

AMF/jas

ROSE-MICHEL MUNGUIA
P. O. Box 266
Austin, Texas 78767

August 8, 1992

Re:   Charles A. Malouff, Jr.

To Whom It May Concern:

I have had the pleasure of knowing Charles A. Malouff, Jr., his
wife, Brenda, and their children since 1986.  Mr. Malouff and his
wife have proven to be loyal, dependable and upstanding close
personal friends.

In 1989, the Texas Legislature conferred the enforcement responsi-
bility of the Cigarette and Tobacco Products Tax Act on the Texas
State Treasury Department (the "Treasury").  As a staff attorney
at the Treasury, I recommended Mr. Malouff for one of the enforce-
ment officer positions because I am familiar with his excellent
record as an officer in other positions he has held.  My specific
job duties at the Treasury have not afforded me the opportunity
to work directly with the Cigarette and Tobacco Products Tax Division,
however, it is well known that Mr. Malouff is highly regarded by
his superiors and his collegues as a proficient and valuable enforce-
ment officer.

Mr. Malouff is extremely knowledgeable of theories, principles, and
practices of professional criminal and civil investigations.  He is
also well trained in the area of civil rights legislation and he is
sensitive to its potential impact in law enforcement situations.
Mr. Malouff has the ability to coordinate, motivate and manage his
subordinates and peers in enforcement programs and to communicate
his thoughts and objectives effectively to his superiors and others.

I highly recommend Mr. Malouff for any position for which he applies.
I feel that he is more than adequately educated and trained to assume
a position that requires his particular experience and credentials.
In addition, I sincerely believe that he has the potential to success-
fully meet the criteria of a higher level position than the one he
currently holds.

I hope that you will seriously consider Mr. Malouff as a qualified
candidate for the position for which he applies.

Sincerely,

Rose-Michel Munguia, Esq.



LETTER OF REFERENCE:

CHARLIE MALOUFF

As Division Loss Prevention Manager for the Texas Division of 7-Eleven Stores (A Division of The Southland Corporation), I have had the good fortune of working with Charlie Malouff in his capacity of Special Agent for the Tobacco Products Division of the Texas Treasury Department over the last several years.

As Special Agent, Charlie has been exceptionally responsive to the problems of the retail industry in Texas concerning the theft and black marketing of cigarettes and tobacco products. Charlie, along with other Special Agents in the team, have helped retailers immensely in investigating and prosecuting those responsible for the illegal and costly trafficking of stolen cigarettes.

Charlie's willingness to listen to the public he serves, his ability to pull together the efforts of various law enforcement agencies, his ability to "sell" a program or course of action to his superiors, and carry it out, is a unique and valuable asset in law enforcement or any industry.

Charlie has a refreshing ability to establish a working relationship with just about anyone, instill trust and confidence in those he works with and for, and delivers on his promises.

Needless to say that this is not the case with all law enforcement officials all the time, but Charlie seems to be able to rise above titles and politics, and gets the job done.

Please feel free to contact me personally if you require further information.

Jeff Feldman
Division Loss Prevention Manager
The Texas Division
7-Eleven Stores
A Division of The Southland Corporation

7-Eleven Stores / Texas Division 1649
2201 North Central Expressway / Suite 171 / Richardson, TX 75080 / Phone (214) 907-0711

DIVISION OF
THE SOUTHLAND
CORPORATION



Charles A. Malouff
801 Fairchild Street
San Antonio, TX  78236

2 8 MAY 1976

Dear Charles

I was extremely pleased to hear of your quick thinking and actions
to protect government property on 18 May 1976.  As you know there
are many in our midst that have less than the desired regard for
both personal and government property.

There are those that may ridicule and criticize you for your action
but they are the same ones that complain because we are losing so
many of our benefits.  These recalcitrant individuals are the last
to realize that benefits cost money and when government property is
destroyed, it must be replaced.  Far too often the money set aside
for our benefits must be diverted to repair or replace maliciously
damaged property.

You are a credit to your family and a definite asset to our community.
This display of courage and just plain "guts" lets my generation know
that your generation will do well when it's your turn to run our
country.

LARRY V. GIRTON, Colonel, USAF
Base Commander

*Prepare the Man*



TREASURY DEPARTMENT
P. O. BOX 12608, CAPITOL STATION
AUSTIN, TEXAS 78711

- KAY BAILEY HUTCHISON
TREASURER
STATE OF TEXAS

LBJ STATE OFFICE BUILDING
CONGRESS AT 17TH ST.
(512) 463-6000

August 20, 1992

TO WHOM IT MAY CONCERN:

I have known and worked with Charles Malouff for the last two years. In my personal opinion, he has many positive qualities that make him a valuable employee in his field.

Charlie is a very energetic and creative individual. He is a hard working person who willingly devotes more than forty hours a week to his job. He is also creative, and frequently comes up with different ways to approach situations, with the goal of doing his job better. Charlie is also very knowledgeable about law enforcement training and procedures.

Therefore, I personally recommend him for your consideration.

Sincerely,

Alicia M. Fechtel
General Counsel
Texas State Treasury Department

AMF/jas

WALTER FELLERS
SHERIFF

# COMAL COUNTY

SHERIFF'S DEPARTMENT

October 6, 1983

NEW BRAUNFELS, TEXAS 78130
Phone 625-9141
625-9142

Mr. Burney Boeck
Chief of Police
New Braunfels Police Dept
111 W. Garden
New Braunfels, Texas 78130

Dear Chief Boeck:

It has come to my attention that one of my jailers, Charles Malouff, has applied for a patrol job for the city of New Braunfels. Although I hate to loose Mr. Malouff I can understand his wanting to move on to something that he prefers, which is being a patrol officer. Therefore, I would like to take this opportunity to recommend Mr. Malouff for the position of patrolman. During the time that he has been working at the Comal County Jail he has been an asset to this department. Mr. Malouff is a good worker, a good listener and is willing to learn. Whenever someone is needed to take care of some extra work or put in some extra time Mr. Malouff is always willing to help out, and I know the job will then be done right. As you well know, when you need a job done you want someone that you can trust to do it the way it must be done.

If you have any questions about Charles Malouff please do not hesitate to contact me.

Yours truly,

JOHN JENKINS
Jail Administrator

JJ/kc



TREASURY DEPARTMENT
P. O. BOX 12608, CAPITOL STATION
AUSTIN, TEXAS 78711

KAY BAILEY HUTCHISON
TREASURER
STATE OF TEXAS

LBJ STATE OFFICE BUILDING
CONGRESS AT 17TH ST.
(512) 463-6000

May 22, 1992

Mr. Charlie Malouff
5408 Scout Island Circle
Austin, Texas  78731

Dear Charlie:

I recently received a letter from Malcolm Kirkland of the Grocery Supply Company commending you for your help in investigating an incident of stolen cigarettes within the Grocery Supply Company.

I always appreciate hearing about employees of the Texas Treasury whose hard work is making such a difference to people throughout the state. It is efforts such as yours which will help us to eliminate the cigarette black market and save taxpayers millions of dollars.

Thank you again for a job well done.

Sincerely,

Kay Bailey Hutchison
State Treasurer

KBH/dcr/rc

cc:    Donna Reynolds



## GROCERY SUPPLY COMPANY
### A GSC ENTERPRISE

P. O. Box 638, 130 Hillcrest
Sulphur Springs. Texas 75483-0638
(903) 885-7621
1-800-231-1938
FAX (903) 439-3249

May 7, 1992



RECEIVED

MAY 11 1992

TREASURY DEPARTMENT
EXECUTIVE ADMIN.

Ms. Kay Bailey Hutchison
State Treasurer
P. O. Box 12608, Capitol Station
Austin, Texas 78711

Dear Ms. Hutchison,

This letter is to say "Thank You" to you as State Treasurer and your Department, specifically Mr. David Boatright and Mr. Charlie Malouff, for your assistance in investigating a recent incident of stolen cigarettes within our Company. Mr. Boatright was very responsive to our needs in arranging the investigation and, according to my people, Mr. Malouff was outstanding in handling the investigation.

Ms. Hutchison, we, Grocery Supply Company, have worked together with your Department in the past and hope that we have been some benefit to your efforts. Please know that we stand ready to assist you in the future if needed and that we really appreciate Mr. Boatright's and Mr. Malouff's recent assistance to us and you for allowing them to respond so effectively and efficiently. Thank you again.

Respectfully,

Malcolm Kirkland
Division President

MK:sm

# TREASURY INTEREST

A MONTHLY PUBLICATION FOR THE EMPLOYEES OF THE TEXAS STATE TREASURY DEPARTMENT



## FROM THE TREASURER'S DESK ...

Plans for the Treasury picnic are well underway! Our hard-working Activity Committee has already secured the date, the time and the place and now all we need is you! The picnic is planned for Saturday, June 13th and we will all be meeting at Brentwood Park at 10:00 a.m. to make sure we get a good spot.

Brentwood has a swimming pool, softball field, sand volleyball, tennis courts and two playscapes, so there will be plenty of fun activities in which to participate. We will also have a dunking booth where you can dunk a deputy or a division director! Please bring blankets and any lawn furniture you will need as well as any necessary sports equipment (tennis rackets, bathing suits, etc.). The Activity Committee will be providing club dogs and potato chips, but you will need to provide your own beverages.

The following Activity Committee members have generously volunteered their time to organize the important elements of our picnic:

Cooking/Barbecue Pit - Doug Prince
Children's Activities - Joyce Sibley
Menu Planning - Rebecca Contreras and Yvette Abeita
Softball/Volleyball - Richard Green and Steve Bazan
Fireant Commissar - Doug Prince

Please contact your Activity Committee member if you have any fun ideas or if you would like to help out!

Ray and I are really looking forward to seeing you all there with your families. We do not have many opportunities to get together and get to know each other in such a relaxing atmosphere, so please take advantage of this one!
See you on the 13th!

*Kay Bailey Hutchison*

## TOBACCO TAX CRACK DOWN

Our Tobacco Tax division is celebrating yet another success in saving the state of Texas losses in cigarette and tobacco tax revenues.

Felony charges have been filed against a 51 year old Fannin County woman who is accused of purchasing untaxed cigarettes in Oklahoma and transporting them to Texas. The arrest culminated a two-week investigation by Treasury agents, Fannin County Precinct 1 Constable Craig Nichols and the Texas Alcoholic Beverage Commission.

By joining our forces and making this arrest, we are conveying the message to cigarette bootleggers that we are serious about enforcing Texas' cigarette and tobacco tax laws. Thanks to David Boatright and his fine staff for ensuring that this investigation was a successful one!



Directions to Brentwood Park:

From I-35:
Driving North, take the 290 exit and head West on Koenig Lane (past Lamar Blvd.). Take a right on Arroyo Seca and drive North seven blocks to Brentwood Avenue. Make a left on Brentwood, drive one block to Yates and take a right. The school parking lot is half a block on the right side of the street.

From Mopac:
Take the Northland exit. Go East on Northland past Burnet Road. Turn left at Arroyo Seca and follow the directions above.

 Printed on 100% Recycled Paper

# ⊛TREASURY INTEREST

A MONTHLY PUBLICATION FOR THE EMPLOYEES OF THE TEXAS STATE TREASURY DEPARTMENT

## FROM THE TREASURER'S DESK ...

It's that time of year again in Texas! The time when we deliver great news to thousands of people through the Treasury's Unclaimed Money Fund program. On Sunday, March 1st, four million copies of the eighth annual Unclaimed Property publication will go out to the public in thirty-five newspapers across the state to inform people that we have something that belongs to them.

Last fiscal year, we returned more money to missing owners than ever before in the program's history. Since this year's publication contains over 100,000 names representing more than $86 million, we are expecting another monumental year. Each year the number of mail and phone inquiries goes up due to the increasing popularity of this Treasury public service. In fact, over 170,000 pieces of mail and 130,000 phone calls are becoming routine.

Clearly, making this all happen is no simple task. The work begins in November and it involves many areas of the Treasury. Requests for Proposals (RFP's) must go out for printing bids; computer lists must be generated and edited in order to get a clean tape to send to the winning bidder; public service announcements must be prepared and sent to TV stations; camera ready art work and information must be prepared for the printer; lists and final draft copies must be proofed; and temporary staff must be tested, hired and trained.

The effort generally involves all of the Unclaimed Property staff, most of Information Resources, Facilities Services and Planning, and various others. Some special thanks also must go to Sarah Marlow, Director of Unclaimed Property, and Eleanor Roe, Assistant Director of Unclaimed Property: Doug Prince, Manager of Public Outreach, whose job it is to see that the publication is printed and distributed; Sally Quereau, Jim Ross, Henry Rodriguez, Stephen Bright, Tina Newstrom and Mark Toohey. Each of you was instrumental in ensuring that this process ran smoothly and efficiently, and I am so proud of your hard work.

The list frequently contains names of people we all know, including Treasury employees. Look for your name. Who knows? We might have something for you!

*Kay Bailey Hutchison*

## CIGARETTE RING SHATTERED IN FORT WORTH

February 11, 1992 marked the Treasury's largest and most successful cigarette bust in recent history when an estimated $50,000 worth of stolen cigarettes and $30,000 in cash, weapons and vehicles were confiscated in Fort Worth.

Treasury special agents traveled to Fort Worth to work in conjunction with Fort Worth police, Department of Public Safety officials and the Tarrant County District Attorney's Office to make the arrests.

The arrests and confiscations culminated a three-month investigation into stolen cigarette trafficking in Tarrant County. At 4 a.m., twenty-five arrest warrants and eight search warrants were issued. At least twenty suspects will face felony charges ranging from engaging in organized criminal activity to theft over $750.

Special agents Charlie Malouff and Alex Pena worked directly with the Fort Worth Police Department during the undercover operation, under the supervision of Tobacco Tax Director Alicia Fechtel and Assistant Director David Boatright. Treasury agents Tommy Adams, Jeff Bishop, Barbara Foreman, Lance Idol and Calvin Lee assisted in the pre-dawn arrests and seizures. They also conducted Treasury inspections of the targeted locations where stolen goods had been purchased. Thanks to all of you for helping to make this major sting operation such a tremendous success!



Lieutenant A. J. Allcon of the Fort Worth Police Department displays some of the cigarettes seized as part of the investigation.

♺ Printed on 100% Recycled Paper



# TEXAS ALCOHOLIC BEVERAGE COMMISSION

Post Office Box 13127, Capitol Station, Austin, Texas 78711-3127    (512) 458-2500    Jeannene Fox, Acting Administrato

1206 Manor Drive
Victoria, Texas 77901
December 3, 1991

Ms. Kay Bailey Hutchison, Treasurer
Treasury Department
P. O. Box 12608
Austin, Texas 78711

Dear Ms. Hutchison:

I want to take this opportunity to commend two of your Special Agents in your Tobacco Tax Division for their work and cooperation in a joint venture we conducted with your department on November 22, 1991.

Special Agents Charlie Malouff and Jeff Bishop were invaluable to us in investigating and ultimately seizing bootlegged, untaxed cigarettes and alcoholic beverages brought from Old Mexico and sold in Victoria, Texas. Without these two agents expertise, our job would have been more difficult. I also convey to them my thanks.

Sincerely,

Bob Hatcher
District Supervisor
Victoria District #19

BLH:al

cc — Charlie Malouff
     Jeff Bishop

Louis M. Pearce, Jr., Chairman          Allan Shivers, Jr., Member          Renee Higginbotham-Brooks, Member
       Houston                                  Austin                                 Fort Worth